# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

FDIC AS RECEIVER FOR SIGNATURE
BRIDGE BANK,

              Plaintiff,

      v.

CYNTHIA E. CONCORDIA AND DREAM
TO RISE LLC,

              Defendants.

Civil Action No.:  1:23-cv-07222-VSB

**DECLARATION OF CATHERINE PASTRIKOS KELLY, ESQ. IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. §12(b)(6)**

---

CATHERINE PASTRIKOS KELLY, ESQ. declares the truth of the following under penalty of perjury, pursuant to 28 U.S.C. 1746:

1.      I am an attorney-at-law of the State of New York, admitted to practice in this Court and a Partner of the law firm Meyner and Landis LLP, counsel for Plaintiff FDIC as Receiver for Signature Bridge Bank.

2.      I make this declaration in opposition to Defendants Cynthia E. Concordia and Dream to Rise LLC's Motion to Dismiss pursuant to Fed. R. Civ. P. §12(b)(6).

3.      Attached as **Exhibit A** is a true and correct copy of the First Amended Complaint, dated November 16, 2021.

4.      Attached as **Exhibit B** is a true and correct copy of *James X. Lynch C.O. v. Slayton*, 1997 WL 176396 (N.D.N.Y. April 11, 1997).

5.      Attached as **Exhibit C** is a true and correct copy of *Robinson v. Wentzell*, 2019 WL 1207858 (D. Conn. March 14, 2019).

6.      Attached as **Exhibit D** is a true and correct copy of *Neewra, Inc. v. Manakh Al Khaleej General Trading and Contracting Co.*, 2004 WL 1620874 (S.D.N.Y. July 20, 2004).

1

7.      Attached as **Exhibit E** is a true and correct copy of *Chen v. Trs. of Columbia Univ. in City of New York*, 2001 WL 815521 (S.D.N.Y. July 18, 2001).

8.      Attached as **Exhibit F** is a true and correct copy of *In re Actos End Payor Antitrust Litig.,* 13-CV-9244 RA, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015).

9.      Attached as **Exhibit G** is a true and correct copy of *In Re: San Luis & Rio Grande R.R., Inc. v. Brandt,* 1:23-CV-00016-CNS, 2023 WL 6376713 (D. Colo. Sept. 29, 2023).

10.      Attached as **Exhibit H** is a true and correct copy of *Schottenstein v. Lee,* 22CV1197 (DLC), 2023 WL 4363002 (S.D.N.Y. July 6, 2023)*.*

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  October 24, 2023


                                              *Catherine Pastrikos Kelly*
                              By: _____
                                              Catherine Pastrikos Kelly, Esq.

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

---

SIGNATURE BANK,

               Plaintiff,

        v.

CYNTHIA E. CONCORDIA and DREAM TO
RISE LLC,

               Defendants.

---

INDEX NO.: 656524/2021

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Signature Bank ("**Signature**"), by its attorneys Meyner and Landis LLP, as and for its First Amended Complaint against Defendants Cynthia E. Concordia ("**Concordia**") and Dream to Rise LLC ("**Dream to Rise**" and together with Concordia, "**Defendants**"), alleges as follows:

<strong>I.    PARTIES</strong>

1.    Signature is a New York State-chartered bank with a principal place of business at 565 Fifth Avenue, 8th Floor, New York New York 10017.

2.    On information and belief, at all relevant times, Defendant Concordia was an individual residing at 4480 Market Commons Drive, Unit 211, Fairfax, Virginia 22033.

3.    On information and belief, at all relevant times, Defendant Dream to Rise was a company established pursuant to the laws of Virginia with its principal place of business at 4480 Market Commons Drive, Unit 211, Fairfax, Virginia 22033, which is Concordia's home address.

1

## II.  <u>VENUE</u>

4.      New York County is selected as the place of trial for this action because Signature resides in New York County and transacts business in New York County.

## III.  <u>FACTS</u>

5.      On or before June 11, 2021, Signature's customer, non-party Sleepy Hollow Local Development Corporation ("**Sleepy Hollow**"), was the victim of a business email compromise which ultimately resulted in fraudulent wire transfers totaling in the aggregate $2,270,326.50 from Sleepy Hollow's Signature account ending in -0923.

6.      The $2,270,326.50 from Sleepy Hollow's Signature account, was transferred in part to TD Bank, N.A. ("**TD Bank**") and the remainder to JP Morgan Chase Bank, N.A. ("**Chase**").

7.      Specifically, TD Bank received $1,445,326.50 and Chase received $825,000 ("**Fraudulent Funds**").

8.      On June 11, 2021,Chase accepted the Fraudulent Funds for deposit into Dream to Rise's Chase account ending in -0585 (the "**Dream to Rise Chase Account**").

9.      Concordia opened the Dream to Rise Chase Account on April 30, 2021, and has maintained and controlled it since that date.

10.     On Monday, June 14, 2021, Signature identified the fraudulent transactions and began to take measures to secure the return of the misappropriated funds from TD Bank and Chase.

11.     On June 14, 2021, Signature contacted both TD Bank and Chase and informed both that Signature's client Sleepy Hollow had been the victim of a business email compromise involving fraudulent wire transactions to TD Bank and Chase.

2

12.     On June 14, 2021, Signature, through its Corporate Security Department, requested that TD Bank and Chase immediately take appropriate action to ensure the misappropriated funds from the fraudulent transactions be preserved so the misappropriated funds could be returned.

13.     Upon information and belief, TD Bank froze the available funds and arranged for those funds to be returned. Subsequently, funds were returned.

14.     On June 14, 2021, Chase's Global Security Department advised Signature it would restrain the Fraudulent Funds held in the Dream to Rise Chase Account.

15.     On June 14, 2021, Signature issued a Hold Harmless Letter to Chase to ensure Chase that it would be protected by Signature for actions Chase took to recoup or restrain the funds, including indemnifying and holding Chase harmless from any claims by Chase's customer against Chase.

16.     Chase communicated to Signature that it had secured most of the Fraudulent Funds; however, the Fraudulent Funds were not returned in full to Signature.

17.     On June 14, 2021, Concordia and Dream to Rise used $380,000.00 of the Fraudulent Funds in the Dream to Rise Chase Account to purchase a cashier's check, which Concordia deposited in an account in Concordia's name at Wells Fargo Bank.

18.     Also on June 14, 2021, Concordia opened a checking account at Chase in her own name ("**Concordia's Personal Chase Checking Account**").

19.     Concordia withdrew $250,000 of the Fraudulent Funds in the Dream to Rise Chase Account and deposited it in Concordia's Personal Chase Checking Account.

20.     Of the $825,000.000 in Fraudulent Funds, Chase recovered $446,985.00 and returned same to Signature.

3

21.     On information and belief, on or about July 13, 2021, Chase spoke to Concordia and requested that she return the remaining $378,015.00 in Fraudulent Funds.

22.     Concordia and Dream to Rise did not comply with Chase's request to return the $378,015.00 to Signature.

23.     Thus, Concordia and Dream to Rise continue to hold $378,015.00 of the Fraudulent Funds.

24.     Signature reimbursed Sleepy Hollow for the funds that had been fraudulently misappropriated, including all of the funds that were wired to TD Bank and to Chase.

25.     Pursuant to an Assignment of Claims, Sleepy Hollow assigned and transferred to Signature Bank any and all claims, demands, and causes or action of any kind that Sleepy Hollow may have against Concordia and Dream to Rise. A true and correct copy of the Assignment of Claims is attached as **Exhibit 1**.

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION: UNJUST ENRICHMENT

26.     Signature repeats and realleges the above paragraphs of the Complaint as if fully set forth herein.

27.     Concordia and Dream to Rise received the Fraudulent Funds without any authorization from Signature and/or Sleepy Hollow and refused to return them.

28.     Thus, Concordia and Dream to Rise have taken possession, custody and control over the Fraudulent Funds.

29.     Concordia and Dream to Rise have been unjustly enriched by the Fraudulent Funds and it is against equity and good conscience to permit Concordia and Dream to Rise to retain the Fraudulent Funds.

4

30.     As a result of Concordia and Dream to Rise's unjust enrichment from the Fraudulent Funds, Signature has been damaged.

## SECOND CAUSE OF ACTION: CONVERSION

31.     Signature repeats and realleges the above paragraphs of the Complaint as if fully set forth herein.

32.     The Fraudulent Funds were transferred from Sleepy Hollow's account at Signature and Signature has reimbursed Sleepy Hollow the funds that were improperly transferred from Sleepy Hollow's Signature account.

33.     Concordia and Dream to Rise are now in the possession, custody and control of the Fraudulent Funds, which were obtained unlawfully and without authorization from Sleepy Hollow and/or Signature.

34.     On information and belief, on or about July 13, 2021, Chase requested that Concordia and Dream to Rise return the remaining $378,015.00 in Fraudulent Funds.

35.     Concordia and Dream to Rise, however, failed and/or refused to return the $378,015.00 to Chase.

36.     Accordingly, Signature has been damaged in an amount to be determined at trial by Concordia and Dream to Rise's conversion of the $378,015.00 in Fraudulent Funds.

**WHEREFORE**, Signature respectfully requests that the Court enter judgment in Signature's favor and against Defendants, as follows:

1.   In the amount of $378,015.00, plus interest;

2.   Other damages in favor of Signature in an amount to be determined at trial;

3.   For punitive damages in favor of Signature in an amount to be determined at trial;

4.   For attorneys' fees and costs necessary to this action;

5

5. Such other relief as the Court deems just and proper.

DATED: February 8, 2022

By: *David B. Grantz*
David B. Grantz, Esq.
Catherine Pastrikos Kelly, Esq.
**MEYNER AND LANDIS LLP**
100 Park Avenue, 16th Floor
New York, New York 10017
Phone: (973) 602-3423
Fax: (973) 624-0356

*Attorneys for Plaintiff*
*Signature Bank*

6

Case 1:23-cv-02072-JSR   Document 21-1   Filed 05/17/23   Page 10 of 89

1

## ASSIGNMENT OF CLAIMS

BE IT KNOWN, for value received, the undersigned hereby unconditionally and irrevocably assigns and transfers unto Signature Bank ("Assignee") and its successors, assigns and personal representatives, any and all claims, demands, and cause or causes of action of any kind whatsoever which the undersigned has or may have against Cynthia E. Concordia, Dream to Rise, LLC, JP Morgan Chase Bank, N.A. and Wells Fargo Bank N.A. arising from the fraudulent wire transfers that occurred on or about June 11, 2021 emanating from Sleepy Hollow Local Development Corporation's ("Assignor") account at Signature Bank ending in 0923 in the amount of $2,270,326.50 (hereinafter the "Claims").

The Assignee may in its own name, at its own expense, and for its own benefit prosecute the Claims and collect, settle, compromise, and grant releases on said Claims as it, in its sole discretion, deems advisable, provided the undersigned shall reasonably assist and cooperate in the prosecution of said Claims to the extent required or requested. Assignee shall be entitled to all judgments, awards and payments thereon.

The undersigned warrants it has full right and authority to assign the Claims and that said Claims are free and clear of any lien, encumbrance or other adverse interest. Assignor disclaims any representation as to the merits or collectability of such claim.

This assignment shall be binding upon and inure to the benefit of the parties, their successors, assigns and personal representatives.

Signed this _26_ day of January, 2022

_Anthony Giaccio_

Sleepy Hollow Local Development Corporation
By: ANTHONY GIACCIO
Title: C.E O.

### Corporate Acknowledgment

State of New York           )
                            ) ss.:
County of Westchester       )

On the 26th day of January in the year 2022, before me, the undersigned, personally came Anthony Giaccio (*signer*) to me known, who, being by me duly sworn, did depose and say that he/she/they Anthony Giaccio reside(s) at Hawthorne, NY _____ (*address*); that he/she/they is/are the Village Administrator (*title, such as president or other officer or director or attorney-in-fact duly appointed*) of the Village of Sleepy Hollow LDC (*name of corporation*), the corporation described in and which executed the above instrument; and that he/she/they signed his/her/their name thereto by authority of the board of directors of said corporation.

_Paula A. McCarthy_
(*Notary Public*)

PAULA A MCCARTHY
Notary Public - State of New York
NO. 01MC6198640
Qualified in Westchester County
My Commission Expires 2/5/25

# EXHIBIT B

1997 WL 176396
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James X. LYNCH C.O., Plaintiff,

v.

Sid SLAYTON, Vincent Bradley, Zhang Hong Nian,
Paul Shultis, Tracy Meyer, Richard Dugan, M.O. Freer,
"Tiny" Carlson, 2 Jane Does, 2 John Does, Defendants.

No. 95–CV–856.
|
April 11, 1997.

**Attorneys and Law Firms**

James X. Lynch C.O., Woodstock, NY, pro se.

Kerr & Weiss (James H. Kerr, of counsel), New Paltz, NY, for Defendants Shultis and Carlson.

Cook Tucker Netter & Cloonan (Robert D. Cook, of counsel), Kingston, NY, for Defendant Slayton.

S. James Matthews, Kingston, NY, for Defendant Zhang Hong Nian.

Dennis C. Vacco, Attorney General of State of New York (David Roberts, Assistant Attorney General, of Counsel), Albany, NY, for Defendant Judge Vincent G. Bradley.

MEMORANDUM-DECISION AND ORDER

MCCURN, District Judge.

BACKGROUND

**\*1** The court assumes familiarity with the underlying facts of this litigation. As the parties are well aware, in *Lynch v. Slayton,* 95–CV–856, 1996 WL 31314, (N.D.N.Y. Jan.23, 1996) (*"Lynch I"*), the court gave plaintiff James X. Lynch the opportunity to amend his *pro se* complaint. Plaintiff has now done that,[1] and the current motions by defendants Vincent Bradley, Zhang Hong Nian,[2] and Sid Slayton, are directed at that amended complaint. Because several aspects of *Lynch I,* as well as of *Lynch v. Slavton,* (N.D.N.Y. April 18, 1996) (*"Lynch II"*), have some bearing on these pending motions, first it is necessary to review those decisions in some

detail. Then, the court will be free to address the merits of these defense motions. Turning first to *Lynch I,* there the court held that "because the gist of plaintiff's complaint is that Justice Bradley's order was incorrect, and because a consideration of such claim would require this court to review the actions of that state court, under *Rooker–Feldman,*[3] this court lacks subject matter jurisdiction to engage in such a review." *Lynch I,* 1996 WL 31314, at *4 (footnote added). Therefore, the court granted defendant Bradley's motion to dismiss "to the extent that plaintiff is seeking to collaterally attack state court orders and/or judgments in this federal action." *Id.* Then, proceeding from the assumption that there was a basis for subject matter jurisdiction alleged in plaintiff's original complaint which did not violate *Rooker–Feldman,* the court, *inter alia,* addressed defendant Bradley's judicial immunity claim, ultimately holding that although "plaintiff['s] ... action seeking monetary damages as against defendant Bradley is barred by the doctrine of judicial immunity[,]" judicial immunity would not necessarily bar plaintiff's claim for injunctive relief *Id,* at *9. In light of the foregoing, after allowing plaintiff to amend his complaint, the court suggested that thereafter defendant Bradley "make any motion he deems appropriate[,]" noting that he "should address, among other things, the fact that judicial immunity is not a bar to injunctive relief." *Id., at * 10.* Accepting the court's invitation, defendant Bradley is once again moving for dismissal of the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).

As to defendant Slayton, recognizing that he "might" be entitled to judicial immunity, nonetheless, the court in *Lynch I* could not so hold because Slayton moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), rather than seeking summary judgment under Rule 56. Thus, given the procedural posture of that motion, "the court [was] constrained ... to consider *only* the allegations in the complaint." *Id.* at *9 (emphasis added). When the court did that, because it was "unable to discern *on the face of the complaint* whether defendant Slayton would be entitled to judicial immunity[,]" it denied his motion on that basis. *Id.* (emphasis added). In so doing, the court carefully pointed out that Slayton's submission of his own affidavit for consideration in connection with his Rule 12(b)(6) motions was clearly improper. *Id.* at * 11 n. 15. The court could only consider that affidavit if defendant Slayton had moved for summary judgment under Rule 56, or if he had moved for dismissal based upon either Rule 12(b)(1) or (2). *Id.* Despite that admonition, defendant Slayton again has

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 14 of 89

James X. Lynch C.O. v. Slayton, Not Reported in F.Supp. (1997)

moved for relief under Rule 12(b)(6) for failure to state a claim upon which relief may be granted; and, once again, he has improperly submitted affidavits (his own and one from his attorney) for consideration on this motion. The court will return to this procedural error in a moment.

**\*2** Besides defendants Bradley and Slayton, in this second round of motions, another of the remaining defendants,[4] Nian, is also moving for dismissal of the amended complaint. In his Notice of Motion, defendant Nian is moving "for an order pursuant to Rule 12(b)(1) and 12(b)(6), granting summary judgment in [his] favor." Nian Notice of Motion at 1. Obviously, that request is internally inconsistent. Summary judgment is appropriate only when a party is seeking relief under Fed.R.Civ.P. 56. What is more, although defendant Nian mentions Rule 12(b)(1) in his notice of motion, he makes no argument in his accompanying memorandum of law as to lack of subject matter jurisdiction. Finally, if defendant Nian is, in fact, moving under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, then, as explained in *Lynch I,* he has improperly submitted an affidavit in support of this motion, which confines the court to examining only the allegations in the complaint—not matters outside the pleadings. Despite the foregoing, because it is possible to decide defendant Man's motion without reference to his attorney's affidavit, the court will treat it as a Rule 12(b)(6) motion, considering only the sufficiency of the allegations in the complaint as they pertain to this particular defendant.

Defendant Nian relies almost exclusively upon *Lynch II* as the basis for his motion. In *Lynch II* the court held, first of all, that in plaintiff's complaint he failed to properly allege a section 1985(3) conspiracy cause of action against defendants Feeney and VanNess because he did not allege the requisite class-based animus for such a cause of action. *Lynch II,* slip op. at 3–8. Second, the court held that in his complaint, plaintiff also did not allege that defendants Feeney or VanNess acted under color of state law, and in the absence of such an allegation, he could not maintain a claim under 42 U.S.C. § 1983 against those defendants. *Id.* at 8–9. Based upon these prior rulings, defendant Nian reasons that because, in terms of the allegations in the complaint, he stands in the same position as former defendants Fenney and VanNess, who successfully obtained summary judgment, likewise, the complaint as against him should be dismissed.[5]

Plaintiff Lynch is not opposing any of these defense motions. In accordance with Local Rule 7.1(3), the court should deem this failure to respond by plaintiff to be consent to the granting of these motions. *See* L.R. 7.1(3) ( "Failure to file or serve any

papers as required by this Rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be."). Due to plaintiff's *pro se* status, however, combined with the fact that there was no specific mention in *Lynch I* of the time frame in which plaintiff should respond to these motions, the court will not invoke L.R. 7.1(3). Instead, it will consider these motions on the merits. But plaintiff is forewarned that the court will not hesitate to rely upon this Local Rule if he does not timely file or serve response papers to any future motions in this action.

**\*3** *DISCUSSION*

*I. Defendant Bradley*
Turning first to the more substantive motion of defendant Bradley, he makes a number of arguments in support of his renewed motion for dismissal. He first argues that plaintiff's amended complaint was not filed within the time specified by this court in *Lynch I.* Next, again relying upon the *Rooker–Feldman* doctrine, Bradley asserts that plaintiff cannot overcome that doctrine by requesting to be placed in possession of the premises which are the subject of this dispute because the upshot of that request is to seek to nullify or reverse the eviction warrant which defendant Bradley previously issued, and *Rooker–Feldman* prohibits the court from granting such relief. Thus, in accordance with Fed.R.Civ.P. 12(b)(1), defendant Bradley contends that the amended complaint should be dismissed as against him for lack of subject matter jurisdiction.

As a further basis for dismissing the amended complaint, defendant Bradley contends that despite the "conclusory" allegations therein that he acted " 'in the complete absence of jurisdiction[,]"[6] plaintiff cannot avoid dismissal of his complaint based upon absolute judicial immunity. Memorandum of Law in Support of Motion to Dismiss on Behalf of Judge Vincent G. Bradley at 5. That is so, argues defendant Bradley, because even assuming, as plaintiff alleges, that Bradley somehow departed from the procedural requirements of New York's Real Property Actions & Procedure Law ("RPAPL") by not providing plaintiff with the seventy-two (72) hour notice required thereunder prior to eviction,[7] still, he is entitled to judicial immunity. In addition, according to defendant Bradley, plaintiff cannot, through this federal action, enforce purported rights under the RPAPL—a state statute. Defendant Bradley's penultimate argument is, in essence, that in *Lynch I* this court too narrowly construed the scope of judicial immunity in suggesting that such immunity

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 15 of 89

James X. Lynch C.O. v. Slayton, Not Reported in F.Supp. (1997)

"is not a bar to injunctive relief." *Lynch I,* 1996 WL 31314, at *10. He contends that judicial immunity does bar plaintiff's claim for injunctive relief. Even if judicial immunity does apply to a claim for injunctive relief, defendant Bradley asserts that that claim should be dismissed because it fails to present a justiciable "case or controversy." For all of these reasons, defendant Bradley seeks dismissal with prejudice of the amended complaint.

The court has already held that it will not disregard plaintiffs amended complaint because it was filed three days late. Therefore, the court is free to move on to the second issue which defendant Bradley raises; and that is whether, in this federal action, plaintiff is seeking to collaterally attack state court orders, judgments, or both, in violation of the *Rooker–Feldman* doctrine. Following the court's directive in *Lynch I,* [8] in paragraph eleven of his complaint plaintiff alleges that he "[d]oes not run afoul of the *Rooker–Feldman* doctrine as falsely alleged by defendants." Amended Complaint at 3, ¶ 11. Further alleges plaintiff, he is "not seek[ing] to collaterally attack a state court order or judgement [sic] but rather, seeks damages for unlawful actions of a judicial nature taken in the complete absence of all jurisdiction by the defendants in public and private capacities." *Id.* (emphasis added). Contrary to these self-serving allegations, as defendant Bradley correctly points out, plaintiff is seeking to have this court nullify or reverse the eviction warrant issued by Bradley; and, as discussed in *Lynch I,* the court cannot do that. *See Lynch I,* 1996 WL 31314, at *3—*4.

 *4  Moreover, as part of his relief, plaintiff is seeking to be placed in possession of the real property which is, in large part, the subject of this dispute. *See* Amended Complaint at 5, ¶ 1. Obviously, in order for this court to grant such relief the court would be required to revisit all the facts and circumstances surrounding defendant Bradley's issuance of the warrant of eviction in the first place; and that is precisely the sort of action which *Rooker–Feldman* prohibits this court from taking. *See Lynch I,* 1996 WL 31314, at *3. Thus, despite plaintiff's efforts, at least certain aspects of his complaint violate *Rooker–Feldman.* Hence, to that extent, the court grants defendant Bradley's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

Assuming that there are any allegations remaining in the amended complaint which are not violative of the *Rooker–Feldman* doctrine, the court will address defendant Bradley's other arguments as to why he is entitled to dismissal of that complaint. With respect to judicial immunity, the court

agrees with defendant Bradley that merely declaring that he acted "in the complete absence of jurisdiction," does not make it so. There must be allegations in the complaint which would support such a conclusion, and such allegations are conspicuously absent from plaintiff's amended complaint.

In *Lynch I,* this court discussed judicial immunity in terms of the allegations i plaintiff's original complaint against defendant Bradley. *Lynch I,* 1996 WL 31314, at *8—*9. In the court's opinion, still, the allegations in this amended complaint are not sufficient to overcome defendant Bradley's defense of absolute judicial immunity. The exception to judicial immunity upon which plaintiff is relying—the "clear absence of all jurisdiction" exception [9] " '[h]as been narrowly construed to encompass *only acts* taken outside the scope of *all authority,* as in the case of a probate judge adjudicating a criminal trial.' " *Jemzura v. Monserrate,* 96–CV–816, 1996 WL 745470, at *1 (N.D.N.Y. Dec.26, 1996) (quoting *Sassower v. Mangano,* 927 F.Supp. 113, 120 (S.D.N.Y.1996)) (citing *Stump v. Sparkman,* 435 U.S. 349, 357, n. 7, 98 S.Ct. 1099, 1105 n. 7, 55 L.Ed.2d 331 (1978)) (emphasis added) (other citation omitted). Thus, "[a] defendant who possesses subject matter jurisdiction of the proceedings before him is *not* operating within the 'clear absence of all jurisdiction' required to abrogate immunity." *Sanchez–Preston v. Luria,* CV–96–2440, 1996 WL 738140, at *5 (E.D.N.Y. Dec.17, 1996) (citing *Green v. Maraio,* 722 F.3d 1013, 1017 (2d Cir.1983)) (emphasis added).

As explained in *Lynch I,* clearly defendant Bradley had subject matter jurisdiction to issue the warrant of eviction which plaintiff is challenging in this action. *Lynch I,* 1996 WL 31314, at *9. Thus, in light of the foregoing, because there are absolutely no allegations in the amended complaint from which it could be rationally inferred that defendant Justice Bradley acted without jurisdiction in issuing the eviction warrant, much less that he acted in "the clear absence of all jurisdiction," he is entitled to absolute judicial immunity. *See Jemzura,* 1996 WL 745470, at *2. Moreover, assuming *arguendo* that, as plaintiff contends, defendant Bradley did violate the seventy-two (72) hour notice provision found in section 749 of the RPAPL, by ordering that plaintiff be "immediately" removed from the subject premises, [10] that alleged error cannot defeat the defense of absolute judicial immunity. That is so because " 'as long as a judicial officer has jurisdiction over the subject matter before him, he is absolutely immune from liability for his judicial acts, even if his exercise of authority is flawed by the commission of grave procedural errors.' " *Gugliaro v. New York Coffee, Sugar and*

Case 1:23-cv-07222-LTS-GWG  Document 21-1  Filed 10/24/23  Page 16 of 89

James X. Lynch C.O. v. Slayton, Not Reported in F.Supp. (1997)

*Cocoa Exchange, Inc.,* 96 Civ. 4942, 1997 WL 109442, at *3 (S.D.N.Y. March 11, 1997) (quoting *Mandelbaum v. New York Mercantile Exchange,* 894 F.Supp. 676, 682 (S.D.N.Y.1995)) (quoting in turn *Stump,* 435 U.S. at 359, 98 S.Ct. at 1105).[11] Accordingly, the court grants defendant Bradley's motion for dismissal insofar as the amended complaint can be read as asserting claims for monetary relief against that defendant for acts taken in his judicial capacity.[12] (Given that all of the actions allegedly undertaken by defendant Bradley were done in his capacity as a Justice of the New York State Supreme Court, it appears as though he is being sued in his official capacity only; and plaintiff does not contend otherwise.)

**\*5** Before considering defendant Bradley's other arguments pertaining to immunity, it should be noted, that, as in his original complaint, plaintiff's amended complaint includes "vague and conclusory allegations of a conspiracy between defendant Bradley and other defendants[.]" *Lynch I,* 1996 WL 31314, at *9. Judicial immunity also bars this claim. *Id; see also Gugliaro,* 1997 WL 109442, at *3 (quoting *Mandelbaum,* 894 F.Supp. at 678) (other citation omitted) (" 'Since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." ').

There are two other aspects of defendant Bradley's immunity argument which the court must address. The first is his assertion that in *Lynch I* this court too narrowly construed the defense of judicial immunity by declining to find that it bars an injunctive relief claim. Even in the face of the public policy concerns advanced by defendant Bradley, the court remains convinced that "judicial immunity does not extend to actions for prospective injunctive relief[13] brought under § 1983[.]" *See Sanchez–Preston,* 1996 WL 738140, at *5 (citing, *inter alia, Pulliam v. Allen,* 466 U.S. 522, 540, 104 S.Ct. 1970, 1980, 80 L.Ed.2d 565 (1984)) (footnote added); *see also Lynch I,* 1996 WL 31314, at *9 (and cases cited therein). Even though the court does not believe that judicial immunity bars plaintiff Lynch's claim for injunctive relief, plaintiff is unable to pursue that claim because he has not alleged "that a violation of [his] constitutional rights is ongoing or is threatened to recur in the future."[14] *Id.* (citations omitted). Consequently, defendant Bradley is also entitled to dismissal of the claim for injunctive relief as against him. In short, then, the court grants in its entirety defendant Bradley's motion to dismiss.

## II. Defendant Slayton

As to defendant Slayton, the court is tempted to deny his motion a second time because, as discussed earlier, he improperly submitted affidavits for the court's consideration on this Rule 12(b)(6) motion. To avoid that harsh result, the court will simply disregard those affidavits and treat defendant Slayton's motion solely under Rule 12(b)(6).[15] As mentioned at the outset, defendant Slayton is moving for dismissal under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, maintaining that he is entitled to judicial immunity because his "only involvement in this litigation is in his capacity as Town Judge of the Town of Woodstock." Memorandum of Law in Support of Motion to Dismiss on Behalf of Judge Sid Slayton at 1. In making this assertion, defendant Slayton is conveniently ignoring one of the "two limited sets of circumstances[ ]" whereby judicial immunity can be overcome. *See Sassower v. Abrams,* 833 F.Supp. 253, 263 (S.D.N.Y.1993). More specifically, he fails to take into account the well settled exception to judicial immunity, already discussed in connection with defendant Bradley, and that is that "[a] judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles,* 502 U.S. at 12, 112 S.Ct. at 288. Obviously, if the allegations in the amended complaint are sufficient to show that defendant Slayton acted "in the complete absence of all jurisdiction[,]" then he would not be entitled to defeat this action on the basis of judicial immunity. *See id* And so, that must be the focus of the court's inquiry at this point.

**\*6** When that is done, the court finds that the allegations in the complaint against defendant Slayton are not sufficient to show that he acted in the complete absence of all jurisdiction.[16] In paragraph twenty-two of his complaint, plaintiff declares, *inter alia,* that the claim of judicial immunity by defendant Slayton is "rebutted and refuted" by the exception to judicial immunity just noted. Amended Complaint at 4–5, ¶ 22. There is no mention in that paragraph (or anywhere else in the complaint, for that matter) of any act or acts which Slayton allegedly undertook which would even tend to support that conclusory allegation. Consequently, the court grants defendant Slayton's motion for dismissal of the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6).[17]

## III. Defendant Nian

James X. Lynch C.O. v. Slayton, Not Reported in F.Supp. (1997)

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 17 of 89

As already explained, the court is considering defendant Nian's motion solely under Rule 12(b)(6). An examination of this *pro se* plaintiff's amended complaint in light of the oft-recited standard governing motions brought pursuant to that Rule, [18] convinces the court that plaintiff Lynch has not stated a cognizable claim against defendant Nian under either section 1983 or under section 1985(3). As to the purported section 1983 cause of action, defendant Nian asserts that as with former defendant Feeney and VanNess, the plaintiff has failed to adequately allege that Nian acted under color of state law. Hence, plaintiff's section 1983 claim against Nian is legally insufficient. For the reasons discussed in both *Lynch I* and *Lynch II,* [19] the court agrees. Similarly, the court agrees that defendant Nian is entitled to dismissal pursuant to Rule 12(b)(6) with respect to plaintiff's alleged section 1985(3) conspiracy claim because, as fully discussed in *Lynch II,* plaintiff has failed to allege the class-based animus necessary

to support such a claim. *Lynch II,* slip op. at 3–8. Accordingly, the court grants defendant Nian's motion to dismiss the amended complaint as against him in its entirety. [20]

To conclude, the motions by defendants Vincent Bradley, Zhang Hong Nian, and Sid Slayton are granted and the complaint as against them is dismissed in its entirety with prejudice. Plaintiff Lynch has thirty (30) days from the date hereof in which to file a second amended complaint in full compliance with the directives set forth herein.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1997 WL 176396

---

### Footnotes

1    Given plaintiff's *pro se* status, the court is willing to overlook the fact that he did not timely file his amended complaint. (It was filed three days beyond the deadline extended by the court.) The court cannot disregard the fact, however, that plaintiff did not actually amend his original complaint. Instead he supplemented it, "re[ ]alleg [ing] each and every allegation set forth in the original complaint and Memorandum of Law filed in this action as if fully set forth herein." Amended Complaint at 5, ¶ 23. This is a significant procedural defect because an amended complaint supersedes the complaint it modifies, rendering the original complaint meaningless. *Laza v. Reish,* 84 F.3d 578, 581 (2nd Cir.1996) (quoting 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1476 (2d ed. 1990)) (" 'Once an amended pleading is interposed, the original pleading no longer performs any function in the case....' "); *See also Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 706 n. 2, 102 S.Ct. 3304, 3325 n. 2, 73 L.Ed.2d 1057 (1982) (White, J., concurring in the judgment in part and dissenting in part) ("It is the complaint which defines the nature of an action, and once accepted, an amended complaint replaces the original."). Therefore, the court directs plaintiff Lynch to file a second amended complaint.

In so doing, plaintiff should not generally refer to allegations contained in his prior pleadings; nor should he rely upon allegations contained in any other documents, such as his memorandum of law. Rather, he must specifically set forth those allegations from his prior two complaints, as well as "allegations" from his original memorandum of law, which he intends to pursue in this action. That is all. Plaintiff is not free to expand upon the allegations in those prior complaints. After its filing, the court will scrutinize his second amended complaint to ensure that plaintiff has not impermissibly broadened the scope of his claims beyond those just described. To the extent plaintiff does impermissibly broaden the scope of his second amended complaint, the court will strike any such allegations.

Furthermore, the court cannot overlook the fact that this amended complaint contains allegations which were not a part of the original complaint; and to that extent, the court is disregarding the same. For example, plaintiff now alleges that defendant Zhang Hong Nian perpetrated a fraud upon a third-person, as well as upon plaintiff himself *See* Amended Complaint at 2–3, ¶¶ 6–7. Plaintiff also alleges that that same

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 18 of 89

James X. Lynch C.O. v. Slayton, Not Reported in F.Supp. (1997)

defendant, along with others, was unjustly enriched. *Id.,* at 4, ¶ 16. None of those allegations were part of plaintiff's original complaint. To be sure, in *Lynch I* plaintiff was granted permission to amend his original complaint, but only to the extent outlined therein. Consequently, this amended complaint should not have included allegations broader than those permitted by the court in *Lynch I.* Plaintiff Lynch's second amended complaint should not include such allegations. As just discussed, in that complaint, plaintiff is confined to setting forth allegations from his original complaint, clarified in terms of the court's discussion in *Lynch I,* as well as "allegations" from his "original memorandum of law," but only insofar as those "allegations" serve to clarify the claims asserted in his original complaint.

2    It is the court's understanding that this defendant's last name is actually Zhang, but because in his amended complaint plaintiff refers to Zhang by Nian, Zhang's middle name, so too will the court. *See* Affidavit of S. James Matthews (May 15, 1996), at ¶ 2.

3    In a nutshell, *Rooker–Feldman* stands for the proposition that " ' [a]n inferior federal court established by Congress pursuant to Art. III, § 1, of the Constitution may not act as an appellate tribunal for the purpose of overruling a state court judgment, even though the judgment may rest on an erroneous resolution of constitutional or federal law issues." ' *Lynch I,* 1996 WL 31314, at *3 (quoting *King v. James,* 91–CV–952, 311 Or. 166, 806 P.2d 1153, 1991 WL 25510, at *3 (N.D.N.Y. Nov. 29, 1991)) (other internal quotations and citation omitted).

4    Excluding the two "John Doe" and the two "Jane Doe" defendants, originally plaintiff named ten defendants in this action. In *Lynch II,* however, the court granted summary judgment in favor of two of those defendants, and for now eight defendants remain (again, excluding the Doe defendants).

5    The moving defendants all requested that oral argument not be held in connection with their motions, and the court acceded to those requests.

6    Amended Complaint at 4–5, ¶ 22 (quoting *Mireles v. Waco,* 502 U.S. 9, 12, 112 S.Ct. 286, 288, 116 L.Ed.2d 9 (1991)).

7    Section 749(2) of the RPAPL provides: "The officer to whom the warrant is directed and delivered shall give at least seventy-two hours notice, in writing and in the manner prescribed in this article for the service of a notice of petition, to the person or persons to be evicted or dispossessed and shall execute the warrant between the hours of sunrise and sunset." N.Y. REAL PROP. ACTS. § 749(2) (McKinney 1979).

8    *Lynch I,* 1996 WL 31314, at *10 ("[P]laintiff ... should be prepared to allege a jurisdictional basis which does not in any way run afoul of the *Rooker–Feldman* doctrine.").

9    *See Mireles,* 502 U.S. at 12, 112 S.Ct. at 288.

10   *See* Amended Complaint, exh. B thereto.

11   *See also Mireles,* 502 U.S. at 13, 112 S.Ct. at 288 (quoting *Stump,* 435 U.S. at 356, 98 S.Ct. at 1104) (other citation omitted) ("If judicial immunity means anything, it means that a judge 'will not be deprived of immunity because the action he took was in error ... or was in excess of his authority." ').

12   This ruling obviates the need for the court to consider defendant Bradley's additional argument that plaintiff cannot enforce purported state law rights under the RPAPL through this federal litigation.

13   Presumably plaintiff is seeking prospective injunctive relief because, as defendant Bradley mentions, the amended complaint does not allege that any of the defendants, including Bradley, are currently in possession

James X. Lynch C.O. v. Slayton, Not Reported in F.Supp. (1997)

Case 1:23-cv-07222-LTS-GWG  Document 21-1  Filed 10/24/23  Page 19 of 89

of this unspecified "records." Indeed, the lack of such an allegation, in the court's opinion, points to the arguably frivolous nature of this claim for injunctive relief

14    Even if he had, the court has serious reservations as whether plaintiff has standing to assert a claim for injunctive relief insofar as he is seeking to enjoin the defendants from "destruct[ing], conceal[ing], [and] alter[ing][the] records of the personal and real estate" of the estate of Rosella Hartman Feine, which is not a party to this action. See Amended Complaint at 5,¶ 2.

15    The court is fully aware that under Fed.R.Civ.P. 12(b) it could convert this motion by defendant Slayton to one for summary judgment pursuant to Rule 56; and in that way, these affidavits could be considered. However, the court declines to convert this motion because it would only further prolong the resolution of this litigation. Moreover, as will be seen, it is possible to resolve this action against defendant Slayton without jumping over this additional procedural hurdle.

16    In engaging in this task the court, of course, has in mind the off-recited standard governing motions to dismiss under Rule 12(b)(6). *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 860 (2nd Cir.1997) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (per curiam)) (("In order to survive dismissal, plaintiff must assert a cognizable claim and allege facts that, if true, would support such a claim. In evaluating whether a plaintiff has met these requirements, we hold complaints prepared *pro se* 'to less stringent standards than formal pleadings drafted by lawyers." ').

17    Plainly, this ruling encompasses the asserted conspiracy claim against defendant Slayton as well. For the same reasons previously discussed, with respect to the conspiracy claim against defendant Bradley, this conspiracy claim against defendant Slayton also fails.

18    *See supra* n. 16.

19    *See Lynch I,* 1996 WL 31314, at *6—*7; and *Lynch II,* slip op. at 8–9.

20    As previously noted, insofar as plaintiffs complaint can be read as asserting claims against defendant Nian (or others) which go beyond the scope of those discussed in *Lynch I* in connection with the amendment of plaintiffs complaint, the court is disregarding the same. Furthermore, the court reiterates that those claims should not appear in plaintiff's second amended complaint.

---

**End of Document**                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

Case 1:23-cv-07222-LTS-GWG Document 21-1 Filed 10/24/23 Page 21 of 89

Robinson v. Wentzell, Not Reported in Fed. Supp. (2019)

2019 WL 1207858
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

LaShawn ROBINSON, et al., Plaintiffs,

v.

Diana WENTZELL, et al., Defendants.

No. 3:18-cv-00274 (SRU)
|
Signed 03/14/2019

**Attorneys and Law Firms**

Scott William Sawyer, The Jill S. Sawyer Bldg, New London, CT, Jeremy Talcott, Joshua P. Thompson, Oliver James Dunford, Wencong Fa, Pacific Legal Foundation, Sacramento, CA, for Plaintiffs.

Darren P. Cunningham, Ralph E. Urban, Attorney General's Office, Hartford, CT, for Defendants Dianna Wentzell, Glen Peterson, Allan B. Taylor, Dannel Malloy, George Jepsen.

Howard G. Rifkin, Julia Vacek Wilde, City of Hartford, Office of the Corporation Counsel, Hartford, CT, Maree Frances Sneed, Hogan Lovells US LLP, Washington, DC, Natashia Tidwell, Hogan Lovells US LLP, Boston, MA, for Defendant Craig Stallings.

## ORDER ON MOTIONS FOR JUDGMENT ON THE PLEADINGS

Stefan R. Underhill, United States District Judge

**\*1** Plaintiffs LaShawn Robinson, Nichole Burke-Kane, Natalie Delgado, Shara Ferguson, Marie Joulet, Tynima Toney, Juan Tirado, and Jahaira Velazquez ("Plaintiffs"), filed suit on behalf of themselves and their minor children against Defendants Dianna Wentzell, Commissioner of the Connecticut State Department of Education; Glen Peterson, Director of the Sheff and Regional School Choice Office; Allan Taylor, Chairperson of the Connecticut State Department of Education's Board of Education; Dannel Malloy, then-Governor of Connecticut; and George Jepsen, then-Connecticut Attorney General; ("State Defendants"), and Craig Stallings, Chairperson of the Hartford Public Schools Board of Education, all in their official capacities, alleging that the 75% minority cap on students attending Hartford magnet schools violates the equal protection clause

of the Fourteenth Amendment (Count One), and that the "racial manipulation" of the Regional School Choice Office ("RSCO") lottery violates the equal protection clause of the Fourteenth Amendment (Count Two).

Plaintiffs seek declaratory judgments that the following policies are unconstitutional, illegal, invalid, and unenforceable because of race discrimination in violation of the equal protection clause: (1) the cap on minority students who may attend Hartford magnet schools, and (2) the use of race in the RSCO lottery. They also seek a permanent prohibitory injunction enjoining State Defendants and Defendant Stallings from enforcing the cap on black and Hispanic students who may attend Hartford's magnet schools.

State Defendants, Defendant Stallings, and the Intervenors all filed motions for judgment on the pleadings. For the following reasons, the State Defendants' motion for judgment on the pleadings and the Intervenors' motion for judgment on the pleadings are **DENIED**. Defendant Stallings' motion for judgment on the pleadings is **GRANTED**, and the case against Defendant Stallings and the Hartford Board of Education is dismissed without prejudice. The case shall proceed to discovery against the following defendants: Dianna Wentzell; Glen Peterson; Allan Taylor; Ned Lamont; and, William Tong. [1]

## I. Standard of Review

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, I must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether the plaintiff has set forth a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

**\*2** Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual

allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and ... recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II. Background

The following facts are drawn primarily from Plaintiffs' complaint. In 1989, ten families filed a class action in Hartford Superior Court alleging racial discrimination and segregation in Connecticut, including in Hartford and its suburbs. Compl. at ¶ 28. The case, *Sheff v. O'Neill*, resulted in a ruling by the Connecticut Supreme Court requiring the State of Connecticut to provide all schoolchildren with a "substantially equal educational opportunity", including a requirement that the schools would not be "substantially impaired by racial and ethnic isolation." *Id.* at ¶ 29, citing *Sheff v. O'Neill*, 238 Conn. 1, 24 (1996). The Connecticut Supreme Court remanded the case to the Superior Court to oversee the enactment of remedial programs to address the issue of racial and ethnic isolation in the Hartford schools. *Id.*

As a result of the *Sheff* decision, the Connecticut Legislature passed Public Act 97-290, which adopted many of the recommendations contained in a report issued by Governor John Rowland's Education Improvement Panel, including interdistrict magnet and charter schools and public school choice programs beyond neighborhood schools. *Id.* at ¶¶ 28-29. The program replaced a voluntary busing system that had been operating since 1966. *Id.* at ¶ 32. The Regional School Choice Office (RSCO) was created to operate and conduct a lottery process to place children in magnet schools and other public schools. *Id.* at ¶ 33.

In 1998, the *Sheff* plaintiffs requested additional remedial action. *Id.* at ¶ 34. Negotiations led to a process by which reducing racial isolation would be measured for a period of four years. *Id.* at ¶¶ 36-38. After that period, and after the City of Hartford intervened in the case, another stipulation was reached in 2008, which included a "Desegregation Standard" that required "Sheff Region"[2] interdistrict magnet schools to maintain no more than 75% minority-student enrollment in order to receive operating grants from the

State of Connecticut. *Id.* at ¶¶ 38-39. That stipulation also put forth a goal that 41% of minority students would be in "reduced isolation settings" within five years. The Desegregation Standard was later incorporated into the definition of "reduced isolation setting" and was altered to exclude all minorities except for black and Hispanic students. The current stipulation includes the requirement of a total school enrollment in accordance with the reduced isolation setting standards for interdistrict magnet school programs, meaning that the total percentage of enrolled students who identify as black or Hispanic must be limited to no more than 75% of students in a magnet school. *Id.* at ¶¶ 42, 46.

**\*3** To determine which magnet school a student may attend, RSCO operates a school choice lottery. *Id.* at ¶ 50. Plaintiffs allege that the RSCO lottery "uses race to carefully engineer the racial makeup of magnet schools in Hartford" and that state and local officials "test and tweak the lottery in order to tip the scales in favor of white and Asian applicants." *Id.* at ¶¶ 55-60.

Plaintiffs filed the complaint on February 15, 2018 (Doc. No. 1). State Defendants filed a motion for judgment on the pleadings, or in the alternative, motion for summary judgment, on April 27, 2018 (Doc. No. 34). On May 8, 2018, eight current and proposed plaintiffs in the *Sheff* litigation, Elizabeth Horton Sheff, Aldwin Allen, Suzann Beckett, Charles Hollis, Sandra Vermont-Hollis, Tyasha Adams Roberts, Amanda Soto, and Nordia Stone ("Intervenors") filed a motion to intervene on their own behalves and/or on behalf of their minor children (Doc. No. 35). I held a status conference on May 10, 2018, and granted the motion to intervene on that date. Defendant Stallings, Chairperson of the Hartford Board of Education, moved separately for judgment on the pleadings on June 15, 2018 (Doc. No. 56). The Intervenors also moved for judgment on the pleadings that same day (Doc. No. 58). Plaintiffs responded on July 13, 2018 (Doc. No. 62). Replies were filed in early August (Doc. Nos. 64, 65, and 67). I scheduled a hearing, which took place on October 16, 2018 (Do. No. 73).

## III. Discussion

State Defendants argue that their actions regarding the policy at issue were and are narrowly tailored pursuant to a compelling state interest. *See* Doc. No. 34. Defendant Stallings argues that the complaint against him is "devoid of allegations pertaining to the Hartford Board's role" regarding the policy at issue, and that the complaint fails to state a plausible claim for relief with regard to Defendant Stallings

and the Hartford Board of Education. *See* Doc. No. 56. Intervenors argue that I should abstain from deciding the other motions for judgment on the pleadings while the state court proceedings in the *Sheff* case are pending. *See* Doc. No. 58. They argue in the alternative that the State Defendants should be subject to rational basis review rather than strict scrutiny. *Id.*

The issue of standing was raised by the Intervenors in their motion for judgment on the pleadings, and I requested supplemental briefing after the October 16, 2018 hearing (Doc. No. 72). Intervenors argue that Plaintiffs do not have standing regarding either claim, and State Defendants argue that Plaintiffs have standing only to pursue Count One, challenging the cap on the percentage of minority students admitted to Hartford charter schools. Plaintiffs contend that they have standing to pursue both claims.

Finally, State Defendants and Defendant Stallings have responded to my May 10, 2018 order instructing the parties to submit questions for potential certification to the Supreme Court of Connecticut (Doc. No. 39).

A. Intervenors' Motion for Judgment on the Pleadings

Intervenors request that I abstain from deciding Defendants' motions for judgment on the pleadings while the state court proceedings in *Sheff* are pending. Intervenors' Motion, Doc. No. 58-1, at 13. They rely on the *Pullman* abstention doctrine for support. Plaintiffs, however, argue that *Pullman* abstention is inappropriate here. Plaintiffs' Combined Response, Doc. No. 62, at 30.

**\*4** Under the *Pullman* abstention doctrine, the Supreme Court has "required deferral, causing a federal court to 'sta[y] its hands,' when a constitutional issue in [a] federal action will be mooted or presented in a different posture following conclusion of [a] state-court case." *Growe v. Emison,* 507 U.S. 25, 32 (1993). The Second Circuit has held that three basic conditions must be present to trigger *Pullman* abstention: "First, the state statute must be unclear or the issue of state law uncertain; second, resolution of the federal issue must depend upon the interpretation given to the ambiguous state provision; and third, the state law must be susceptible of an interpretation that would avoid or modify the federal constitutional issue." *United Fence & Guard Rail Corp. v. Cuomo,* 878 F.2d 588, 594 (2d Cir. 1989).

Intervenors contend that the issue whether the reduced isolation standard is an appropriate remedy in *Sheff* is

currently before the Connecticut Superior Court. Intervenors' Motion, Doc. No. 58-1, at 14 (citing Exhibit J to Intervenor's Motion, Doc. No, 58-12, Superior Court Order). Intervenors argue that the "*Sheff* plaintiffs' recent motion for a preliminary injunction was the first time in which any Connecticut court was asked to expound on the propriety of the reduced isolation standard. The [S]uperior [C]ourt's rejection of the State Defendant's premature invitation to rule on these issues before the evidentiary hearing makes it evident that issues of state law remain uncertain." *Id.* [3]

Plaintiffs argue that the current law regarding the requirement for reduced isolation is unambiguous, and that an argument that an issue might become ambiguous sometime in the future is not enough to warrant abstention. Plaintiffs' Combined Response, Doc. No. 62, at 32. Plaintiffs also argue that because the Superior Court has approved past stipulations containing the reduced isolation standard, the issue is not ambiguous. *Id.*

I agree with Plaintiffs. Exhibit J provides insufficient evidence for the contention that the issue whether the reduced isolation standard is an appropriate remedy in *Sheff* will soon be decided by the Connecticut Superior Court. There is no indication by the Connecticut Superior Court that the law is currently unsettled, and therefore I need not address the second and third prongs outlined in *United Fence & Guard Rail Corp.,* 878 F.2d at 594. Accordingly, Intervenors' motion for judgment on the pleadings is denied.

B. State Defendants' Motion for Judgment on the Pleadings

Procedurally, State Defendants argue that I should take judicial notice of several matters that they argue relate to the pleadings, State Defendants' Memorandum in Support of their Motion for Judgment on the Pleadings, Doc. No. 34-1, at 7 ("State Defendants' Memo"). Substantively, they argue that all of their actions were taken pursuant to a compelling state interest and were narrowly tailored to achieve that interest. *Id.* at 2-3. Finally, they request that I deny any injunction as unnecessary, and deny any associated fees and costs. *Id.* at 7.

1. *Judicial Notice*

State Defendants argue that in addition to considering all pleadings, including affirmative defenses, I am "also free to consider attachments to the pleadings where warranted,

matters of which judicial notice may be taken, and other suitable evidentiary materials, including affidavits where appropriate." State Defs' Memo, Doc. No. 34-1, at 7. Plaintiffs argue that judicial notice is improper here because all findings and studies proffered by State Defendants are "matters of dispute." [4] Plaintiffs' Combined Response, Doc. No. 62, at 7.

**\*5** Federal Rule of Evidence 201, which governs adjudicative facts, states that a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see* Judicial Notice of Adjudicative Facts, 1 Federal Evidence Rule 201.

On a motion for judgment on the pleadings, I can consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) ). A complaint is also "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Id.* (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ).

The Second Circuit has held that "[w]hen a motion to dismiss presents material outside the pleadings, a district court may convert the motion into one for summary judgment provided that the non-moving party receives notice and an opportunity to respond." *Cancel v. Amakwe*, 551 F. App'x 4, 5 (2d Cir. 2013). Moreover, Rule 12(d) of the Federal Rules of Civil Procedure provides that if matters outside the pleadings are presented to and, not excluded by, the district court on a motion to dismiss, "the motion must be treated as one for summary judgment under Rule 56 [and] [a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *See also Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999) (vigorous enforcement of conversion requirement ensures that courts will not engage in fact-finding when ruling on motion to dismiss and that plaintiffs are given fair chance to contest defendants' evidence). Rule 56 requires that parties be given at least ten days' notice before converting a Rule 12(b)(6) motion to a motion for summary judgment. *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983).

State Defendants ask that I consider Defendant Peterson's affidavit, in addition to the previous Superior Court approved stipulations. State Defs' Memo, Doc. No. 34-1, at 7 (referencing Exhibit H, attached to Doc. No. 34-1. The affidavit "describes in detail the RSCO lottery and processes for populating seats in the *Sheff* interdistrict magnet schools."). State Defendants also request that their motion for judgment on the pleadings be converted into a motion for summary judgment. *Id.* at 7-8. Plaintiffs argue that Peterson's "affidavit may not be considered without converting the State's Motion into a Motion for Summary Judgment." *See* Plaintiffs' Combined Response, Doc. No. 62, at 6.

Intervenors urge me to take judicial notice of "the state statutes, the *Sheff* stipulations, and judicial orders and opinions, and any other information of which the pleaders 'had notice and which were integral to their claim[.]' " Intervenors' Motion, Doc. No. 58-1, at 3. Intervenors rely on Peterson's affidavit, publicly available magnet enrollment statistics and other data that explain the lottery system in Hartford schools to make their arguments. *Id.*

**\*6** It would be improper to take judicial notice of Peterson's affidavit because its contents are *not* universally known and its accuracy *can* be questioned. *See* Fed. R. Evid. 201. Judicial Notice of Adjudicative Facts, 1 Federal Evidence Rule 201(b)(2) (4th ed.).

Furthermore, Peterson is a defendant in the case, and the facts regarding the implementation of the lottery program are "in dispute." *Id.* The Peterson affidavit can be properly considered on a motion for summary judgment, after both sides have been afforded an opportunity for discovery. [5] I will not consider the contents of the Peterson affidavit at the current stage of the proceedings.

### 2. *Strict Scrutiny*

Strict scrutiny applies to all government classifications that are facially discriminatory based on race. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 225–26 (1995). In order to survive strict scrutiny, the challenged classification must serve a compelling government interest, and be narrowly tailored to further that interest. *See id.* at 227.

Although Intervenors argue that the State Defendants must merely pass a rational basis review, the policy at issue is discriminatory on its face. [6] Therefore, in order to grant their

Robinson v. Wentzell, Not Reported in Fed. Supp. (2019)

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 25 of 89

motion for judgment on the pleadings, Defendants must show that their actions were taken to achieve a compelling state interest, and that the policy at issue was narrowly tailored to achieve that interest.

#### i. Narrow Tailoring

State Defendants argue that the factors outlined in *United States v. Paradise* should be used to determine whether "race-conscious remedies are appropriate[.]" State Defs' Memo, Doc. No. 34-1, 17-18. *See Paradise*, 480 U.S. 149, 171 (1987) (listing the following factors: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties).

Plaintiffs argue that the factors outlined in *Paradise* are not appropriate where, as here, the compelling interest is something other than remedying a state's own past discrimination. Plaintiffs' Combined Response, Doc. No. 62, at 24. Plaintiffs argue that I should instead use the framework provided in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), where a majority of the Supreme Court held that a traditional narrow tailoring analysis was proper. Plaintiffs' Combined Response, Doc. No. 62, at 23.

**\*7** The Second Circuit has held that "the question of whether the precise goals of [a program designed to address *de facto* segregation] requires a fact-specific determination that we believe should be made by the District Court in the first instance." *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 752 (2d Cir. 2000). Therefore, whether I apply the factors put forth in *Paradise* or apply a traditional narrow tailoring analysis to the purported racial quota, as set forth by the Supreme Court in *Parents Involved*, it will be necessary to engage in a "fact specific inquiry" as required by the Second Circuit.

A fact specific inquiry here requires examining Peterson's affidavit regarding the lottery program. Because I have determined that I cannot rely on the Peterson affidavit at the motion for judgment on the pleadings stage of the proceedings, I cannot determine whether the policy at issue is narrowly tailored at the current stage in the pleadings.[7]

#### ii. Compelling State Interest

Because I cannot adequately address the question of narrow tailoring without examining the Peterson affidavit, I reserve judgment on the issue whether State Defendants acted and continue to act pursuant to a compelling state interest. That issue can only be decided after discovery.

State Defendants have not met their burden on their motion for judgment on the pleadings that Hartford's policy written to address *de facto* segregation is narrowly tailored to achieve that interest. Accordingly, the State Defendants' motion for judgment on the pleadings is denied and the case shall proceed to discovery with regard to those defendants.

### C. Defendant Stallings' Motion for Judgment on the Pleadings

Defendant Stalling argues that the "majority of Plaintiffs' allegations are 'threadbare' and therefore not entitled to the assumption of truth," pursuant to the first prong in *Iqbal*. Memorandum of Law in Support of Defendant Stallings' Motion for Judgment on the Pleadings, Doc. No. 56-1, at 5 ("Defendant Stallings' Memo") (citing *Iqbal*, 556 U.S. at 679). Defendant Stallings further argues that other than one statement describing the responsibilities of the Hartford Board of Education, the "Complaint contains no further reference to actions or inactions by the Hartford Board or Chairman Stallings." *Id.* at 5.

Plaintiffs argue that they have "pled sufficient facts" to survive Defendant Stallings' motion. Plaintiffs further argue that they easily meet the Supreme Court's plausibility standard in *Twombly* and *Iqbal* because the determination whether claims are plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Plaintiffs' Combined Response, Doc. No. 62, at 28 (citing *Iqbal*, 556 U.S. at 679).

Plaintiffs do not appear to have pled any material allegations against the Hartford Board of Education or Defendant Stallings in the Complaint. The Complaint contains no allegations regarding the interplay between the Hartford Board and the administration of the RSCO lottery or the creation of the policy being challenged. Therefore, I dismiss the claims against the Hartford Board of Education and Defendant Stalling without prejudice.

D. Standing

**\*8** After the October 16, 2018 hearing, I requested supplemental briefing on the issue of standing. *See* October 29, 2018 Order, Doc. No. 72.

To have standing, Plaintiffs must show that (1) they suffered a concrete injury; (2) there is a causal connection between the alleged injury and challenged conduct; and (3) the injury can be redressed. *United States v. Hays*, 515 U.S. 737, 743 (1995). It appears that the parties only dispute the second element because they all address the causal connection between considerations regarding race in student admissions to Hartford's magnet schools.

In their supplemental brief, Plaintiffs argue that they have standing to pursue both counts. They contend that they have standing to challenge the cap on minority students because they applied, and were denied admission, to Hartford magnet schools, and that Hartford's use of a cap on minority students "enacts a discriminatory barrier that deprives them of equal treatment in the admissions process." Plaintiffs' Supplemental Brief, Doc. No. 76, at 4. They further argue that "an invalidation of the quota would mean that Plaintiffs will no longer have to compete for seats on the basis of race" and therefore their "injury is redressable by a favorable court decision." *Id.* at 10. Plaintiffs argue that they have standing to challenge the lottery because the lottery and the cap on minority students are "inextricably linked", meaning that the cap applies to the racial composition of the student population overall, so even if the race of students in Hartford is not taken into account, the use of race in the lottery still affects how many minority students can be admitted overall. *Id.* at 12.

State Defendants argue that Plaintiffs have standing to pursue their claim regarding the cap on minority students, but do not have standing to pursue their claim regarding the use of race in the RSCO lottery because students in Hartford are considered according to entirely race-neutral criteria, as explained in detail in the Peterson affidavit. State Defendants' Supplemental Brief, Doc. No. 78, at 3–4. Intervenors argue that Plaintiffs lack standing on both counts because they were denied admission based on race-neutral criteria, and that Hartford students are not subject to the aspect of the lottery process that considers neighborhood demographics. Intervenors' Supplemental Brief on Standing, Doc. No. 77, at 1–2. Defendant Stallings does not argue the issue of standing. *See* Def. Stallings' Response to Court's Request for Supplemental Briefing on the Issue of Plaintiffs' Standing, Doc. No. 74, at 1.

As discussed above, I cannot consider the Peterson affidavit at this stage in the pleadings. Plaintiffs have standing to pursue both counts because the cap on minority students appears to have a direct effect on the number of minority students that will be admitted through the lottery, and, on its face, the policy is alleged to take race into account. Therefore, the issue of standing cannot be resolved at this stage of the case and can be raised following appropriate discovery.

E. Certification

At the status conference on May 10, 2018, I requested that the parties provide briefing regarding (a) whether I should certify questions to the Connecticut Supreme Court, and (b), if so, what questions should be certified. *See* May 10, 2018 Conference Memorandum, Doc. No. 39. The State Defendants request that I certify six questions, and/or any others I wish to formulate, to the Connecticut Supreme Court pursuant to Conn. Gen. Stat. § 51-199b. State Def's Motion, Doc. No. 34-1, at 4-5. [8]

**\*9** Under Connecticut law, "[t]he Supreme Court may answer a question of law certified to it by a court of the United States ... if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Conn. Gen. Stat. § 51-199b(d). "Th[at] statute grants the Connecticut Supreme Court discretion to review a certified question under certain circumstances; it does not demand that a court certify a question." *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 164 (D. Conn. 2014) (Hall, C.J.). Rather, "the decision to certify a question of law to [ ] Connecticut's highest court is within th[e] [district] [c]ourt's discretion." *Lopez v. Smiley*, 375 F. Supp. 2d 19, 26 (D. Conn. 2005) (Kravitz, J.). I have "discretion to certify questions ... even where ... the parties have not requested certification." *See Beck Chevrolet Co. v. GM LLC*, 787 F.3d 663, 681–82 (2d Cir. 2015).

In deciding whether to certify, a federal court should consider, among other factors, "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation." *O'Mara v. Town of Wappinger*, 485 F.3d 693, 698 (2d Cir. 2007). The Second Circuit "ha[s] long recognized that state courts should be accorded the first opportunity to decide significant issues of state law through the certification process, and that, especially where the issues implicate

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 27 of 89

**Robinson v. Wentzell, Not Reported in Fed. Supp. (2019)**

the weighing of policy concerns, principles of comity and federalism strongly support certification." *Cadle Co. v. Fletcher*, 804 F.3d 198, 202 (2d Cir. 2015). "Certification is especially important in categories of cases where, unless there is certification, the state courts are substantially deprived of the opportunity to define state law." *Munn v. Hotchkiss Sch.*, 795 F.3d 324, 334 (2d Cir. 2015).

Federal courts "do not certify every case that meets th[o]se criteria," however, and "even when it is otherwise desirable, [certification] has its costs and may in some instances be foregone." *See O'Mara*, 485 F.3d at 698; *City of Burlington v. Indem. Ins. Co. of N. Am.*, 346 F.3d 70, 75 n.4 (2d Cir. 2003) (Calabresi, J.). "Where possible, it is [my] responsibility to predict how the forum state's highest court would rule." *O'Mara*, 485 F.3d at 698 (citing *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005) ).

In the interests of efficiency and judicial economy, I choose not to certify these questions to the Connecticut Supreme Court. These motions have been pending for several months and certification would slow down the proceedings because the Connecticut Supreme Court would need time to work through the complex issues in the case. It is also unclear whether certification would promote the resolution of the federal causes of action raised in this action. Therefore, the proposed questions shall not be certified at this time.

## IV. Conclusion

For the foregoing reasons, I am unable to hold that Plaintiffs lack standing at this point. I choose not to certify any questions to the Connecticut Supreme Court. The State Defendants' and Intervenors' motions for judgment on the pleadings are denied because it would be inappropriate to review Defendant Peterson's affidavit at this stage in the litigation, and therefore the question whether State Defendants actions were narrowly tailored and based on a compelling state interest remains open. The claims against the Hartford Board of Education and Defendant Stallings are dismissed without prejudice to repleading within 30 days.

So ordered.

## All Citations

Not Reported in Fed. Supp., 2019 WL 1207858

---

## Footnotes

1    Because the Governor of Connecticut and Attorney General of Connecticut are sued in their official capacities, Ned Lamont is substituted for Dannel Malloy and William Tong is substituted for George Jepsen.

2    "Sheff Region" is defined in the Phrase III Stipulation in *Sheff v. O'Neill*, as: "[a]s defined in the original complaint, the Sheff Region includes the school districts of Avon, Bloomfield, Canton, East Granby, East Hartford, East Windsor, Ellington, Farmington, Glastonbury, Granby, Hartford, Manchester, Newington, Rocky Hill, Simsbury, South Windsor, Suffield, Vernon, West Hartford, Wethersfield, Windsor, and Windsor Locks. For purposes of meeting compliance requirements pursuant to [the Phase III Stipulation], other school districts outside the Sheff Region and their resident students shall participate in Sheff-related school choice programming through the Regional School Choice Office and students attending such schools/programs shall be counted for purposes of compliance with this Stipulation." *See* Doc. No. 34-2, Exhibit A to State Defendants' Motion for Judgment on the Pleadings, at 4-5.

3    In support of that contention, Intervenors cite to a Superior Court order regarding a motion in limine that states, "The court understands the state's desire to clarify or restrict the subject matter of the hearing. However, the future path for this case is dependent upon evidence received at the hearing and any limitation at this stage is unwarranted. The motion is thus denied." Exhibit J to Intervenor's Motion, Doc. No, 58-12, Superior Court Order.

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 28 of 89

**Robinson v. Wentzell, Not Reported in Fed. Supp. (2019)**

4    Plaintiffs do not object to my consideration of Intervenors' exhibits G, H, and J, which are orders of the Superior Court. *See* Plaintiffs' Combined Response, Doc. No. 62, at 7, fn. 6. Exhibits G and H are also referenced in Plaintiffs' Complaint.

5    It is, however, proper to take judicial notice of any pertinent state statutes, judicial orders and opinions, and the *Sheff* stipulations and orders because those documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201 Judicial Notice of Adjudicative Facts, 1 Federal Evidence Rule 201(b)(2).

6    Intervenors argue that the *Sheff* remedies do not classify students based on race, but instead use race-neutral methods to achieve diversity, "including the mere consideration of school and neighborhood demographics, which the Supreme Court has recognized and are not subject to strict scrutiny." Intervenors' Motion, Doc. No. 58-1, at 17. Intervenors argue that the reduced isolation standard is "simply a tool that the *Sheff* court and parties use to determine whether a school is racially isolated." *Id.* However, because magnet school programs that fail to integrate risk losing funding, as measured by whether there are more than 75% black and Hispanic students enrolled in a school, the policy is facially discriminatory, and thus strict scrutiny applies to the policy at issue here.

7    State Defendants first argue that the policy at issue complies with guidelines issued by the United States Department of Justice. State Defs' Memo, Doc. No. 34-1, at 16-17. The guidelines encouraged the use of race to achieve diversity in K-12 education. *Id.* The guidelines were rescinded, however, on July 3, 2018. *See* Doc. No. 61. Therefore, the guidelines cannot be relied upon in a narrow tailoring analysis.

8    The Hartford Board submitted a separate list of questions, with several of the questions overlapping with the State Defendants' questions. Defendant Stallings' Memo, Doc. No 56-1, at 8.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    8

# EXHIBIT D

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 30 of 89

Neewra, Inc. v. Manakh Al Khaleej General Trading and..., Not Reported in...

2004 WL 1620874
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

NEEWRA, INC., Plaintiff,

v.

MANAKH AL KHALEEJ GENERAL TRADING
AND CONTRACTING CO., Kuwait Finance House,
Emirates Airlines, and Aramex International, Defendants.

No. 03 Civ. 2936(MBM).
|
July 20, 2004.

**Attorneys and Law Firms**

Harry H. Wise, III, New York, NY, for Plaintiff.

Richard A. Cirillo, Karen R. Kowalski, King & Spaulding LLP, New York, NY, for Defendant Kuwait Finance House.

OPINION AND ORDER

MUKASEY, J.

**\*1** Plaintiff Neewra, Inc. ("Neewra") sued defendants Manakh al Khaleej General Trading and Contracting Co. ("Manakh"), Kuwait Finance House ("KFH"), Emirates Airlines, and Aramex, after Manakh failed to pay for $2.5 million worth of software that Neewra sent to Manakh in Kuwait. KFH now moves to dismiss the complaint against it for lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. For the reasons stated below, KFH's motion is granted, and Neewra's complaint against KFH is dismissed.

I.

The following relevant facts have been construed in the light most favorable to Neewra. To the extent necessary, the court has drawn logical inferences from the record to fill gaps in the parties' presentation of the facts.

In early 2000, Neewra, a New York corporation, contracted to supply 1,000 units of software to Manakh, a Kuwaiti company, in exchange for $2.5 million. (Affidavit of Arween Sahni ("Sahni Aff.") ¶¶ 1–3) Before committing to the contract, Manakh asked Neewra to sell it a sample of the software in February 2002; Neewra sent the sample without arranging to be paid before delivery. (Id. ¶ 4) Instead, Neewra's president and sole owner, Arween Sahni, contacted ABN Amro Bank in New York and asked it to arrange an international collection [1] of the $2,500 payment. (Id. ¶ 5) Sahni told ABN Amro that KFH should be designated as the consignee, which meant that ABN Amro would send the necessary documents to KFH in Kuwait, and KFH would deliver them to Manakh in exchange for the $2,500 payment. (Id., Ex. A) ABN Amro instructed KFH to deliver the documents against payment and then remit payment to one of several ABN AMRO accounts. (Declaration of Harry H. Wise, III ("Wise Decl."), Ex. C)

Manakh received the software sample in Kuwait and told Neewra that it was acceptable, and so Neewra went ahead with the main transaction for 1,000 units of software. (Sahni Aff. ¶ 6) Sahni delivered the software to Aramex, a freight forwarding company. (Id.) Aramex gave Sahni duplicate originals of the air waybill and then shipped the software to Kuwait via Emirates Airlines. (Id .) Sahni then prepared the necessary documents for a second collection, including an original air waybill, and delivered them to ABN Amro. (Id. ¶ 7) Sahni told ABN Amro that the documents should be sent to KFH in Kuwait, and KFH was to release the documents to Manakh in exchange for $2.5 million, which ABN ultimately was to transfer to Neewra's account with Banco Popular in New York. (Id., Ex. B) ABN Amro sent the relevant documents to KFH with instructions to deliver the documents to Manakh in exchange for $2.5 million, and ABN again told KFH to remit the payment to one of several ABN Amro accounts. (Wise Decl., Ex. F)

In early March, KFH remitted Manakh's $2,500 payment for the software sample to an ABN Amro account in Chicago, Illinois. (Id., Exs. C, D) KFH had sent this money to ABN Amro through its correspondent account [2] at Citibank, N.A., in New York. (Id., Exs. A, D, E) However, although Manakh had obtained the software in Kuwait, a $2.5 million payment never arrived from KFH. (Sahni Aff. ¶ 9) Neewra later learned that Manakh had never paid KFH for the second set of documents (id. ¶ 10), and it now claims that KFH gave Manakh those documents without requiring that Manakh make any payment. (Compl.¶ 14) According to Neewra, Manakh used the documents it received from KFH to prepare forgeries that enabled it to obtain possession of the software from Emirates Airlines in Kuwait City, Kuwait. (Id. ¶¶ 15–16)

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 31 of 89

Neewra, Inc. v. Manakh Al Khaleej General Trading and..., Not Reported in...

**\*2** KFH is a public shareholding corporation organized and existing under the laws of Kuwait. (Declaration of Anwar Al–Fuzaie ("Al Fuzaie Decl.") ¶ 2) Its headquarters are in Kuwait City, Kuwait, and it is subject to the supervision and regulation of the Kuwaiti government. (*Id.*) KFH engages principally in banking services and real estate construction, leasing, and investing activities on its own behalf and for third parties, as well as in financial trading activities. (*Id.*) KFH has not been authorized by the New York Secretary of State to do business in New York. (*Id.* ¶ 3) KFH has no office or employees in New York, does not advertise or maintain telephone listings in New York, and does not own property in New York. (*Id.*) However, as described above, KFH does maintain a correspondent account with Citibank, N.A., in New York. (*See* Wise Decl., Ex. A, D, E) In addition, KFH boasts on its website that its investments "include various places in Asia, Europe, [and the] United States of America" and that its chairman "highlighted the significance of the American market and the success, which KFH achieved therein through investment in real estate and investment portfolios and funds, which are still operating and achieving highest returns for KFH and its customers." (*Id.*, Ex. B, at 2) With respect to the transactions at issue here, KFH sent and received communications in Kuwait and did not attend any meetings in New York. (Al Fuzaie Decl. ¶ 7) All KFH personnel who have knowledge about this transaction are located in Kuwait. (*Id.* ¶ 8)

On April 25, 2003, Neewra filed this action, which includes claims of conversion and negligence against KFH. (Compl.¶¶ 17–18, 22–23) On November 12, 2003, KFH filed this motion to dismiss, arguing that this court lacks personal jurisdiction over it and that dismissal is appropriate also under the doctrine of *forum non conveniens.*

## II.

A plaintiff served with a Rule 12(b)(2) motion to dismiss bears the burden of establishing that the court has jurisdiction over the defendant, a burden it may carry by making "prima facie showing" of jurisdiction. *Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir.2001). The plaintiff can make this prima facie showing by pleading, in good faith, legally sufficient allegations of jurisdiction through its own affidavits and supporting materials. *Id.* Where the issue of jurisdiction is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff, and any doubts

are resolved in the plaintiff's favor. *Id.* Accordingly, the following facts, which are drawn from the parties' affidavits and supporting materials, are construed in the light most favorable to Neewra. [3] Because Neewra's factual allegations are "deemed true to test the jurisdictional *theory* of the complaint," the court is not now conducting an inquiry into disputed jurisdictional facts. *Credit Lyonnais Securities (USA), Inc. v. Alcantara,* 183 F.3d 151, 154 (2d Cir.1999) (emphasis in original). If its jurisdictional theory proves to be sound, Neewra "still must prove the jurisdictional facts by a preponderance of the evidence, either at an evidentiary hearing or at trial." *Id.*

## III.

**\*3** To determine whether KFH, a foreign corporation, is subject to jurisdiction in New York, this court must first determine whether there is jurisdiction over KFH under New York law and then decide whether such an exercise of jurisdiction would be consistent with federal due process. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999). Although Neewra argues that New York courts have jurisdiction over its cause of action under either subsection (1) or subsection (3) of N.Y. C.P.L.R. ("CPLR") § 302(a) (McKinney 2003), neither provision supports the exercise of jurisdiction over KFH. Accordingly, this court lacks jurisdiction over KFH under New York law and therefore need not determine whether the exercise of jurisdiction would meet due process requirements.

### A. *CPLR § 302(a)(1)*

According to Neewra, this court has jurisdiction over KFH under either prong of CPLR 302(a)(1), which allows a court to exercise personal jurisdiction over a non-domiciliary who "[1] transacts any business within the state or [2] contracts anywhere to supply goods or services in the state," provided that the cause of action also arises from those acts. *Id.* As will be discussed in more detail below, neither prong provides a basis for the exercise of jurisdiction over KFH here.

#### 1. *Transacting Business Within New York*

Under the "transacting business" prong of CPLR § 302(a)(1), a court in New York may exercise jurisdiction over a non-domiciliary if "1) the defendant transacts business in New York, and 2) the cause of action arises out of that business activity, such that an articulable nexus exists between them."

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 32 of 89

Neewra, Inc. v. Manakh Al Khaleej General Trading and..., Not Reported in...

*Credit Lyonnais,* 183 F.3d at 153 (internal brackets and quotation marks omitted). "A defendant transacts business in New York when he 'purposefully avails' himself of the privilege of conducting business there, thus invoking the benefits and protections of New York law." *Id.* at 153–54. Courts look at the totality of circumstances surrounding a party's interactions with, and activities within, New York to determine whether it "transacted business" within this state. *Bank Brussels Lambert,* 171 F.3d at 787. "A cause of action arises out of a defendant's transaction of business in New York for purposes of Section 302(a)(1) when there exists an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 23 (2d Cir.2004) (internal quotation marks omitted).

In this case, KFH's only relevant connection to New York is its correspondent account with Citibank, which it used to transfer Manakh's $2,500 payment for a software sample to ABN Amro's account in Chicago, and which it presumably would have used to transfer the $2.5 million payment to ABN Amro, had that payment been collected. A foreign bank's mere maintenance of a correspondent account with a bank in New York, without more, is not enough to establish jurisdiction under CPLR § 302(a)(1). *See Faravelli v. Bankers Trust Co.,* 85 A.D.2d, 355, 339, 447 N.Y.S.2d 962, 965 (1st Dep't 1982), *aff'd,* 59 N.Y.2d 615, 463 N.Y.S.2d 194 (1983). On the other hand, "a cause of action arising out of a transaction involving the *use* of a correspondent account may confer jurisdiction over defendant in New York." *Chase Manhattan Bank v. Banque Generale du Commerce,* No. 96 Civ. 5184(KMW), 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997) (emphasis in original).

 *4 According to Neewra, this cause of action, like the one in *Chase Manhattan Bank,* arises out of a transaction involving KFH's use of its correspondent account with Citibank because KFH used that account to transfer the $2,500 payment for a software sample to ABN Amro. (*See* Plaintiff's Memorandum of Law in Opposition ("Pl.Memo.") at 9) What Neewra fails to recognize, however, is that the collection of the $2,500 payment for a sample was a different transaction from the later, unsuccessful attempt to collect the $2.5 million. From Neewra's perspective, of course, these two collections were part of the same business transaction because both were made in furtherance of Neewra's agreement to sell software to Manakh. [4] However, KFH, which received two separate sets of instructions from ABN Amro about the two collections, had no basis for concluding that the $2,500 and

$2.5 million collections were related to the same business transaction, rather than to different transactions between the same parties. (*See* Wise Decl., Exs. C, F) Here, KFH entered into two separate agreements with ABN Amro to perform two separate collections on behalf of Neewra, and under these circumstances, Neewra's cause of action arises only from transactions involving the second collection of $2.5 million and not out of transactions involving the first, successful collection of $2,500. *See Goldmark Plastics Int'l, Inc. v. Poly Line, Inc.,* No. 97 Civ. 5568(JG), 1998 WL 817693, at *2 (E.D.N.Y. Feb. 4, 1998) (explaining that cause of action based on breach of contract arose only from the contract that was breached and not also from a separate contract that the same parties entered into "almost contemporaneously"). Accordingly, only KFH's activities in New York that related to the failed second collection may be considered for the purpose of determining whether jurisdiction exists under CPLR § 302(a)(1).

Neewra argues that KFH transacted business in New York with respect to the second collection by maintaining a correspondent account in the state that it would have used to transfer the $2.5 million payment to ABN Amro if the collection had gone according to plan. (Pl. Memo. at 9) However, even assuming *arguendo* that KFH would have transacted business in New York if it had actually used its correspondent account to transfer money for the second collection, this never in fact occurred and thus cannot constitute the transaction of business in New York.

The Appellate Division, First Department, addressed a similar set of facts in *Faravelli,* a case which involved an Indian bank that sent documents to a New York bank with instructions to remit payment to the Indian bank's correspondent account in New York. 85 A.D.2d at 336, 447 N.Y.S.2d at 964. In *Faravelli,* as here, the foreign bank's correspondent account in New York would have been used if the collection had unfolded as planned, but the collection was never completed, and accordingly the correspondent account was never actually used in the transaction. *Id.* The *Faravelli* court never acknowledged the possibility that the correspondent account's intended involvement in the collection, without any actual involvement, could be considered evidence that the Indian bank transacted business in this state, and indeed the court described the bank's "sole nexus" with New York as "the transmittal of the documents calling for payment on the letter of credit and the maintenance of correspondent accounts with three or four banks in New York City." 85 A.D.2d at 338, 447 N.Y.S.2d at 965.

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 33 of 89

Neewra, Inc. v. Manakh Al Khaleej General Trading and..., Not Reported in...

**\*5** Like the *Faravelli* court, I do not consider KFH's correspondent account's potential but unrealized involvement in the second collection to constitute activity in New York that is relevant to the question of jurisdiction. That KFH probably would have used its correspondent account to transfer money to ABN Amro if the collection had gone forward does not mean that KFH has purposefully availed itself of the privilege of conducting business in New York; at most, it shows only that KFH might have so availed itself if circumstances had been different. Because the relevant inquiry for the first prong of CPLR § 302(a)(1) is whether a foreign domiciliary actually transacted business in New York, not whether it might have done so in a hypothetical situation that never occurred, KFH's did not engage in any activities in New York that were relevant to the second collection, apart from maintaining a correspondent account with Citibank. As discussed above, a foreign bank's maintenance of a correspondent account in New York, without more, is not enough to establish jurisdiction under the first prong of CPLR § 302(a)(1), and accordingly this prong does not provide a basis for the exercise of jurisdiction over KFH.

2. *Contract to Supply Goods or Services in New York*

Neewra argues also that jurisdiction is appropriate under the second prong of CPLR § 302(a)(1) because KFH contracted to supply services in New York when it accepted ABN Amro's collection request, which required KFH to send Manakh's money to ABN Amro for ultimate receipt by Neewra in New York. (Pl. Memo. at 10) According to Neewra, KFH's commitment to send the money to ABN Amro through normal banking channels should be considered a contract for services that is analogous to a financial guaranty payable in New York (*id.* at 10–11), which the Second Circuit has construed as a contract to perform services within the meaning of § 302(a)(1). *See A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 80–81 (2d Cir.1993). Neewra's attempt to analogize KFH's role in the collection to a guaranty does not survive scrutiny.

Black's Law Dictionary (8th ed.2004) defines a guaranty as "[a] promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance." *Id.* In this case, there is absolutely no indication that KFH guaranteed Manakh's payment to Neewra by assuming liability for Manakh's debt in the event Manakh failed to pay. Indeed, Neewra does not allege that KFH made such a promise; Neewra claims only, without explanation, that KFH's agreement to forward payments it received from Manakh to ABN Amro is "no

different from the guaranty situation." (Pl. Memo. at 10) As the above definition indicates, KFH's agreement to send money to ABN Amro is different from a guaranty, and so Neewra's invocation of guaranty cases does not establish that this agreement should also be considered a contract to provide services in New York that gives rise to jurisdiction. *Cf. Semi Conductor Materials, Inc. v. Citibank Int'l PLC,* 969 F.Supp. 243, 247 (S.D.N.Y.1997) (explaining that plaintiff's reliance on guaranty cases was unavailing because plaintiff's case did not concern the breach of a guaranty agreement).

**\*6** Neewra does not suggest any other basis for concluding that KFH contracted to provide goods or services in New York, and the court can see no rationale which would support such a conclusion. Accordingly, this cause of action does not arise out of any contract by KFH to supply goods or services in this state, and the second prong of CPLR § 302(a)(1) therefore does not provide a basis for the exercise of jurisdiction over KFH.

B. *CPLR § 302(a)(3)*

In addition to arguing that jurisdiction is proper under either prong of CPLR § 302(a)(1), Neewra argues also that jurisdiction is proper under § 302(a)(3)(ii), which provides for jurisdiction over a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state ..., if he ... expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." *Id.* KFH contends that § 302(a)(3) does not apply in this case for two reasons: (1) KFH's alleged wrongs were contractual in nature, rather than tortious, and (2) Neewra's injury occurred in Kuwait, not in New York. (Defendant KFH's Memorandum of Law in Support of Its Motion at 8–10)

At first glance, this court, like KFH, is hard-pressed to discern how KFH's mishandling of the collection in Kuwait could give rise to a tort claim instead of a breach of contract claim. However, *Zhejiang Tongxiang Import & Export Corp. v. Asia Bank, N.A.,* No. 98 Civ. 8288(JSM), 2001 WL 66331 (S.D.N.Y. Jan. 25, 2001), suggests that KFH's wrongful surrender of Neewra's documents to Manakh might constitute conversion. *See id.* at \*4 (explaining that collecting bank's release of documents before payment constituted conversion when bank was required to release the documents—bills of lading—only after payment). Accordingly, this court assumes, without so deciding, that KFH's alleged wrong in this case—releasing Neewra's documents to Manakh in

Case 1:23-cv-07222-LTS-GWG Document 21-1 Filed 10/24/23 Page 34 of 89

Neewra, Inc. v. Manakh Al Khaleej General Trading and..., Not Reported in...

Kuwait without obtaining the requisite payment—could be considered "a tortious act without the state." CPLR § 302(a)(3).

The next question is whether KFH's tortious act in Kuwait "caus[ed] injury to person or property within the state." CPLR § 302(a)(3). To determine whether there is injury in New York sufficient to warrant CPLR § 302(a)(3) jurisdiction, courts must generally apply a "situs-of-injury" test to determine where the original event that caused the injury occurred. *Whitaker,* 261 F.3d at 209. "The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff." *Id.* (internal brackets and quotation marks omitted). "The occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York." *Id.*

**\*7** In its brief, Neewra appears not to recognize that an "original event which caused the injury" is not necessarily the same as the final injury itself, despite the Second Circuit's instruction that such an " 'original event' is ... generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Bank Brussels Lambert,* 171 F.3d at 791. In this case, the distinction between the original event that caused injury and the injury Neewra felt is critical. No one could seriously dispute Neewra's contention that it suffered financial injury in New York; Neewra is located here, and it was here that Neewra felt the financial consequences of KFH allegedly tortious mishandling of the collection. However, Neewra's financial injury here cannot be considered "the original event which caused the injury" or the first effect of KFH's tort. Instead, the first effect of KFH's mishandling of the collection, and the relevant injury for the purposes of CPLR § 302(a)(3), occurred in Kuwait when Manakh successfully obtained the air waybill without being required to pay $2.5 million. *See Popper v. Podhragy,* 48 F.Supp.2d 268, 274 (S.D.N.Y.1998) (concluding that, for the purposes of CPLR § 302(a)(3), injury occurred where the conversion actually occurred, not where the plaintiff suffered financial loss). This "original event" then caused Neewra financial harm in New York because KFH, left with neither air waybill nor payment, had nothing to send to ABN Amro. Therefore, although Neewra suffered financial consequences here, the situs of Neewra's injury was Kuwait, not New York. *See Fantis Foods, Inc. v. Standard Importing Co., Inc.,* 49 N.Y.2d 317, 325–27, 425 N.Y.S.2d 783, 786–87 (1980) (New York company's indirect financial loss did not

establish injury in New York for purposes of § 302(a)(3) when loss was caused by conversion of feta cheese which occurred either in Greece or on the high seas). Because Neewra has thus failed to allege an injury in New York that can serve as a basis for jurisdiction under § 302(a)(3), that subsection does not provide a justification for the exercise of jurisdiction in this case.

### IV.

Neewra argues in the alternative that this court "should allow discovery of the extent of the contacts of KFH with the United States in general and with New York State in particular." (Pl. Memo. at 13) According to Neewra, KFH's website, which mentions KFH's "investment in real estate and investment portfolios and funds" in the United States and "the significance of the American market" to KFH, shows that KFH may be subject to personal jurisdiction in New York under CPRL § 301 because it is "doing business" in this state. (Wise Decl., Ex. B. *See* Pl. Memo. at 13)

Under CPLR § 301, this court may exercise jurisdiction over KFH "if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 33, 563 N.Y.S.2d 739, 741 (1990). To determine whether a foreign corporation is "doing business" in this state, courts look at several traditional indicia, including "whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 98 (2d Cir.2000).

**\*8** KFH has submitted a declaration from Anwar Al–Fuzaie, the head of its legal department, which reveals KFH's contacts with New York to be minimal. KFH does not have an office in New York, does not own property in New York, does not have a telephone listing in New York, does not advertise in New York, and does not have employees in New York. (Al–Fuzaie Decl. ¶ 3) KFH is also not incorporated, licensed, or authorized by the New York Secretary of State to do business in this state. (*Id.*) Indeed, KFH's only contact with New York appears to be its correspondent account at Citibank, which is insufficient, without more, to show that KFH was doing business in New York. *See Nemetsky v.*

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 35 of 89

Neewra, Inc. v. Manakh Al Khaleej General Trading and..., Not Reported in...

*Banque de Developpement de la Republique du Niger,* 48 N.Y.2d 962, 964, 425 N.Y.S.2d 277, 277 (1979) (mem.). Neewra has provided no concrete facts that discredit Al–Fuzaie's declaration, although Neewra speculates that Al–Fuzaie's declaration "may well be false" because KFH's website contains broad claims about KFH's investments in the United States as a whole. (Pl. Memo. at 13) However, KFH's claims on its website, which does not include any statements specific to New York, do not contradict any statements in Al–Fuzaie's sworn declaration and also do not establish that KFH was doing business in New York in a systematic and continuous way. "Whatever speculations or hopes plaintiff may have that further connections to New York will come to light in discovery, plaintiff has not provided sufficient facts to establish the jurisdiction that is a prerequisite to any such discovery." *Rosenberg v. PK Graphics,* No. 03 Civ.

6655(NRB), 2004 WL 1057621, at *1 (S.D.N.Y. May 10, 2004). Accordingly, Neewra may not conduct discovery of KFH's contacts with New York.

For the reasons stated above, this court may not exercise jurisdiction over KFH under New York law and thus need not address KFH's other arguments about its due process rights and the applicability of the doctrine of *forum non conveniens.* KFH's Rule 12(b)(2) motion is granted, and Neewra's action against KFH is dismissed for lack of personal jurisdiction.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1620874

## Footnotes

1  According to The Uniform Rules for Collections, 1995 Revision, ICC Publication No. 522, a "collection" occurs when banks handle documents, in accordance with instructions received, in order to obtain payment and/or acceptance; deliver documents against payment and/or acceptance; or deliver documents on other terms or conditions. (Declaration of Anwar Al–Fuzaie ("Al Fuzaie Decl."), Ex., at § A–2–a) The documents involved in a collection may be either financial documents—bills of exchange, promissory notes, checks, or other instruments for obtaining the payment of money—or commercial documents, such as invoices, transport documents, documents of title, or other non-financial documents. (*Id.* at § A–2–b)

2  "Correspondent accounts are accounts in domestic banks held in the name of the foreign financial institutions." *Sigmoil Resources, N.V. v. Pan Ocean Oil Corp. (Nigeria),* 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996). "Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions." *Id.*

3  Neewra's attorney, Harry H. Wise III, submitted a nine-page declaration containing assorted statements that relate to personal jurisdiction over KFH and to Neewra's claims against KFH. However, Wise concedes at the beginning of his declaration that "[s]ome of the facts, it will be clear, are not asserted by me upon personal knowledge, but rather upon my information and belief, based on my review of the documents and conversations with various persons." (Wise Decl. ¶ 1) To the extent that Wise's declaration asserts facts that are not based on Wise's personal knowledge, this declaration will be disregarded. *See Zurich Am. Ins. Co. v. Dah Sing Bank, Ltd.,* No. 03 Civ. 7778(DLC), 2004 WL 1328215, at *1 n. 2 (S.D.N.Y. Jun. 15, 2004) (citing *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995)) (refusing to consider attorney affidavit that is not based on personal knowledge for the purposes of a Rule 12(b)(2) motion); *Kamen v. A.T. & T. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (refusing to consider attorney affidavit that is not based on personal knowledge for the purposes of a Rule 12(b)(1) motion). However, for the purposes of this motion, the court will consider the exhibits attached to Wise's declaration, to which KFH does not object. (*See* Reply Memorandum of Defendant KFH, at 1 n. 1)

4      Neewra even suggests that the $2,500 collection was a necessary prerequisite to the $2.5 million collection because the latter would not have occurred if Manakh had not inspired Neewra's confidence by paying for the sample. (Pl. Memo. at 9) However, Neewra's suggestion that the second collection was somehow dependent on the successful completion of the first is belied by the fact that KFH did not complete the first collection until early March, more than two weeks after Neewra initiated the second collection. (*See* Wise Decl., Exs. D, F)

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

2001 WL 815521
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Yaling CHEN, Plaintiff,

v.

TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, Defendant.

No. 00 Civ. 7532(RCC).
|
July 18, 2001.

Opinion and Order

CASEY, J.

**\*1** Plaintiff Yaling Chen ("Plaintiff") brought this action against the Trustees of Columbia University, an institution of undergraduate and graduate studies, located in the Southern District of New York, in New York City ("Defendant" or "Columbia") pursuant to the Rehabilitation Act of 1973, as amended, Title 29 of the United States Code, Section 794, alleging that she was terminated as an international graduate doctoral candidate ("Ph.D") in Columbia's Sociology Department due to a disability. Plaintiff seeks injunctive relief, accommodations for her disability, punitive and compensatory damages, attorney's fees and costs, and statutory damages for state and local claims pursuant to the New York State and City Human Rights Law. Defendants move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"). For the reasons discussed herein, the Court hereby converts Defendant's 12(c) motion to a motion for summary judgment.

I. *Federal Jurisdiction*

Federal jurisdiction is proper pursuant to Title 29 of the United States Code, Section 1331. This Court has supplemental jurisdiction over claims arising under state statutory law pursuant to Title 28 of the United States Code, Section 1367. Venue is proper pursuant to Title 28 of the United States Code, Section 1391(b).

II. *Standard*

In order for a party to succeed on a motion for judgment on the pleadings under Rule 12(c), which permits a party to move for judgment after the pleadings are closed but within such time as not to delay trial, a court must apply the same standard as on a Rule 12(b)(6) motion and "view the pleading in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994) (quoting *Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989)).

In order for a party to succeed on a motion to dismiss under Rule 12(b)(6), it must be clear that the plaintiff can prove no set of facts that would establish his or her claim for relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). When making a determination of whether a plaintiff can prove any set of facts which would entitle him or her to relief, a court must assume that the allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Cooper v. Pate,* 378 U.S. 546, 546 (1964); *Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). Vague and conclusory allegations are not sufficient. A complaint must "contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." *American Council of Learned Societies v. MacMillan, Inc.,* 1996 WL 706911, at \* 3. A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States,* 82 F.3d 23, 26 (2d Cir1996) (quoting *Hughes v. Rowe,* 449 U.S. 5, 10 (1980)). Given the nature of a Rule 12(b)(6) motion, which is addressed to the legal sufficiency of the complaint, courts generally confine their inquiry to the pleadings. However,

> **\*2** when matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material ... [A] district court may not consider affidavits and exhibits submitted by [the parties] or

[rely] on factual allegations contained in legal briefs or memoranda.

*Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (citations omitted).

Here, Defendant submitted additional exhibits not attached to or referenced in the complaint. Plaintiff followed similarly. While under a Rule 12(c) or Rule 12(b)(6) analysis, the Court would be expected to ignore these materials, here the Court finds that the more appropriate course of action is to convert the instant motion into one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and to give notice of such conversion to the parties, allowing them a reasonable time to present material pertinent to a summary judgment motion. *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999). Following additional briefing and/or discovery and after a careful, comprehensive viewing of all of the materials submitted to the Court, if the evidence viewed in the light most favorable to the Plaintiff shows "no genuine issue as to any material fact and that the [Defendants are] entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c), the Court sees no reason as to why summary judgment may not be granted.

Accordingly, the parties are directed to appear in Court at 500 Pearl Street, Courtroom 17B on Friday, August 17, 2001 at 9:30 AM for a conference to set a schedule for submitting additional materials to the Court.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 815521

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

2015 WL 5610752

United States District Court,
S.D. New York.

In re ACTOS END PAYOR
ANTITRUST LITIGATION.

No. 13–CV–9244 (RA).
|
Signed Sept. 22, 2015.

*OPINION & ORDER*

RONNIE ABRAMS, District Judge.

**\*1** This case concerns the purportedly anticompetitive effects of patent infringement litigation settlements between the brand manufacturer of prescription drugs used to treat diabetes and the brand's generic competitors. Plaintiffs are indirect purchasers of the drugs and bring this consolidated purported class action [1] on behalf of themselves and all others similarly situated against Defendants Takeda Pharmaceutical Company Limited, Takeda America Holdings, Inc., Takeda Pharmaceuticals U.S.A., Inc., and Takeda Development Center Americas, Inc. (collectively, "Takeda"), Mylan Inc. and Mylan Pharmaceuticals Inc. (together, "Mylan"), Actavis PLC (formerly known as "Actavis, Inc.") and Watson Laboratories, Inc. (together, "Actavis"), Ranbaxy Laboratories, Ltd. and Ranbaxy, Inc. (collectively, "Ranbaxy"), and Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (together "Teva"). Plaintiffs allege that Takeda (the "Brand"), Mylan, Actavis, and Ranbaxy (the "Generic Defendants"), and Teva (the "Authorized Generic") engaged in anticompetitive conduct designed to control and delay competition in the market for the diabetes drugs sold by Takeda under the brand names ACTOS and ACTO*plus* met in violation of various state antitrust, consumer protection, and unjust enrichment laws. [2]

Before the Court are Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint ("CAC") for failure to state a claim and on standing grounds. Dkt. 122, 124, 125, 131. For the reasons set forth below, the motions are granted.

**BACKGROUND** [3]

**I. Facts of the Case**

   **A. Industry Background**

Pursuant to the Food, Drug, and Cosmetic Act ("FDCA"), a branded drug manufacturer ("brand") must obtain approval from the Food and Drug Administration ("FDA") to sell a new drug product by filing a New Drug Application ("NDA"). The NDA must include information regarding the safety and effectiveness of the drug, as well as any applicable patents. 21 U.S.C. § 355(a), (b). At the time Takeda submitted its NDA for ACTOS, the relevant statute required it to list "any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." CAC ¶ 65 (citing 21 U.S.C. § 355(b)(1) (1999, 2002)). For patents that claimed a drug substance or product, the relevant FDA regulations provided that the NDA applicant submit "information only on those patents that claim a drug product that is the subject of a pending or approved application, or that claim a drug substance that is a component of such a product." 21 C.F.R. § 314.53(b) (1999, 2002). [4] For any approved new applications, the patent information provided by the NDA applicant is published by the FDA in *Approved Drug Products with Therapeutic Equivalence Evaluations,* commonly known as the "Orange Book." *See* 21 C.F.R. § 314.53(e).

**\*2** To facilitate the approval of generic drugs, under the Hatch–Waxman Amendments to the FDCA, a manufacturer seeking to market a generic version of a previously approved brand name drug need only file an Abbreviated New Drug Application ("ANDA"). The ANDA relies on the scientific findings included in the original NDA, but must establish that the generic drug contains the same active ingredients, route of administration, dosage, and strength, and is the "bioequivalent" of the listed drug. 21 U.S.C. § 355(j)(2).

The ANDA-filer is also required to consult the Orange Book and provide the FDA with information regarding the brand's patents. Any ANDA submitted must contain "an appropriate certification for each listed patent." 21 C.F.R. § 314.53(f). This requirement applies even where there is disagreement as to the accuracy of the patent information listed by the brand for a particular drug product.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Where there are no applicable patents, or the patents have expired or will expire prior to the ANDA's approval, the generic manufacturer may simply file a certification to that effect. 21 U.S.C. §§ 355(j)(2)(A)(vii)(I)-(III). But if those provisions do not apply, the generic must do one of two things to obtain approval. One option is to submit a "Section viii Statement," which asserts that the generic manufacturer will market the drug for one or more methods of use not covered by the brand's patents. *See* § 355(j) (2)(A) (viii). This option "is typically used when the brand's patent on the drug compound has expired and the brand holds patents on only some approved methods of using the drug." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* ––– U.S. ––––, ––––, 132 S.Ct. 1670, 1677, 182 L.Ed.2d 678 (2012). Accordingly, the generic will propose a label that " 'carves out' from the brand's approved label the still-patented methods of use." *Id.; 21 C.F.R. § 314.94(a)(8)(iv).* If the FDA accepts the label, the generic can place the drug on the market for those approved uses only. *Caraco Pharm. Labs.,* 132 S.Ct. at 1677. The FDA will not, however, approve an ANDA if the generic's proposed carve-out label overlaps with the brand's use code; notably, that use code is provided by the brand and is not independently reviewed by the FDA. *Id.* (citing 68 Fed.Reg. 36682–36683 (2003)). "Thus, whether section viii is available to a generic manufacturer depends on how the brand describes its patent." *Id.*

In the alternative, the generic may file a "Paragraph IV Certification," providing that the listed patent "is invalid or will not be infringed by the manufacture, use, or sale of the [generic] drug." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The generic will use this option if it wants to market the drug for all uses (instead of carving out the still-patented uses), or if it cannot adopt a viable carve-out, *Caraco Pharm. Labs.,* 132 S.Ct. at 1677. Where a patent contains both a product and a method of use claim, the generic may file a Paragraph IV Certification as to the product claim and a Section viii Statement (and proposed "carve-out" label) as to the method of use claim. *See Watson Labs., Inc. v. Sebelius,* 2012 WL 6968224, at *4 n. 3 (D.D.C. Oct.22, 2012).

**\*3** The filing of a Paragraph IV Certification is treated under the Hatch–Waxman Act as an act of infringement of the brand's patent, and gives the brand the immediate right to sue. *See* 35 U.S.C. § 271(e)(2)(A). Once the brand sues, the FDA generally cannot approve the ANDA until 30 months pass or the litigation is resolved in favor of the generic. *See* 21 U.S.C. 355(j)(5)(B)(iii).

Generic manufacturers challenging the validity of a patent claimed by the brand have recourse under the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA"). The MMA authorizes a generic sued for patent infringement to "assert a counterclaim seeking an order requiring the [brand] to correct or delete the patent information submitted by the [brand] under subsection (b) or (c) [of § 355] on the ground that the patent does not claim either-(aa) the drug for which the [brand's NDA] was approved; or (bb) an approved method of using the drug." 21 U.S.C. § 355(j)(5)(C)(ii)(I); *see also Caraco Pharm. Labs.,* 132 S.Ct. at 1678. If successful, the generic may thus obtain a judgment directing the brand to remove the patent information blocking the FDA's approval of the generic drug product.

In recognition of the uncertainty and expense a generic manufacturer faces when initiating a patent infringement suit, the Hatch–Waxman Act provides the first generic filer of a Paragraph IV Certification with a special benefit: the FDA may not approve a subsequent generic ANDA until 180 days after that so-called first-filer enters the market. 21 U.S.C. § 355(j)(5)(B)(iv). If there are multiple first-filers, they share this exclusivity period. *Id.* During that period, no other generics may enter the market. This exclusivity period does not, however, preclude entry by so-called "authorized generics," which are sold by the brand or through a licensed third-party generic drug manufacturer. CAC ¶ 85.

Despite the protections provided by the statutory scheme to generic manufacturers, Plaintiffs allege that brand manufacturers may nonetheless "game the system" by suing generic drug manufacturers under the Hatch–Waxman Act not to enforce a valid patent, but with the goal of delaying generic drug competition. CAC ¶ 75. Prior to the enactment of the MMA, the first generic filer could assist the brand manufacturer by delaying not only its own market entry, but the entry of all other generics as well in exchange for payments from the brand. *Id.* ¶ 76. After the passage of the MMA, however, a generic ANDA applicant forfeits its 180–day exclusivity period under certain circumstances, such as if the applicant fails to obtain tentative approval from the FDA within 30 months of filing the ANDA. *Id.* ¶¶ 77–78; 18 U.S.C. § 355(j)(5)(B)(iv)(D). According to Plaintiffs, however, the MMA does not prevent brands and generics from unlawfully structuring their settlement agreements so that there is no judgment invalidating the brand's patent or finding it not infringed, but the first-filer generic's 180–day exclusivity period is left intact. *Id.* ¶ 79. In these cases, they

assert that any subsequent generic ANDA applicants must obtain a judgment that all patents subject to the first-filer's ANDA are invalid or not infringed in order to enter the market before the 180–day period expires. *See id.* This barrier to entry reduces generic competition.

**B. ACTOS and ACTO*plus***

**\*4** ACTOS and ACTO*plus* met ("ACTO*plus* ") are pioglitazone hydrochloride medications prescribed to treat Type 2 diabetes. ACTOS is prescribed as a monotherapy treatment (by itself), or in combination with sulfonylurea, metformin, or insulin. ACTO*plus*, which contains pioglitazone hydrochloride and metformin, is prescribed to improve blood sugar control in adults with Type 2 diabetes who are already taking ACTOS and metformin separately, or are taking metformin alone. CAC ¶ 2. In 1999, the FDA approved Takeda's NDA for ACTOS for the use of improving glycemic control as a monotherapy or in combination with a sulfonylurea, metformin, or insulin and in 2005, the FDA approved Takeda's NDA for ACTO*plus*. *Id.* ¶¶ 89, 123.

Together, ACTOS and ACTO*plus* generated over three billion dollars in annual sales for Takeda by 2011. *Id.* ¶ 3. Plaintiffs claim that to prevent generic drug manufacturers from depleting those profits, Takeda devised a "multi-part scheme which it enticed its would-be generic competitors to join." *Id.* ¶ 4.

**1. The ACTOS Patents**

**a. The ACTOS NDA and Orange Book Listing**
Pursuant to the FDA's requirements, when Takeda filed its NDA for ACTOS, it was required to list all patents that "claim[ed] the drug" and all patents that "claim[ed] a method of using the drug" for publication in the Orange Book. *See* 21 U.S.C. § 355(b)(1). Takeda listed three patents as claiming the ACTOS drug: Nos. 4,687,777 ("777 patent"), 5,965,584 ("584 patent") and 6,329,404 ("404 patent"). The 584 and 404 patents also claimed methods of using ACTOS.

There is no dispute that the 777 patent claimed the active ingredient in ACTOS, pioglitazone hydrochloride. *See id.* ¶¶ 9, 90. Nor is there any dispute that the 584 and 404 patents were properly listed as claiming methods of using ACTOS. *See id.* ¶¶ 92, 93. Plaintiffs allege, however, that Takeda's description of the 584 and 404 patents as claiming the ACTOS drug product was false and misleading because

the drug composition claimed by those patents contained not only pioglitazone hydrochloride, but additional drug components. *Id.* In particular, the 584 patent claims a drug product consisting of pioglitazone hydrochloride and a biguanide (metformin), and the 404 patent claims a drug product consisting of pioglitazone hydrochloride and an insulin secretion enhancer. *Id.* ¶¶ 92, 93. Accordingly, the 584 patent was also listed by Takeda in the Orange Book for ACTO*plus* (which contains metformin), and the 404 patent was listed for Ducetact (which contains an insulin secretion enhancer). *Id.*

Because the patents purport to claim the drug compositions of these other products, Plaintiffs posit that Takeda's listing of the 584 and 404 patents as patents claiming the ACTOS drug- which does not contain either a biguanide or insulin secretion enhancer-was inaccurate and misleading. The inclusion of those patents is significant, they argue, because although the 777 patent claiming the active ingredient in ACTOS expired on January 17, 2011, *id.* ¶ 9, the 584 and 404 patents did not expire until June 19, 2016, *id.* ¶¶ 92, 93. Consequently, the purportedly inaccurate listing of the 584 and 404 patents in the Orange Book, they say, delayed generic entry past the 2011 expiration date of the 777 patent, when Plaintiffs assert generic entry should have occurred. *Id.* ¶ 9.

**\*5** More specifically, Plaintiffs allege that by listing the 584 and 404 patents as drug component patents for ACTOS, Takeda ensured that the first generic manufacturer to file an ANDA for ACTOS would be required to submit a Paragraph IV Certification with regard to those patents, which entitled the first-filer to 180 days of generic marketing exclusivity. During that 180 day period, no other generics were permitted to enter the market, which in Plaintiffs' view, created a "bottleneck" on FDA approval of other ACTOS generic products until the first generic filer entered the market. *Id.* ¶ 7.

According to Plaintiffs, if Takeda had not improperly described the 584 and 404 patents as claiming the ACTOS drug product, "no ANDA filer would (or could) have submitted a Paragraph IV Certification for ACTOS." *Id.* ¶ 102. As a result, Defendants Mylan, Ranbaxy, and Actavis could have entered the market-presumably after submitting Section viii Statements and having "carve out" labels approved-as soon as the 777 patent expired on January 17, 2011. Moreover, because no 180–day period of exclusivity would have attached to their entry, additional generics could have simultaneously entered the market. *Id.* ¶ 103.

#### b. The ACTOS ANDAs

In July 2003, Defendants Mylan, Alphapharm (since acquired by Mylan), Ranbaxy, and Actavis (formerly Watson), each filed an ANDA for generic versions of ACTOS with Paragraph IV Certifications as to the 584 and 404 patents and Section viii Statements as to the method of use patents. *Id.* ¶¶ 105–108. Mylan (and Alphaphann) also made a Paragraph IV Certification as to the 777 patent, but Actavis and Ranbaxy filed Paragraph III Certifications instead, indicating that they would not seek final FDA approval until the 777 patent expired. *Id.;* Def. Joint Mem. at 7.

Subsequently, the FDA determined that all generic manufacturers seeking to market generic ACTOS were required to submit Paragraph IV Certifications as to each of the three patents. Prior to the expiration of the 777 patent, a non-party generic manufacturer submitted a Citizens Petition to the FDA regarding Takeda's listing of the 584 and 404 patents in the Orange Book as patents claiming the ACTOS drug product. *Id.* ¶ 99. On March 15, 2010, after Takeda confirmed to the FDA that the patents claimed both the drug product and methods of using ACTOS, the FDA issued a ruling concluding that all ANDA filers seeking approval to market generic ACTOS before the expiration of the 584 and 404 patents were required to submit Paragraph IV Certifications with respect to those patents. *Id.* ¶¶ 100–101. Thereafter, no generic manufacturer could obtain FDA approval of its ACTOS ANDA by submitting Section viii Statements as to the 584 and 404 patents.

#### 2. ACTOS Patent Infringement Litigation

On October 17, 2003, in response to the ANDA filings, Takeda filed suits in this district against Mylan, Ranbaxy, and Actavis, alleging that their generic products would infringe the drug product claims of the 584 and 404 patents, and induce infringement of those patents' methods of use claims as well as certain of the eight additional method of use patents listed for ACTOS. *Id.* ¶ 109. The trial judge, the Honorable Denise Cote, first considered whether the 777 patent was valid and infringed by Mylan/Alphapharm. [5] Judge Cote ruled in favor of Takeda, concluding that the 777 patent was valid and that Mylan/Alphapharm had engaged in "exceptional" misconduct and had filed their Paragraph IV Certifications in bad faith. *See Takeda Chem. Indus. Ltd. v. Mylan Labs., Inc.,* 459 F.Supp.2d 227 (S.D.N.Y.2006), *subsequent determination,* 2007 WL 840368 (S.D.N.Y. Mar.21, 2007), *aff'd,* 549 F.3d 1381 (Fed.Cir.2008). Judge Cote awarded Takeda over $16.8 million dollars in attorney's fees and

entered a limited final judgment in its favor; this judgment was later affirmed by the Federal Circuit. *Id.*

**\*6** The parties then began additional discovery and settlement negotiations regarding the 584, 404, and method of use patents. *See* CAC ¶ 110. Ultimately, Takeda settled the litigations. Plaintiffs claim it did so in order to "protect its monopoly." *Id.* ¶¶ 110–111.

On or about March 15, 2010, Takeda entered into individual settlement agreements with the Generic Defendants, pursuant to which Takeda agreed to immediately dismiss its patent infringement actions and the Generic Defendants agreed to drop their challenges to Takeda's patents. Pursuant to the agreements, Mylan, Actavis, and Ranbaxy were each granted a nonexclusive license by Takeda to enter the market with a generic ACTOS product on August 17, 2012–almost four years prior to the expiration of the 584 and 404 patents. *See* Generic ACTOS Agreements, Def. Exs. 1, 2, 4. Ranbaxy's agreement additionally included a supply provision, which allowed Ranbaxy, at its option, to purchase the ACTOS drug product from Takeda pursuant to a fee included in the agreement. Def. Ex. 1, Ranbaxy Agreement at 10. None of the agreements prohibited Takeda from issuing additional licenses to generic manufacturers or from licensing an authorized generic to manufacture generic ACTOS on its behalf. Def. Exs. 1, 2, 4. Neither the FTC nor the Department of Justice objected to the settlements.

Plaintiffs allege that as part of these three settlements, Takeda made several forms of unlawful "payments" to the Generic Defendants, including (1) "acceleration clauses" in each agreement providing that in the event that any other ACTOS generic entered the market before August 17, 2012, Mylan, Ranbaxy, and Actavis would also be able to enter at such date; (2) a license for Ranbaxy to enter the market with a generic form of ACTO*plus* 180 days after the first ANDA filer (Mylan) entered the market; and (3) a license for Actavis to enter the market with generic ACTO*plus* at the same time as Ranbaxy. *Id.* ¶¶ 114–116; *see also* Def. Exs. 1, 2, 4. [6]

Pursuant to the so-called acceleration clauses, Mylan, Ranbaxy, and Actavis' entry dates for ACTOS would be moved up from August 17, 2012 under certain circumstances. *See* Def. Exs. 1–4. The terms triggering earlier entry varied slightly under the respective agreements, but generally, they provided that Mylan, Ranbaxy, and Actavis could enter the market as early as any other generic did. *See id.* [7]

Case 1:23-cv-07222-LTS-GWG  Document 21-1  Filed 10/24/23  Page 45 of 89
In re Actos End Payor Antitrust Litigation, Not Reported in F.Supp.3d (2015)
2015-2 Trade Cases P 79,309

Following the settlements, at least seven other generic drug manufacturers who had filed ANDAs for generic ACTOS entered into joint stipulations of dismissal of their own infringement actions with Takeda and purportedly agreed to delay their entry into the market until 180 days after Mylan, Ranbaxy, and Actavis entered the market. CAC ¶¶ 120–122.

Plaintiffs allege, however, that had the cases not settled, the Generic Defendants would have prevailed in the infringement actions because the 584 and 404 patents did not claim the ACTOS drug product, but only claimed a method of using ACTOS. As a result, Plaintiffs claim, the Generic Defendants would have been able "to enter the market on or about January 17, 2011"-the date the 777 patent expired-and other generics would have entered the market earlier as well. *Id.* ¶¶ 9, 163.

### 3. ACTO*plus* Litigation

**\*7**  Plaintiffs further allege that Takeda employed the same strategy with ACTO*plus.* On June 23, 2008, Mylan informed Takeda that it filed an ANDA for a generic version of ACTO*plus* with a Paragraph IV Certification as to the 584 patent and certain method of use patents. *Id.* ¶ 125. As the first ANDA filer for ACTO*plus,* Mylan was eligible for the 180–day exclusivity period. *Id.* ¶ 12. On August 5, 2008, Takeda sued Mylan for infringing the 584 patent. *Id.* ¶ 126. Although Plaintiffs contend that Takeda sued Mylan "[w]ithout regard to whether the lawsuits had legal merit," *id.* ¶ 11, they also concede that the 584 patent claimed for ACTO*plus* covered the drug's components, *id.* ¶¶ 6, 127.

Nevertheless, Plaintiffs allege that Takeda made "large, unjustified payments" to Mylan to settle the ACTO*plus* litigation. *Id.* ¶ 12. Mylan agreed to drop its challenge to Takeda's patents and to stay out of the generic ACTO*plus* market until December 14, 2012, or August 17, 2012 if Takeda's sales of ACTO*plus* fell below a certain threshold. *Id.* ¶ 130. As with the ACTOS agreement, in the event that any other generic entered the market first, Mylan would be permitted to enter at the same time. *Id.* ¶ 132. According to Plaintiffs, Takeda's *ACTOplus* agreement with Mylan was contingent on the terms of their settlement of the ACTOS patent litigation. *Id.* 133. Neither the FTC nor the Department of Justice objected to the ACTO*plus* settlement.

By entering into the settlement, Plaintiffs assert, Mylan protected its 180–day exclusivity period for ACTO*plus* and prevented at least four other generics from entering the market until that period concluded. *Id.* ¶¶ 135–37. After Mylan settled, these generics entered into their own stipulations of

dismissal with Takeda, agreeing to delay entry until 180 days after Mylan entered. *Id.* ¶ 138–39. Plaintiffs allege that if not for the settlement agreement between Mylan and Takeda, generic manufacturers of ACTO*plus* would have been able to compete as early as February 25, 2011. *Id.* ¶ 163. The CAC cites to no point of reference for this date, which appears inconsistent with the 584 patent's expiration date in June of 2016.

### 4. Teva—The Licensed Generic

On or about July 14, 2004, Teva, another generic manufacturer, also submitted an ANDA for a generic version of ACTOS. *Id.* ¶ 141. Teva filed a Section viii Statement as to each of the 584 and 404 patents, attesting that it did not seek FDA approval for a method of use covered by those patents. *Id.* As required, the Section viii Statements asserted that Teva's label for generic ACTOS would "carve out" information regarding methods of using ACTOS in combination with a biguanide or an insulin secretion enhancer-the methods of use claimed by the 584 and 404 patents-or other uses covered by Takeda's method of use patents. *Id.* Because no Paragraph IV Certification was filed, the ANDA filing did not immediately trigger an infringement lawsuit by Takeda. *Id.* ¶ 143.

**\*8**  On April 14, 2009, Teva filed an ANDA with regard to a generic version of ACTO*plus,* and included a Paragraph IV Certification as to the 584 patent and two additional patents held by Takeda. *Id.* ¶ 143. Takeda sued Teva on that basis on May 18, 2009, asserting that Teva's ANDA for ACTO*plus* intentionally infringed Takeda's patents, and that its ANDA for ACTOS intentionally induced infringement of the 584 and 404 patents and the method of use patents. *Id.* ¶ 144.

While the lawsuit was pending, the FDA issued its March 15, 2010 decision on the Citizen's Petition regarding Takeda's Orange Book listing for ACTOS, concluding that because the 584 and 404 patents included both drug product and method of use claims, it would not approve any ACTOS ANDA without a Paragraph IV Certification. *Id.* ¶ 146. On March 30, 2010–after Takeda settled with the Generic Defendants–Teva filed a motion to amend its answer to add a counterclaim that, as to ACTOS, Takeda had improperly submitted patent information for the 584 and 404 patents, describing them as drug product patents claiming the ACTOS drug. *Id.* ¶ 147.

Had Teva succeeded on its counterclaim, Plaintiffs allege, it would not have been subject to the 180–day exclusivity period preserved by Takeda's settlement agreements with

the Generic Defendants, and could have entered the market as early as January 17, 2011. *Id.* But Takeda and the Generic Defendants, they claim, sought to stop Teva from "unravel[ling] the anticompetitive schemes." *Id.* ¶ 13. Takeda and Teva thus began settlement negotiations, during which Takeda purportedly disclosed the existence of the acceleration clauses in its agreements with the Generic Defendants in order to dissuade Teva from entering the market before August 17, 2012. *Id.* ¶¶ 150–51.

Teva and Takeda entered into a settlement agreement on December 22, 2010, pursuant to which Teva agreed to drop its challenges to Takeda's patents for ACTOS and ACTO*plus*. See *id.* ¶ 153. In return, Takeda granted Teva licenses to launch authorized generic versions of ACTOS and ACTO*plus* during the first 180 days of generic marketing. *Id.* ¶¶ 155–56, 158–60; Def. Ex. 5, Teva Agreement. Teva also agreed to pay Takeda a royalty of seventy-five percent of its net profits on the authorized generic ACTOS and ACTO*plus* sales during that initial 180 day period. Def. Ex. 5, Teva Agreement Ex. B at 3. The agreement further provided non-exclusive, royalty-free licenses for Teva to market its own generic versions of ACTOS and ACTO*plus* after the first 180 days of generic marketing. *Id.* at 11, 14. Pursuant to the agreement, in the event that any other generic ACTOS or ACTO*plus* products entered the market before the date specified for Teva, Teva's licensed entry date would be accelerated accordingly. CAC ¶¶ 157, 161. As with the other settlements, neither the FTC nor the Department of Justice objected to the Teva settlement.

**\*9** Plaintiffs allege that this settlement prevented Teva from entering the ACTOS and ACTO*plus* markets as soon it otherwise would have, and thus that the settlement's terms constituted unlawful payments to delay generic entry. *Id.* ¶ 162.

### C. Allegations Regarding Anticompetitive Effect

As to both the ACTOS and ACTO*plus* settlement agreements, Plaintiffs allege that they-the indirect purchaser classes-were deprived of "a marketplace in which manufacturers and distributors of generic drugs make their decisions about challenging patents and entering markets free from the influence of unlawful payments" and the "most cost efficient means of distribution" of the drugs. *Id.* ¶ 164. As a result of the agreements, the classes allegedly sustained substantial losses in the form of overcharges they paid for ACTOS, ACTO*plus* and their generic equivalents. *Id.* ¶ 165.

### D. The ACTOS Class and ACTO*plus* Classes

The ACTOS class is defined as:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/ or provided reimbursement for some or all of the purchase price for ACTOS and/or its AB-rated generic equivalents in any fonn, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries ... from January 17, 2011 through and including the date that the anticompetitive effects of Defendants' unlawful conduct cease.

*Id.* ¶ 166.

The ACTO*plus* class is defined as:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/ or provided reimbursement for some or all of the purchase price for ACTO*plus* and/or its AB-rated generic equivalents in any fonn, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries ... from February 25, 2011 through and including the date that the anticompetitive effects of Defendants' unlawful conduct cease.

*Id.*[8]

### LEGAL STANDARD

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Plaintiffs must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." In order to defeat a motion to dismiss pursuant to Rule 12(b)(6), Plaintiffs need not provide "detailed factual allegations," but their "obligation to provide the grounds of [their] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Rather, the complaint must contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "[t]he plausibility standard is not akin to a probability requirement ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation omitted). Where a complaint pleads facts that are "merely consistent with" Defendants' liability, it "stops short of the line between possibility and plausibility" of Plaintiffs' entitlement to relief. *Twombly,* 550 U.S. at 557.

## DISCUSSION

### I. Reverse Payment Claims

**\*10**  The central issue in this case is whether the terms of the settlement agreements between Takeda and the generic manufacturers are subject to antitrust scrutiny. Plaintiffs allege in Counts 3 to 6 that Takeda unlawfully conspired with the Generic Defendants and Teva, delaying generic competition in the ACTOS market through their settlement agreements regarding ACTOS. CAC ¶¶ 247–282. Plaintiffs further allege in Counts 8 and 9 that Takeda unlawfully conspired with Mylan and Teva to delay generic competition in the ACTO*plus* market. *Id.* ¶¶ 292–309. Although Plaintiffs sue under a variety of state statutes, the parties rely on the legal standards set forth in *FTC v. Actavis, Inc.,* ––– U.S. ––––, 133 S.Ct. 2223, 186 L.Ed.2d 343 (2013), and its progeny for evaluating a reverse payment settlement, and the Court will do the same. *See* Pl. Opp. at 1; Def. Joint Mem. at 12. [9]

In *Actavis,* the FTC filed suit against a brand manufacturer, Solvay Pharmaceuticals, and generic competitors Actavis and Paddock for entering into "reverse payment" settlement agreements after the brand sued the generics for patent infringement. 133 S.Ct. at 2224–25. Pursuant to those settlements, the generics agreed not to bring their generic products to market for a number of years and further agreed to promote the brand drug to doctors in exchange for a "reverse payment"-that is, a payment from the patentee brand to the alleged patent infringers-of millions of dollars. *Id.* at 2225. The FTC claimed that these suits violated § 5 of the Federal Trade Commission Act because they caused the generics to abandon their patent challenges and refrain from launching their own low-cost generic drugs in exchange for a share of the brand's monopoly profits. *Id.* The district court dismissed the suit and the Eleventh Circuit affirmed, holding that a reverse payment agreement was generally "immune from antitrust attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of the patent." *Id.* at 2227 (quoting *FTC v. Watson Pharmaceuticals, Inc.,* 677 F.3d 1298, 1312 (11th Cir.2012)). At that time, this "scope of the patent" test was also employed in other Circuits, including this one. *See In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d 187, 213 (2d Cir.2006) *abrogated by Actavis,* ––– U.S. ––––, 133 S.Ct. 2223, 186 L.Ed.2d 343, *See also Actavis,* 133 S.Ct. at 2238–39 (Roberts, C.J., dissenting).

In reversing the Eleventh Circuit, the Supreme Court rejected the scope of the patent test, concluding that a reverse payment may sometimes result in anticompetitive harm when a patent holder seeks to "exclude products or processes that do not actually infringe" the patent by paying the alleged generic manufacturer to stay out of the patent holder's market. *See Actavis,* 133 S.Ct. at 2231, 2233. "[R]ather than measur[ing] the length or amount of a restriction solely against the length of the patent's term or its earning potential," the Court instructed, the antitrust question is answered "by considering traditional antitrust factors such as likely anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances, such as here those related to patents." *Id.* at 2231.

**\*11**  The Court based this conclusion on five considerations. First, it noted that a reverse payment has the "potential for genuine adverse effects on competition" because in effect, it amounts to the patentee's purchase of the exclusive right to sell its product-a right that it claims to have under the patent but would lose if the patent was found to be invalid or not infringed. *Id.* at 2234 (quoting *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (2009)). Second, it recognized that "these anticompetitive consequences will at least sometimes prove unjustified." *Id.*

at 2235–36. Although there may be offsetting, or even pro-competitive justifications for the settlement, the Court stated that this consideration was insufficient to "justify dismissing [plaintiff's] complaint" because defendants will have the opportunity to show "that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason." *Id.* at 2236. Third, the Court noted that "where a reverse payment threatens to work unjustified anticompetitive harm," the patentee likely possesses the market power to follow through on that threat. *Id.* Fourth, the Court instructed that it will typically not be necessary "to litigate patent validity" in order to answer the antitrust inquiry because the existence of an "unexplained large reverse payment" suggests that the patentee has "serious doubts about the patent's survival." *Id.* That, "in turn, suggests that the payment's objective is to maintain supracompetitive prices," and that the settlement is unlawful. *Id.* at 2236–37.

Notwithstanding the Court's prohibition on large, unjustified reverse payments, it nonetheless made clear that a patentee and purported infringer may still lawfully settle their suit by other means. It observed, for instance, that they may settle "by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point." *Id.* at 2237. This safe harbor has direct relevance in this case, as discussed further below.

Pursuant to *Actavis,* to trigger antitrust concern, the settlement term at issue must be (1) a "payment" that is (2) made in "reverse"-that is, from the patent holder to the alleged infringer-and is (3) "large," and (4) "unexplained." *See id.* at 2237. Because the "existence and degree of any anticompetitive effects" may vary depending on the particular settlement and the relevant industry, reverse payments are not presumptively unlawful. *Id.* Plaintiffs must therefore prove their case under the rule of reason analysis applied to other types of antitrust claims. *Id.*

In this Circuit, the rule of reason analysis proceeds in three steps:

> First, the plaintiff bears the initial burden of showing that the defendant's conduct had an actual adverse effect on competition as a whole in the relevant market. If plaintiff satisfies

this burden, the burden then shifts to [the] defendant to offer evidence that its conduct had pro-competitive effects. If [the] defendant is able to offer such proof, the burden shifts back to plaintiff, who must prove that any legitimate competitive effects could have been achieved through less restrictive alternatives.

**\*12** *Arkansas Carpenters Health & Welfare Fund v. Bayer AG,* 604 F.3d 98, 104 (2d Cir.2010), *as corrected* (June 17, 2010) (internal citations and quotations omitted).

### A. Alleged Unlawful Reverse Payments

In accordance with the principles stated above, the Court begins its inquiry by assessing whether Plaintiffs have plausibly pleaded a reverse payment with anticompetitive effect. With the exception of Takeda's settlement with Teva, [10] the parties do not dispute that the settlement tenns between Takeda and the generics mainly flowed from the patentee to the alleged infringers and were thus "reverse." [11] Defendants argue instead that the settlement terms are not "payments" because, unlike the settlements in *Actavis,* the agreements here provided only early entry licenses to the generic manufacturers. Def. Joint Mem. at 14. They further argue that the "acceleration clauses" in the settlements do not constitute unlawful reverse payments because, if triggered, the clauses allowed generic competition even earlier than otherwise provided for in the agreements. *Id.* at 19. Finally, they contend that even if the licenses may be characterized as "payments," Plaintiffs have failed to plausibly allege that they were "large" or "unexplained" as required by *Actavis. Id.* at 28.

For the reasons that follow, the Court agrees that dismissal of these claims is appropriate.

### 1. Non–Cash Settlements Under *Actavis*

The settlements in this case do not involve cash payments like the one in *Actavis* and thus require the Court to determine whether they fall within the case's purview. The *Actavis* Court held that a monetary payment from a brand patentee to a generic may potentially violate antitrust principles, and is thus subject to scrutiny under the rule of reason. It is the payment made to the infringer "for staying out of the market" that

2015-2 Trade Cases P 79,309

is of concern because it safeguards the patentee's monopoly returns, even if it splits them between the patentee and the generic challenger. 133 S.Ct. at 2234–35.

The Court in *Actavis* expressly provided, however, that settlements without reverse payments, such as those that permit a generic manufacturer to enter the patentee's market prior to the patent's expiration, remained lawful. *Id.* at 2237. The Government has echoed this position. In the reply brief filed in *Actavis,* the FTC noted that "the parties to paragraph IV litigation have broad freedom to settle by agreeing to a compromise date of generic entry." Pet'r Reply Br., *FTC v. Actavis,* No. 12–CV–416, 2013 WL 1099171, at *8–9 (Mar. 18, 2013). At oral argument, the Deputy Solicitor General reiterated that position: "the kind of settlement that we would regard as legitimate [is] where the parties simply agree to a compromise date of generic entry, then the parties would certainly take into account their own assessment of what would likely happen at the end of the suit." Tr. of Oral Argument at 10, *FTC v. Actavis,* No. 12–CV–416.

**\*13** Unsurprisingly, many settlement agreements include terms that cannot easily be categorized as either an illegal reverse payment or a legal early-entry settlement-that is, they do not include a cash payment, but they contain more consideration than merely a compromise entry date. As a preliminary matter, because *Actavis* did not explicitly address whether its holding was limited to cash payments, a number of district courts have reached differing conclusions as to whether a non-cash settlement may ever constitute an unlawful "payment." This Court shares the majority view that *Actavis'* s holding is not limited to payments made in cash. *See, e.g., In re Aggrenox Antitrust Litig.,* F.Supp.3d, 2015 WL 1311352, at *11 (D.Conn. Mar.23, 2015); *United Food and Comm. Workers Local 1776 & Partic. Emp'rs Health and Welfare Fund v. Teikoku Pharma USA, Inc.,* 74 F.Supp.3d 1052, 1068 (N.D.Cal.2014); *In re Effexor XR Antitrust Litig.,* 2014 WL 4988410, at *20 (D.N.J. Oct.6, 2014); *In re Niaspan Antitrust Litig.,* 42 F.Supp.3d 735, 751 (E.D.Pa.2014); *In re Nexium (Esomeprazole) Antitrust Litig.,* 968 F.Supp.2d 367, 382 (D.Mass.2013). *But see In re Loestrin 24 Fe Antitrust Litig.,* 45 F.Supp.3d 180 (D.R.I.2014) (holding that only cash payments fell within ambit of *Actavis,* but noting reservations with that approach); *In re Lamictal Direct Purchaser Antitrust Litig.,* 18 F.Supp.3d 560 (D.N.J.2014), *rev'd, King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.,* 791 F.3d 388 (3d Cir.2015) (reversing lower court's finding that only cash payments stated an *Actavis* claim). This view is consistent with traditional understandings of the term

"payment," which is defined in Black's Law Dictionary as the "[p]erformance of an obligation by the delivery of money *or some other valuable thing* accepted in partial or full discharge of the obligation." (10th ed.2014) (emphasis added); *see also Oxford English Dictionary* (3d ed.2005).

Like several other courts that have considered the question, however, the Court also concludes that not *all* non-cash settlement terms fall within the purview of *Actavis*; rather, in order for the Court to find an unlawful reverse payment, it must be able to estimate the value of the term, at least to the extent of determining whether it is "large" and "unjustified." *See Teikoku Pharma,* 74 F.Supp.3d at 1069–70; *In re Effexor XR Antitrust Litig.,* 2014 WL 4988410, at *21.* Contrary to Plaintiffs' contention, this requirement does not require precise calculations or otherwise heighten a plaintiff's pleading burden, but is consistent with the limiting principles articulated in *Actavis* for determining whether a reverse payment is subject to antitrust scrutiny. *See* 133 S. Ct at 2237. Indeed, the Supreme Court identified some of the attributes of the payment that should he analyzed, namely, "its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Id.*

**\*14** In the Court's view, a reading of *Actavis* that would compel antitrust scrutiny of a settlement regardless of whether its terms could reasonably be construed as a large and unjustified reverse payment would ignore the limiting principles set forth in the decision, and subject virtually *any* settlement to antitrust scrutiny-a result the Court could not have intended. *See Asahi Glass Co. v. Pentech Pharms., Inc.,* 289 F.Supp.2d 986, 994 (N.D.Ill.2003) (Posner, J., sitting by designation) ("*[A]ny* settlement agreement can be characterized as involving 'compensation' to the defendant, who would not settle unless he had something to show for the settlement. If any settlement agreement is ... classified as involving a forbidden 'reverse payment,' we shall have no more patent settlements.").

### a. Takeda's Settlement Agreements with Mylan, Ranbaxy, and Actavis

Applying these principles, the settlement agreements in this case do not provide a basis for a claim under *Actavis,* despite Plaintiffs' creative pleading. Pursuant to the essential tenns of the settlement agreements with Mylan, Ranbaxy, and Actavis, Takeda licensed the Generic Defendants to enter the market

on August 17, 2012. [12] This date fell approximately 20 months after the 777 patent expired in January 2011, and approximately four years before the 584 and 404 patents expired in June 2016. Moreover, in the event that any other generics received approval to market generic ACTOS prior to that date, each of the settlement agreements contained an acceleration clause which permitted them to immediately enter the market, despite the date fixed in the agreement.

At their core, the settlements at issue simply granted the Generic Defendants a compromise date of generic entry-the very type of settlement sanctioned by the *Actavis* Court. Indeed, the *Actavis* Court expressly provided that a "settlement on terms permitting the patent challenger to enter the market before the patent expires would ... bring about competition ... to the consumer's benefit." 133 S.Ct. at 2234. Accordingly, courts have distinguished settlement terms similar to those found in the agreements here from the types of provisions that trigger antitrust scrutiny. *See, e.g., FTC v. AbbVie,* —— F.Supp.3d, —— 2015 WL 2114380 (E.D.Pa. May 6, 2015) (holding that early-entry license does not run afoul of *Actavis* and is procompetitive), *recons. denied,* 2015 WL 5025438 (Aug. 25, 2015); *In re Niaspan,* 42 F.Supp.3d at 751–52 (distinguishing early-entry license settlements from other fonns of consideration).

Plaintiffs do not dispute that a mere early-entry license is insufficient to trigger antitrust scrutiny. They argue, rather, that the settlement agreements in this case were made unlawful because the acceleration clauses discouraged generic competition, and in the case of Ranbaxy and Actavis, the settlements included unlawful compensation in the form of early-entry licenses for generic ACTO*plus.* Pl. Opp. at 16. These arguments fail.

### (i) "Acceleration Clauses"

 **\*15** First, as to the acceleration clauses, Plaintiffs have failed to set forth any plausible basis for viewing them as anticompetitive. These clauses, which were present in slightly different forms in each of the Generic Defendants' agreements, allowed entry before August 17, 2012 if another generic came to market first. *See* Def. Ex. 1, § 3.1(b), (c); Ex. 2 § 3.1(b), (c), (d); Ex. 4 § 3.1(b), (c), (d). The rationale behind these provisions is clear. Because the licensing agreements were explicitly non-exclusive, the possibility remained that another generic competitor could pursue ANDA approval and attempt to enter the market before the entry date fixed by the settlement agreements. The acceleration clauses ensured

that if a generic or authorized generic began marketing its product before that date, the licensed generic could also enter without further delay. The practical effect of the acceleration clauses was thus to increase competition in the event that other generics entered the market earlier than contemplated by the agreement. If no other generic entered before the licensed entry date, the effect would be neutral. As applied to the facts as alleged in this case, the triggering of the acceleration clause in any of the Generic Defendants' settlement agreements with Takeda would result in four or more generics entering the market, instead of three-an indisputably procompetitive effect. If the clauses were not triggered, the compromise entry date of August 17, 2012 remained in effect and the Generic Defendants retained the 180 days of generic market exclusivity they would have received as first-filers under the HatchWaxman Act.

Given this factual context, it is difficult to view the provisions as "payments" from Takeda to the generics to retain monopoly pricing power. As Defendants point out, under the agreements, the Generic Defendants received no compensation from Takeda, but rather, were compensated only through the market when they began selling their generic product. *See* Oral Arg. Tr. at 14. Significantly, Plaintiffs do not allege that the Generic Defendants shared in Takeda's monopoly profits by charging supracompetitive prices when they entered the market, in fact, other than their conclusory allegations that Defendants charged more and Plaintiffs paid more for the drugs than they otherwise would have *before* the date of generic entry, Plaintiffs allege no anticompetitive effects on pricing resulting from the agreements.

Plaintiffs nonetheless argue that the acceleration clauses had the anticompetitive effect of deterring other generics from disputing Takeda's patents-presumably because even if a generic challenger won its suit, it would be deprived of any period of market exclusivity as the licensed Generic Defendants would also enter the market immediately thereafter. *See* Pl. Opp. at 30. While another case may present circumstances in which such a deterrent effect is plausible, Plaintiffs' theory is not borne out here for several reasons. First, Mylan, Actavis, and Ranbaxy were the firstfilers as to ACTOS; thus, under the statutory scheme, there is no plausible scenario in which another generic would have been entitled to earlier entry. Although Plaintiffs argue that another generic could have entered earlier by relying solely on a Section viii Statement, that avenue was foreclosed by the FDA's Citizen's Petition decision, which was issued on the same day the settlement agreements took effect. Secondly,

after Takeda settled with the Generic Defendants, other generics continued to pursue litigation regarding ACTOS; Teva, for instance, continued to litigate its case for seven months.

 *16  But even if the Court were to credit Plaintiffs' speculation as to how other generics would have acted if not for the acceleration clauses, it remains unpersuaded that this kind of settlement term is made unlawful by *Actavis.* An acceleration clause by its plain terms merely affects the date of entry into the market-a date that can be lawfully agreed upon by the parties settling a patent infringement suit. Indeed, Plaintiffs concede that acceleration clauses may be "procompetitive under some circumstances." Pl. Opp. at 34. The mere possibility that the absence of an acceleration clause may result in more diverse generic competition is insufficient for Plaintiffs to plausibly state a reverse payment claim here. *Actavis* requires only that a brand manufacturer not unlawfully restrict competition; it does not demand that the brand maximize competition. *See Smith–Mine Beecham Corp.,* 791 F.3d at 409 ("*Actavis* does not stand for the proposition that parties must reach the most procompetitive settlements possible.")

As Plaintiffs acknowledged at oral argument, no other court has found an acceleration clause to constitute a reverse payment. Oral Arg. Tr. at 98. Without any legal authority or factual basis for doing so in this case, the Court declines to expand *Actavis'*s holding in this manner. [13]

Finally, to the extent Plaintiffs attempt to assert a new theory of antitrust liability in the Hatch–Waxman context, *see* Pl. Opp. at 33–34 (arguing that even if the clauses are not "payments," they are illegal), it is not supported by the allegations in the CAC, which repeatedly and emphatically refer to the provisions as unlawful "payments."

### (ii) ACTO*plus* Licenses for Ranbaxy and Actavis

Plaintiffs' arguments regarding the so-called "sweet heart deals" given to Ranbaxy and Actavis for generic ACTO*plus* licenses similarly fail to persuade the Court that the settlements contained unlawful reverse payments. Under those provisions in their respective agreements, Takeda granted Ranbaxy and Actavis licenses to market generic ACTO*plus* as of the earlier of June 15, 2015, or 180 days after the first-filing generic (Mylan) entered the market. Def. Ex. 1 § 3.2; Def. Ex. 4 § 3.2. Plaintiffs argue that these licenses constituted illegal payments because neither Ranbaxy nor

Actavis had filed an ANDA for ACTO*plus* and they could not have obtained the licenses as a result of the pending ACTOS litigation with Takeda. Pl. Opp. at 35.

Although ACTOS and ACTO*plus* were different drug products, they are closely related; ACTO*plus* simply combined the ACTOS drug with metformin-a patent-protected combination therapy approved by the FDA as a method of use for ACTOS. Both drugs are covered by the 584 and other method of use patents that Takeda accused Actavis and Ranbaxy of infringing in the ACTOS litigation under an inducement theory. *See* CAC ¶ 109.

As to Plaintiffs' argument that Ranbaxy and Actavis could not have obtained this relief in the ACTOS patent litigation, *Actavis* does not provide a legal basis for restricting negotiated settlement terms where they do not restrain competition. Plaintiffs contend that the FTC has asserted that settlements granting licenses for other drugs are anticompetitive. *See* Pl. May 19, Letter at 1. To the contrary, in another reverse payment case, the FTC posited that *Actavis* only precludes these types of settlements if the consideration could not have been obtained in the litigation *and* "the parties [are] sharing monopoly profits by avoiding competition." Pl. May 19, Letter, Ex. A at 20. Plaintiffs have not plausibly alleged that the parties charged monopoly prices or shared monopoly profits here. [14]

 *17  The prospective effect of the ACTO*plus* licenses on competition was no different from that of the ACTOS licenses discussed above. Like the ACTOS licenses, the ACTO*plus* licenses merely allowed Actavis and Ranbaxy to enter the market earlier than they otherwise would have been permitted to do. The licenses were not exclusive and, because they would only become effective 180 days after Mylan entered the market, they did not give Ranbaxy and Actavis any competitive advantage over other generic ACTO*plus* competitors. Finally, as with the ACTOS licenses, any benefits that Actavis and Ranbaxy received under the agreements were benefits shared by consumers.

Finally, Plaintiffs' speculation that the ACTO*plus* licenses for Ranbaxy and Actavis caused them to agree to a later date of entry in the ACTOS market than they otherwise would have does not alter the Court's conclusion. Pl. Opp. at 16. Both the early-entry ACTOS and ACTO*plus* licenses were permissible settlement terms under *Actavis,* and the simultaneous grant of both does not render either license unlawful. *See AbbVie,* 2015 WL 2114380, at *7 (finding simultaneous agreements

between brand and generic regarding different drugs lawful because each agreement, by itself, was pro competitive).

### b. Takeda's Licensed Generic Agreement With Teva

Pursuant to its settlement with Teva, Takeda granted Teva a license to enter the ACTOS market as an authorized generic on August 17, 2012, or whenever another generic came to market, and with its own product 180 days later. Def. Ex. 5, Teva Agreement §§ 3 .1, 3.3. In addition, Teva was granted a license to enter the ACTO*plus* market as Takeda's Authorized Generic on the earlier of December 14, 2012 or when another generic came to market, and with its own product 180 days later. *Id.* §§ 3.4, 3.6. In other words, under the agreements, Teva-which was not a first-filer for either ACTOS or ACTO*plus*-was permitted to enter both markets as an Authorized Generic at the same time as the first-filer Generic Defendants. Finally, Teva was permitted to enter the market with its own product 180 days later, reflecting the same period of exclusivity to which the first-filers would have been entitled had they not settled their litigation with Takeda.

Plaintiffs argue that these settlement terms were anticompetitive because they prevented Teva from entering the "market even earlier. Specifically, they posit that Teva had a "substantial likelihood, if not near certainty" of entering the ACTOS market immediately after the 777 patent expired in January 2011, assuming certain events occurred: (1) Teva proceeded to trial against Takeda in June 2010, (2) at trial, Teva invalidated the 584 and 404 patents as to ACTOS and the Orange Book listings for ACTOS were changed, (3) Teva obtained final FDA approval of its ACTOS ANDA with Section viii Statements, including appropriate carve out labels, as to the 584 and 404 patents prior to January 17, 2011, and (4) Teva entered the market immediately after its ANDA was approved. Pl. Opp. at 36–37.

**\*18** Setting aside the series of inferences the Court must make in order to reach this conclusion, the main flaw with Plaintiffs' argument is that it side-steps the relevant *Actavis* inquiry: was there a large, unexplained reverse payment from Takeda to Teva to settle the litigation? The Teva agreement, like the Generic Defendants' agreements, merely fixed early-entry dates for Teva to enter the ACTOS and ACTO*plus* markets. The only "payments" provided for by the settlement consisted of 75 percent royalty payments from Teva *to* Takeda (*i.e., not* reverse) for marketing its drugs as an authorized generic manufacturer. Def. Ex. 5, Ex. B at 3. As discussed above, this type of early entry date settlement does not trigger antitrust scrutiny under *Actavis*. The possibility of even earlier

entry than that contemplated by the settlement agreement does not transform the settlement into an unlawful one.

The particular terms of the licenses also do not change the Court's conclusion. Plaintiffs argue that the Teva settlement was made unlawful by the inclusion of acceleration clauses and "non-compete pledges." Pl. Opp. at 39. The acceleration clauses functioned similarly to those in the other agreements-in the event that another authorized generic or non-first-filer generic entered the market first, Teva was permitted to compete immediately, rather than wait for the date fixed in the agreement. *See* Def. Ex 5 §§ 3.1, 3.3, 3.4, 3.6. As previously discussed, these clauses are not "payments" under *Actavis.*

Contrary to what Plaintiffs allege, the Teva agreements do not contain so-called "noncompete pledges." Plaintiffs cast these provisions as "no authorized generic" promises, but this misconstrues the meaning of the term. As Plaintiffs acknowledged at oral argument, neither Takeda nor any other brand manufacturer is obligated as a matter of law to license an authorized generic. Oral Arg. At 33. In any event, Takeda *did* opt to license an authorized generic; it licensed Teva to enter the ACTOS and ACTO*plus* markets as its Authorized Generic during the first 180 days of generic marketing for each drug. It is beyond dispute that doing so increased generic competition during those periods. Furthermore, the settlement did not preclude Takeda from authorizing any other generic; it expressly reserved Takeda's right to grant licenses for authorized generic ACTOS and ACTO*plus* products to the first ANDA filers for each drug during the first 180 days of generic marketing, and to any other manufacturer at the conclusion of that period. *See* Ex. 5, §§ 3.2, 3.5.

These circumstances stand in stark contrast to a true "no authorized generic" pledge, where the brand name settles exclusively with one generic and agrees not to market its own generic drug during the first 180 days of marketing-thereby limiting competition to just one generic drug. *See, e.g., Smithkline Beecham, Corp.,* 791 F.3d at 407–09 (reversing district court and holding that agreement pursuant to which brand manufacturer agreed not to introduce an authorized generic during the first 180 days of generic marketing was subject to rule of reason scrutiny under *Actavis* ); *Teikoku Pharma,* 74 F.Supp.3d at 1072 (concluding that plaintiffs plausibly alleged reverse payment based on no-authorized generic agreement in which the brand manufacturer agreed not to release their authorized generic until seven and one-half months after settling generic manufacturer began selling its version); *In re Niaspan,* 42 F.Supp.3d 735,

744, 751–52 (brand manufacturer agreed not to launch any authorized generic until 180 days after settling generic launched its product).[15] The Court agrees with Plaintiffs that such arrangements trigger antitrust scrutiny due to their potential anticompetitive effect. *See Smithkline Beecham Corp.,* 791 F.3d at 407–09; *see also* "Authorized Generic Drugs: Short–Term Effects and Long–Term Impact," Federal Trade Commission, August 2011 Report.

**\*19** Takeda, however, did not make a similar promise; indeed, each of the settlement agreements at issue in this case, including that with Teva, preserved Takeda's right to authorize generic forms of both ACTOS and ACTO*plus* from the first filers. That Takeda opted to license one rather than multiple authorized generics during a period in which the other generics were guaranteed entry-three others manufacturers with respect to ACTOS and one other with respect to ACTO*plus*-does not render Takeda's agreement with Teva illegal. Plaintiffs cite no legal authority to the contrary.

### c. Value of the Settlements

For the foregoing reasons, the Court concludes that the settlements at issue were not "reverse payments" within the meaning of *Actavis.* Even if the Court were to view the licensing terms as reverse payments, however, Plaintiffs' claims fail for the additional reason that they do not plausibly allege that the payments were "large" and "unjustified." Although the Supreme Court did not define "large" in *Actavis,* it instructed that the payment be compared to the payor's future litigation costs as a measure of scale. 133 S.Ct. at 2237. As to whether the payment was "unjustified," the Court explained that a payment is justified if it "reflects traditional settlement considerations, such as avoided litigation costs or fair value for services." *Id.* at 2236. In such circumstances, "there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement." *Id.*

As explained above, to meet their pleading burden as to whether the payments were "large" and "unjustified," Plaintiffs must plausibly allege a factual basis for the Court to reasonably estimate the value of the settlement terms. For instance, Plaintiffs cite a recent decision from the Eastern District of Pennsylvania in which the court concluded that payments were sufficiently large to defeat summary judgment. There, the record contained both dollar amounts paid to the generics under settlement agreements as well

as the amounts saved in litigation costs, enabling the court to compare the two. *King Drug Co., of Florence, Inc. v. Cephalon, Inc.,* —— F.Supp., 3d ——, 2015 WL 356913, at \*3–4, 13–14 (E.D.Pa. Jan.28, 2015).[16] Similarly, in *Teikoku Pharma,* the Northern District of California court found allegations that calculated the difference in projected revenues under an agreement prohibiting an authorized generic, and projected revenues with an authorized generic on the market, to be sufficient to state a claim for relief. 74 F.Supp.3d at 1071, (estimating that brand's projected revenues were $170,000,000 higher with the agreement than without it).

By contrast, while Plaintiffs allege that the licensing terms in the settlements were of "substantial value" and worth "tens" and "hundreds of millions" of dollars, they do not explain the basis for those assertions, or offer any method of calculating the value of the licensing terms. *See, e.g.* CAC ¶ 114, 134, 156, 159–60, 162. instead, Plaintiffs argue that the actual value of the payments is "irrelevant" because they have alleged that the payments were "sufficiently large." Pl. Opp. at 43. The Court disagrees. *Twombly* requires more than mere "labels and conclusions" to state a claim for relief. 550 U.S. at 555. Although Plaintiffs need not provide precise calculations at the pleading stage, here, they do not even attempt to provide a factual basis for the "tens" and "hundreds of millions" of dollars allegedly paid by Takeda. The bare allegations in the CAC are thus insufficient for the Court to make a reasonable estimate of the settlements' value and detennine whether they constituted large and unjustified payments. *See In re Effexor XR Antitrust Litig.,* 2014 WL 4988410, at \*21 (discussing no-authorized generic clause and concluding that to state a claim, plaintiffs must provide "some reliable foundation to show that a reverse payment agreement was actually entered and present specific facts showing how the alleged non-monetary payment was calculated").[17]

**\*20** Moreover, Plaintiffs have failed to plausibly allege any other factual basis for the Court to evaluate the settlements' unlawful anticompetitive effect. They have not, for instance, alleged that any particular generic manufacturers were deterred from earlier entry, or alleged any specific effect on price. In these circumstances, crediting Plaintiffs' unsupported assertions that the settlements were unlawful "payments" would suggest that any and all settlements between a brand and a manufacturer are potentially unlawful-a result that the *Actavis* Court was unlikely to have intended.

2015-2 Trade Cases P 79,309

## B. Rule of Reason Analysis

In sum, although the Court recognizes that some settlements with non-cash settlement terms may provide a basis for an *Actavis* reverse payment claim, the settlement agreements in this case do not. Plaintiffs have thus failed to meet their initial burden under the rule of reason of alleging cognizable anticompetitive conduct. Accordingly, the Court need not proceed further with the rule of reason analysis; Counts 3–6 and Counts 8 and 9 are dismissed.

## II. Monopolization Claims against Takeda

In Count 1, Plaintiffs allege that Takeda monopolized the market for ACTOS by submitting "improper" patent information regarding the 584 and 404 patents and entering into unlawful settlement agreements with the Generic Defendants that had the effect of creating a "bottleneck" on competition. CAC ¶¶ 230–238. In Count 2, Plaintiffs allege that Takeda attempted to monopolize the ACTOS market, although it alleges no particular anticompetitive conduct in which Takeda engaged to do so. *Id.* ¶¶ 239–246.

As with their other claims, Plaintiffs do not set forth the requirements for a monopolization claim under the numerous state laws cited in the CAC, nor do they plead any state-specific factual allegations. Assuming, as the parties do, that those statutes accord with the federal standard, Plaintiffs have not met their pleading burden. Pursuant to Section 2 of the Sherman Act, it is unlawful to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Plaintiffs asserting a monopolization claim must allege that (1) the purported monopolist possesses monopoly power in the relevant market, as well as (2) the intent to monopolize-*i.e.* "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *In re Adderall XR Antitrust Litig.,* 754 F.3d 128, 133 (2d Cir.2014) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004)). To protect the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct, that is, "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *Id.* (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 124 (2d Cir.2007)). In addition, plaintiffs also "must allege facts sufficient to prove that [they] suffered 'antitrust injury,' " " from the defendants'

conduct. *In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d at 219 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). This injury must be an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.*

**\*21** The first element of a monopolization claim-market power-is not in dispute. As to anticompetitive conduct, Plaintiffs specifically allege that Takeda acted anticompetitively by (1) listing false patent infonnation for ACTOS in the Orange Book, and (2) entering unlawful settlement agreements. Takeda responds that it was required to list the patents in the fashion it did and did not provide any patent information in bad faith, and that Plaintiffs have not plausibly alleged that the Orange Book listings caused antitrust injury. Takeda Mem. at 1–2.

## A. Listing of Patent Information for ACTOS in the Orange Book

Plaintiffs allege that Takeda acted anticompetitively by listing the 584 and 404 patents in the Orange Book as "drug product patents" because those patents did "not claim the ACTOS drug product"; in other words, they assert that the 584 and 404 patents correspond to different drug compositions than that in ACTOS. Pl. Opp. at 47; CAC ¶¶ 92–93. According to Plaintiffs, the listing of these patents caused generic ANDA filers to file Paragraph IV Certifications instead of Section viii Statements as to those patents, triggering patent infringement litigation by Takeda and a 30 month delay in FDA approval of the generic ANDAs, and thereby delaying generic entry into the ACTOS market. Plaintiffs contend that this patent litigation and delay in FDA approval were improper because the drug component claims of the 584 and 404 patents would not have been infringed by the applications. Pl. Opp. at 49.

To support this theory, Plaintiffs rely on the alleged invalidity of the 584 and 404 drug component claims as to the ACTOs drug. *Actavis* instructs, however, that litigating the validity of the patent is "normally not necessary" to "answer the antitrust question"; instead, courts may look to the value of the settlement offered by the brand as a proxy for the strength of the patent. 133 S.Ct. at 2236. Of course, in some cases, the invalidity of the patent will be readily established and the Court need not rest its analysis on the settlement value. For example, following a bench trial in which the patent at issue was held to be invalid and procured by fraud, the court in *FTC v. Cephalon, Inc.* concluded that the brand name manufacturer was collaterally estopped from asserting "the

Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 55 of 89
In re Actos End Payor Antitrust Litigation, Not Reported in F.Supp.3d (2015)
2015-2 Trade Cases P 79,309

strength of its patent, or litigation uncertainty and business risk" as defenses against a reverse payment antitrust claim by the FTC. 36 F.Supp.3d 527, 537 (E.D.Pa.2014). In such a case, the brand manufacturer is properly estopped from relying on the validity of the patent as a defense to an antitrust claim because it is well established that "one who acted fraudulently in obtaining a patent necessarily knows its patent is unenforceable." Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 706a2.

The facts alleged here, however, do not provide a basis for litigating the 584 and 404 patents to "answer the antitrust question," *Actavis,* 133 S.Ct. at 2236, because even assuming the allegations to be true, Plaintiffs have not plausibly alleged an antitrust injury resulting from Takeda's conduct. At the time of the settlements at issue, no patent listed for ACTOS, including the 584 and 404 patents, had been found invalid or not infringed by a generic ANDA; the only relevant ruling on the ACTOS patents to date was Judge Cote's decision that the 777 patent *was* valid and had been infringed by Mylan. *See Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.,* 417 F.Supp.2d 341, 344 (S.D.N.Y.2006) *judgment entered sub nom., Takeda Chem. Indus., Ltd. v. Ranbaxy Labs., Ltd.,* 2006 WL 618424 (S.D.N.Y. Mar, 13, 2006) *and affd sub nom., Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350 (Fed.Cir.2007). Indeed, Plaintiffs do not dispute that the 777 patent was properly listed in the Orange Book for Takeda's ACTOS NDA. Furthermore, as Takeda argues in its motion papers, it was required under the Hatch–Waxman Act to list any patent which claimed *either* the ACTOS drug or a method of using the drug. Takeda Mem. at 10 (citing 21 U.S.C. § 355(h)(1)). Although Plaintiffs dispute that the 584 and 404 patents claimed the ACTOS drug product, they do not dispute that the patents claimed methods of using ACTOS in conjunction with an insulin secretion enhancer (sulfonylurea) or biguanide (metformin). There is thus also no dispute that the 584 and 404 patents were properly listed in the Orange Book by Takeda as claiming methods of using ACTOS.[18]

**\*22** For this reason, Plaintiffs have not sufficiently alleged an antitrust injury resulting from Takeda listing the 584 and 404 patents in the Orange Book. Plaintiffs summarily allege that had Takeda submitted correct patent information, "no ANDA filed would (or could) have submitted a Paragraph IV Certification for ACTOS with respect to the 584 and 404 patents," and would have submitted only Section viii Statements-averting the 30 month delay in FDA approval. CAC ¶ 102. As explained above, however, every ANDA submitted must "despite any disagreement as to the correctness of the patent information, contain an appropriate certification for each listed patent"-including method of use patents. 21 C.F.R. § 314.53(f). Accordingly, even if the 584 and 404 patents were described only as claiming methods of using ACTOS, each ANDA filer would have been required to submit an appropriate certification for those patents, *i.e.* either: (1) a Paragraph IV certification if they intended to market the drug for the same use, or (2) a request for FDA approval for a "carve out" label that did not overlap with the patented methods of use. *See Caraco Pharm. Labs.,* 132 S.Ct. at 1677. Plaintiffs' conclusory allegations that the generic manufacturers nonetheless could have filed only Section viii Statements are thus inconsistent with the applicable statutory requirements and do not raise Plaintiffs' right to relief beyond a speculative level.

In any event, even crediting Plaintiffs' speculation that no generic would have filed a Paragraph IV Certification if not for the inaccurate Orange Book information provided by Takeda, Plaintiffs have not plausibly alleged that Takeda's conduct unlawfully delayed generic entry. After the Generic Defendants filed ANDAs with Paragraph IV Certifications as to the 584 and 404 patents, Takeda filed patent infringement actions against them on October 17, 2003. Those actions triggered the 30–month waiting period for FDA approval of the ANDAs, precluding any generic entry in the ACTOS market until April 17, 2006. The delay of generic entry until April 17, 2006 is thus plausibly attributed to Takeda's alleged conduct. Plaintiffs cannot allege an antitrust injury resulting from that delay, however, because there is no dispute that generic entry was lawfully precluded until January 17, 2011, the date that the 777 patent expired. In other words, regardless of any delay caused by Takeda's Orange Book listing for ACTOS, neither the Generic Defendants nor any other generic manufacturer could have entered the ACTOS market prior to January 17, 2011–nearly five years after the 30 month waiting period for FDA approval ended. Because there is no dispute that generic entry was lawfully barred until that date, Plaintiffs cannot plausibly allege an actionable antitrust injury resulting from Takeda's alleged Orange Book violation.[19]

### B. Settlement Agreements

Takeda's grant of licenses to the Generic Defendants and Teva to enter the ACTOS and ACTO*plus* markets also fail to provide a basis for the monopolization claim. By their plain tenns, the settlements resulted in additional competition as of an agreed-to entry date, rather than a further concentration

of market power in Takeda. In addition, the agreements did not preclude other generic manufacturers from also entering the market. Plaintiffs' attempt to recast the reverse payment claims as stand-alone monopolization claims thus fails.

**\*23** Viewing the settlements in the context of Plaintiffs' Orange Book allegations does not alter the Court's conclusion. Although Plaintiffs dispute the validity of some of Takeda's patent claims, this is not an example of "sham" infringement litigation by a brand manufacturer. *See Actavis,* 133 S.Ct. at 2236. [20] Plaintiffs acknowledge that Takeda's infringement suits against Defendants included both infringement and inducement claims. *See* CAC ¶¶ 109, 144. Setting aside the drug product claims of the 584 and 404 patents, the Generic Defendants may nonetheless have been found liable for inducing infringement of those patents' method of use claims.

Indeed, Judge Cote denied Actavis's motion to dismiss Takeda's patent infringement lawsuit on this very basis. *Takeda Chem. Indus., Ltd. v. Watson Pharm., Inc.,* 329 F.Supp.2d 394, 401 (S.D.N.Y.2004) (finding allegations that Actavis (then Watson) "ha[d] taken and will take acts to induce infringement of [the 584 and 404] patents" sufficient to state a claim for relief). Similarly, in a parallel infringement action against another generic ACTOS manufacturer, Judge Cote denied the generic's motion for judgment on the pleadings, concluding that the Court could not find as a matter of law "that a generic drug manufacturer cannot induce infringement of combination-use patents as a matter of law after the principal patent has expired." *Takeda Pharm. Co. v. Sandoz, Inc.,* No. 07–CV–3844, 2007 WL 2936208, at \*5 (S.D.N.Y. Oct. 9, 2007). These rulings established that far from constituting a "sham litigation," there was at least a colorable legal basis for Takeda to pursue induced infringement claims against the Generic Defendants and Teva (as well as a basis for the generic manufacturers to pursue settlement), notwithstanding the generics' positions on the 584 and 404 patents' validity. *See Commil USA, LLC v. Cisco Sys. Inc.,* ––– U.S. ––––, ––––, 135 S.Ct. 1920, 1922, 191 L.Ed.2d 883 (2015) (holding that "[a] defendant's belief regarding patent validity is not a defense to an induced infringement claim").

In sum, Plaintiffs do not plausibly allege that Takeda engaged in anticompetitive conduct to monopolize or attempt to monopolize the ACTOS market. Accordingly, Counts 1 and 2 are dismissed.

### III. "Overarching" Conspiracy Claim

In Count 7, Plaintiffs allege that "[t]hrough an overarching anticompetitive scheme, including the Exclusion Payment Agreements ... Defendants conspired to block and delay the entry into the market of generic ACTOS." CAC ¶ 284. This claim fails as a matter of law.

As with their other antitrust claims, Plaintiffs fail to plead the elements of an overarching conspiracy claim under any of the state laws they list in Count 7. Under federal law, which the parties cite to in their briefs, [21] the "crucial question" in any conspiracy case is "whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 135 (2d Cir.2013) (internal quotation omitted); *see also Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 183 (2d Cir.2012) ("whether [the conspiracy is] horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice"). The existence of an agreement is a legal conclusion; a mere conclusory allegation that Defendants agreed to enter into unlawful settlements without supporting factual allegations is insufficient to state a claim for relief. *See Mayor & City Council of Baltimore, Md.,* 709 F.3d at 135 (citing *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 319 n. 2 (2d Cir.2010)). Rather, "[a] plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Id.* at 136.

**\*24** Plaintiffs may do this in one of two ways. First, they may allege direct evidence that defendants entered into an agreement in violation of the antitrust laws. *Id.* (citing *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 323–24 (3d Cir.2010)). Secondly-and more commonly because direct evidence is often unavailable-plaintiffs may present circumstantial facts supporting the inference that a conspiracy existed. *Id.* Such facts may include conscious parallel or interdependent conduct, although parallel conduct alone is generally insufficient to defeat a motion to dismiss. *Id.* (citing *Twombly,* 550 U.S. at 551, 553, 556, which held that allegations of illegal agreements based solely on the parallel actions by competitors failed to state a claim). This is because parallel conduct by competitors may be explained by "rational and competitive business strategy unilaterally prompted by common perceptions of the market," just as reasonably as it may be explained by an unlawful agreement. *Id.* at 137 (quoting *Twombly,* 550 U.S. at 554).

Therefore, when relying on parallel or interdependent conduct as circumstantial evidence, plaintiffs must also allege the existence of other circumstances, typically called "plus factors," that when viewed in conjunction with the conduct, support an inference of an agreement. *Id.* at 136 (citing *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001)). These factors may include a common motive to conspire, evidence establishing that the conduct was against the economic selfinterest of the alleged conspirators, and frequent inter-firm communications. *U.S. v. Apple Inc.,* 952 F.Supp.2d 638, 690 (S.D.N.Y.2013), *aff'd,* 791 F.3d 290 (2d Cir.2015). Moreover, the parallel actions and "plus factors" alleged must actually support an inference of conspiracy; that is to say, the allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly,* 550 U.S. at 557. In a particular case, it may be that the "plus factors" support "an equally plausible inference of mere interdependent behavior, *i.e.,* actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Mayor & City Council of Baltimore,* 709 F.3d at 137 (quoting *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 254 (2d Cir.1987)).

Plaintiffs argue that the settlement agreements in this case are evidence of a "hub-andspoke" conspiracy to control the ACTOS and ACTO*plus* markets. Pl. Opp. at 66–68. In this type of conspiracy, the "hub" defendant coordinates a series of substantively identical agreements with the "spoke defendants" (usually vertical partners) while ensuring the spoke defendants that the same deal was offered to each. *See In re Elec. Booh Antitrust Litig.,* 859 F.Supp.2d 671, 685 (S.D.N.Y.2012). To establish a hub-and-spoke conspiracy, the plaintiff must demonstrate both that there was a horizontal agreement between the spoke defendants, and that each of those defendants was a "knowing participant in that agreement and facilitated the scheme." *Apple,* 952 F.Supp.2d at 690. Plaintiffs have not, however, plausibly alleged the existence of any overarching illegal agreement-"hub-and-spoke" or otherwise-between Defendants. The allegations in the CAC establish only that the Generic Defendants entered into similar agreements with Takeda and that they were aware of the relevant terms-*i.e.* the date of entry—in the other generics' agreements. At most, these allegations establish parallel or interdependent conduct. As to Teva, Plaintiffs have not plausibly alleged even parallel conduct; rather, the CAC asserts that Teva continued litigating Takeda's patents after the Generic Defendants settled. Moreover, there are not sufficient

"plus factors" alleged to support an inference that any of the Defendants unlawfully agreed to coordinate their settlements to block or delay generic competition.

**\*25** Plaintiffs have not, for instance, plausibly alleged that the agreements were against Defendants' self-interest " 'in the absence of similar behavior by its rivals," ' which would suggest that "each [D]efendant ... received assurances that all its rivals [would] act similarly." *King Drug Co. of Florence, Inc. v. Cephalon, Inc.,* 2014 WL 2813312, at \*11 (E.D.Pa. June 23, 2014) (quoting *Starr,* 592 F.3d at 327). *See also Apple,* 952 F.Supp.2d at 693 (explaining that but for the collective action that Apple, the "hub" defendant, nurtured, no individual defendant would have succeeded in imposing the anticompetitive arrangement); *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 935 (7th Cir.2000) (describing how the agreements were financially disadvantageous to the "spoke" defendants). By contrast, the agreements in this case are in accord with the independent interests that each of the Generic Defendants and Teva had in settling their lawsuits and entering the generic market.

Moreover, the settlement agreements reflected each Defendant's respective rights under the Hatch–Waxman statutory scheme: the "first-filers" (Mylan, Actavis, and Ranbaxy for ACTOS, and Mylan for ACTO*plus* ) maintained some semblance of their 180 day period of exclusivity, and Teva, which did not have first-filer status, was permitted to enter simultaneously as an authorized generic, and with its own generic product 180 days later. *See* Def. Exs. 1–5. Thus, as the court observed in *King Drug Co. of Florence v. Cephalon, Inc.,* "the settlements seemed to offer the best of both worlds: an end to costly litigation, combined with lucrative business deals and an assurance that each Generic Defendant would not be disadvantaged regarding [generic entry]." 2014 WL 2813312, at \*12 (E.D.Pa. June 23, 2014) (rejecting conspiracy claim in reverse payment case where the agreements were economically beneficial). Conversely, there is no factual basis from which to infer that, on balance, the agreements were against the Defendants' self-interest. Plaintiffs' argument to the contrary requires the Court to assume that Defendants would have fared better had they proceeded to trial, and that assumption is pure speculation.[22]

Similarly, Plaintiffs do not allege that the Generic Defendants communicated with each other in advance of entering the settlements, or that the agreements were negotiated together. Indeed, there are no specific allegations regarding advance planning or coordination between the Generic Defendants,

Takeda, and Teva. This again contrasts with the circumstantial evidence alleged in cases in which the court found a conspiracy claim to be sufficiently stated. For example, in the purchaser class action regarding Apple's e-book price-fixing conspiracy with various publishers, the complaint described not only allegations of action against self-interest, but also circumstantial evidence of prior meetings between the publisher defendants, public statements made by Apple's Chief Executive predicting a change in prices, and evidence of meetings held on the same day in which the publishers made identical demands from Amazon. *In re Elec. Books,* 859 F.Supp.2d at 687–88.

**\*26** Plaintiffs' allegations of an agreement, on the other hand, lack any factual support and are entirely conclusory. *See, e.g.,* CAC ¶ 140 ("Takeda and its generic coconspirators worked together to neutralize the potential competitor [Teva] and bring it into the conspirators' non-competition pact."); *id.* ¶ 151 ("Mylan, Ranbaxy, and Actavis agreed that Takeda could advise Teva of the existence of the acceleration clauses."). The overall thrust of the CAC further weakens Plaintiffs' argument; rather than describing advance planning and coordinated action by the Defendants, it details the bilateral agreements between Takeda and each of the other Defendants that reflected their respective entry rights in each market under the statutory scheme. *See* CAC Counts 3–6. The "overarching conspiracy" claim thus lacks sufficient factual support.

Finally, even if Plaintiffs had plausibly alleged an unlawful agreement, the overarching conspiracy claim would nonetheless fail on the second prong as there has been no unreasonable restraint of trade. *See Apple,* 952 F.Supp.2d at 687–88 (discussing requirements of Sherman Act, which "does not disallow any and all agreements" but only "unreasonable restraints") (internal quotation and citation omitted). To the extent Plaintiffs rely solely on the terms of the settlement agreements between Takeda, the Generic Defendants, and Teva, as discussed above, Plaintiffs have failed to establish that those settlements contained unlawful payments or otherwise illegally restrained the ACTOS or ACTO*plus* markets. Accordingly, Plaintiffs cannot satisfy this prong of their antitrust claim.

Count 7 is thus dismissed.

## IV. Causation

In further support of their motion to dismiss the antitrust claims in the CAC, Defendants argue that Plaintiffs' general

theory of causation is too speculative to state an antitrust injury resulting from the settlement agreements. Def. Joint Mem. at 33. [23] The Court agrees this provides an additional basis for dismissal.

Plaintiffs do not dispute that causation is an essential element of their antitrust claims. Pl. Opp. at 73. *See also Lotes Co. v. Hon Hai Precision Indus. Co.,* 753 F.3d 395, 415 n. 8 (2d Cir.2014) ("[L]ack of causation in fact is fatal to the merits of any antitrust claim.") (quoting *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 41 (2d Cir.1986)). They allege, however, that the settlement agreements caused their injuries by requiring them to pay higher than necessary prices for ACTOS from January 17, 2011 and for ACTO*plus* from February 25, 2011–when they claim generic entry could have begun-to August 17, 2012–the date of generic entry set by the settlement agreements. *See* CAC ¶¶ 214–19. Plaintiffs assert that earlier entry could have occurred in "at least the following ways": (1) if Takeda listed the 584 and 404 patents as only method of use patents, no generic would have filed Paragraph IV Certifications, leading to "massive generic entry" on or about January 17, 2011; (2) if Teva won its proposed Orange Book counterclaim against Takeda, it would have entered on or about January 17, 2011; and (3) if Mylan did not accept unlawful "payments," it would have received an earlier entry date. Pl. Opp. at 73.

**\*27** The Court has addressed, and disposed of, the alleged factual bases asserted for these theories in the context the antitrust claims discussed above. Even setting aside those previously identified issues, however, Plaintiffs' proffered theories of causation fail to state a claim for relief. Pursuant to the first theory, for instance, the Court must assume (i) that the 584 and 404 patents were inaccurately listed in the Orange Book; (ii) that the generics would have avoided filing Paragraph IV Certifications with their ANDAs by obtaining final FDA approval of carve-out labels as to the patents' method of use claims; and (iii) that Takeda would not have pursued litigation based on the Defendants' induced infringement of the method of use claims. This last assumption is particularly vexing because, as discussed above, there is no dispute that Takeda did pursue infringement inducement claims. CAC ¶¶ 109, 144. As to the second theory, the Court must assume (i) that the district court would have permitted Teva to amend its answer to include the Orange Book counterclaim; and (ii) that Teva would have pursued the counterclaim and prevailed at trial. Plaintiffs' third theory fails because as noted above, they have not plausibly alleged that Takeda offered unlawful payments to Mylan to induce later

entry, and the allegation that Mylan would have obtained a better result by not accepting a settlement has no factual basis in the CAC.

In sura, the unsupported speculation underlying each of Plaintiffs' theories is insufficient to plausibly allege causation. *See In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 261 F.Supp.2d 188, 201–07 (E.D.N.Y.2003) (holding that various theories of causation regarding the timing of FDA approval and success in underlying patent litigation were too speculative to state a claim for relief). In particular, each of the theories requires the Court to assume that Takeda's patent claims were invalid and the infringement actions against the Defendants would have failed. Such assumptions regarding success at trial are generally rejected as unduly speculative unless the facts alleged establish a basis for concluding otherwise. *See id.* at 201–02; *AbbVie,* 2015 WL 2114380, at *8. Because Plaintiffs have failed to do so here, they cannot establish an antitrust injury caused by Defendants' conduct.[24] Plaintiffs' antitrust claims must therefore be dismissed on this basis as well.

### IV. State Consumer Protection Claims

In Counts 10 and 11, Plaintiffs allege that Defendants violated numerous state consumer protection laws. Specifically, Plaintiffs assert that there was a "gross disparity between the price that Plaintiffs and the Class members paid for the brand product" as compared to the price of "generic products which should have been available." CAC ¶¶ 311–12, 316–17. Plaintiffs do not identify any specific provisions of the various state laws that were purportedly violated, nor do they plead any particular conduct in violation of those provisions.

**\*28** As a court in this district observed, "different state consumer protection statutes contain " 'not only nuances, but differing standards of proof, procedure, substance, and remedies.' " *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d 390, 409 (S.D.N.Y.2011) (quoting *Tylka v. Gerber Prods. Co.,* 178 F.R.D. 493, 499 (N.D.Ill.1998)). Plaintiffs fail to account for these differences in the CAC. Indeed, in Counts 10 and 11, Plaintiffs merely restate their antitrust allegations as separate consumer protection claims, providing no distinct factual basis for a violation of consumer protection law. This is insufficient to meet the Rule 8 pleading standard under *Twombly* and *Iqbal. See In re Aggrenox,* 2015 WL 1311352, at *23–24 (dismissing state consumer protection claims by indirect purchaser class on same basis).[25]

The Court thus concludes that Plaintiffs have failed to plausibly allege violations of the various state consumer protection statutes listed in the CAC and Counts 10 and 11 are dismissed.

### V. Unjust Enrichment Claims under State Law

Finally, Defendants argue that Plaintiffs have similarly failed to sufficiently allege the unjust enrichment claims in Counts 12 and 13. Def. Joint Mem. at 43. The Court agrees. Plaintiffs generally allege claims for unjust enrichment under the laws of "all states and jurisdictions within the United States, except for Indiana and Ohio." CAC 328, 340. The CAC does not contain any state-specific allegations, even though "unjust enrichment is not a catch-all claim existing within the narrow scope of federal common law," but rather a state-specific remedy. *See In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 167 (E.D.Pa.2009) (citing *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.,* 164 F.3d 123, 129–130 (2d Cir.1999)). *See also Vista Healthplan, Inc. v. Cephalon, Inc.,* 2015 WL 3623005, at *27–30 (E.D.Pa. June 10, 2015) (discussing "significant" differences in state unjust enrichment laws in the context of class certification analysis). The Court must therefore defer to the substantive state common law of those states' courts to determine whether relief is available. *See Goldenberg v. Johnson & Johnson Consumer Co.,* 8 F.Supp.3d 467, 484 (S.D.N.Y.2014) ("Certainly, if in [the state court] the instant claim for unjust enrichment would be unavailable ... it must equally be unavailable in the Federal courts."). Plaintiffs have failed to provide the Court with any state-specific basis for making such determination.

Even in more general terms, however, Plaintiffs' claims fall short. "Although the requirements to plead unjust enrichment vary by state, almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit." *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d at 411 (internal quotations and citation omitted). An unjust enrichment claim may be "autonomous," meaning it provides an independent ground for restitution, or "parasitic," that is, based on a predicate violation. *Id.* at 411–12. Here, although Plaintiffs do not specify which type of claims they assert, Counts 12 and 13 rely on the same conduct underlying the antitrust claims in the CAC; therefore, the unjust enrichment claims may be considered parasitic.[26] However, because no antitrust claim survives, the parasitic unjust enrichment claims must

be dismissed as well. *See Kramer v. Pollock–Krasner Found.,* 890 F.Supp. 250, 257 (S.D.N.Y.1995) (dismissing unjust enrichment claim where underlying antitrust claims failed); *In re Aluminum Warehousing Antitrust Litig.,* No. 13–MD–2481 (KBF), 2014 WL 4743425, at *4 (S.D.N.Y. Sept.15, 2014). [27]

## CONCLUSION

**\*29** Two years after *Actavis,* federal judges continue to grapple with its implications and many questions of first impression remain to be decided. One thing should be clear. While some settlements of patent infringement suits may produce anticompetitive effects yet are cleverly designed to evade antitrust scrutiny, not all settlements are illegal, nor-in the Court's viewshould they be. Protecting against anticompetitive conduct is an important interest, but so too is the innovation the patent laws are intended to protect. The aim of this Court, like those in *Actavis* and its progeny, is to balance these interests as the law prescribes.

It is not this Court's role, however, to expand the scope of *Actavis* beyond what was contemplated in the Supreme Court's decision, In this case, Plaintiffs' allegations fall short of cognizable anticompetitive conduct. Permitting the claims to go forward would exceed the contours established by *Actavis,* and discourage or needlessly restrict future patent settlements in a fashion not currently supported by law.

For the foregoing reasons, Defendants' motions to dismiss the Consolidated Amended Class Action Complaint are granted in their entirety. Plaintiffs have previously amended the Complaint three times and further amendment would be futile. Accordingly, dismissal is with prejudice.

The Clerk of the Court is directed to terminate items 122, 124, 125, and 131 on the docket and to close the consolidated cases listed in footnote 1 of this Opinion.

SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 5610752, 2015-2 Trade Cases P 79,309

## Footnotes

1    Pursuant to Magistrate Judge Ellis's May 20, 2014 Order, the following cases were consolidated for pretrial purposes under Federal Rule of Civil Procedure 42(a): 1:13–CV–09244; 1:13–CV–09250, 1:14–CV–00116, 1:14–CV00644. 1:14–CV–01493, 1:14–CV–02532, 1:14–CV–01661, 1:14–CV–02617, 1:14–CV–01691, 1:14–CV–01788, 1:14–CV–02424, l:14–CV–02378, 1:14–CV–02137, l:14–CV–02846. *See* Dkt. 46.

2    It is undisputed that because Plaintiffs are indirect purchasers, they may not recover overcharges under federal antitrust law or under the laws of those states which follow the rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Accordingly, Plaintiffs have standing to assert violations of only the state antitrust laws that do not follow *Illinois Brick,* and any claims under the laws of states following *Illinois Brick* fail as a matter of law.

3    The facts are taken from the CAC and are presumed to be true for the purposes of this motion to dismiss. The Court also considers the settlement agreements referenced in the CAC and filed under seal, in accordance with its prior ruling. Dkt. 118. *See also* See *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir.2013) ("In adjudicating a motion to dismiss, a court may consider ... any document upon which the complaint heavily relies,") (quotations and citation omitted).

4    The current version of this provision provides: "For patents that claim the drug substance, the applicant shall submit information only on those patents that claim the drug substance that is the subject of the pending or approved application or that claim a drug substance that is the same as the active ingredient that is the subject of the approved or pending application ... For patents that claim a drug product, the applicant shall

In re Actos End Payor Antitrust Litigation, Not Reported in F.Supp.3d (2015)
Case 1:23-cv-07222-LTS-GWG   Document 21-1   Filed 10/24/23   Page 61 of 89

2015-2 Trade Cases P 79,309

submit information only on those patents that claim a drug product ... that is described in the pending or approved application." 21 C.F.R. § 314.53(b) (2014).

5    Actavis and Ranbaxy's ANDAs indicated that they were not seeking to market generic ACTOS until after the 777 patent expired. *See* Def. Joint Mem. at 7.

6    As discussed further below, by separate agreement, Mylan, as the first-filer for ACTO*plus,* was also granted a license to enter that market no later than December 14, 2012. Def. Ex. 3, Mylan ACTO*plus* Agreement,

7    Earlier entry was permitted, for instance, if the date of first commercial marketing of a generic ACTOS product by a third party under an FDA approved ANDA, Ex. 1, Ranbaxy Agreement at 7, or a final decision holding that the adjudicated claims of the licensed patents for ACTOS were invalid, Ex. 2, Mylan ACTOS Agreement at 9 occurred prior to the dates fixed by the agreements.

8    Excluded from both classes are Defendants and their officers, directors, employees, corporate parents, subsidiaries, affiliates, representatives, and agents; federal or state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; all persons or entities that purchased ACTOS and/or ACTO*plus* or the AB-rated generic equivalent for purposes of resale and/or directly from Defendants or their affiliates; fully insured health care plans; any "flat co-pay" consumers whose purchases were paid, in part, by a third party payor, and those whose co-payment was the same regardless of the retail purchase price; Pharmacy Benefit Managers without capitation agreements; and the Court, Court personnel, and their family members. CAC ¶ 167.

9    The parties do not address the extent to which the state statutes differ from the federal antitrust laws and the standards announced in *Actavis.* Although these potential differences are not raised in Defendants' motion, they may provide an additional basis for dismissal. *See In re Cipro Cases I & II,* 61 Cal.4th 116, 141, 187 Cal.Rptr.3d 632, 348 P.3d 845 (2015) (noting that *Actavis* is not dispositive of reverse payment claim under California statute). *See also In re Aggrenox Antitrust Litig.,* —— F.Supp.3d. ——, 2015 WL 1311352, at *24 (D.Conn. Mar.23, 2015) (dismissing indirect purchaser claims where plaintiffs "attempt[ed] to build a Frankensteinian equivalent of *Actavis'* to reach conduct for which plaintiffs could not attack under federal law because of *Illinois Brick's* prohibition on indirect purchaser suits).

10   This settlement is addressed separately below, *infra* p. 29.

11   Both Ranbaxy and Teva's agreements, however, did contain optional supply provisions that allowed them to purchase drug product from Takeda. Def. Ex. 1, Ranbaxy Agreement at 10; Ex. 5, Teva Agreement at 17.

12   As described above, Teva was permitted to enter the ACTOS market as Takeda's authorized generic on the same date.

13   In fact, acceleration clauses were pleaded as an alleged "payment" in *In re Loestrin,* but the Court summarily rejected plaintiffs' theory. *See* 45 F.Supp.3d at 191 (holding that *Actavis* did not apply to non-cash settlement terms).

14   At least one other court has rejected a reverse payment claim based on a similar settlement term-licenses for entry in foreign markets for another drug manufactured by the brand. *See In re Lipitor,* 46 F.Supp.3d at 546.

15   The agreements in *Teikoku Pharma* and *In re Niaspan* included additional payment-like terms. In *Teikoku Pharma,* the settlement included a supply agreement under which the patentee supplied the infringer generic with product worth $12 million dollars once a month for eight months. 74 F.Supp.3d at 1070. The settlement terms in *In re Niaspan* included a co-promotion agreement under which the brand paid the generic a royalty on all sales of the drug at issue and another drug produced by the brand in return for product promotion, as

well as a manufacturing agreement that included a lump sum and quarterly payments from the brand to the generic in exchange for the generic agreeing to act as a back-up supplier for the brand. 42 F.Supp.3d at 744.

16    The settlements in *King Drug* included actual cash payments as well as supply and manufacturing provisions. 2015 WL 356913, at *3–5.

17    Another court in this Circuit has suggested that generalized allegations may suffice on this issue. *See In re Aggrenox,* 2015 WL 1311352, at *13 (rejecting defendants' argument that allegations of the settlement's value were not sufficiently specific, noting that "precise and particularized estimates of fair value and anticipated litigation costs" may require discovery). In contrast to the facts here, however, the allegations in *In re Aggrenox* specified the amounts of upfront cash payments and royalties paid under the agreements. *Id.* at *12.

18    Takeda further argues that Plaintiffs' argument fails because the regulatory scheme requires only that the brand manufacturer list "patents" in the Orange Book, and does not provide for a "claim-by-claim" listing system for patents with multiple claims. Takeda Mem. at 15 ("The number of claims contained within a particular patent does not affect the ability of the patent to be listed as long as there is at least one claim that meets the two required elements." (citing 68 Fed. Reg, 36,676, 36,685 (June 18, 2003)). The Court need not engage in a textual analysis of the regulations, however, because as discussed below, even assuming the listing of the 584 and 404 patents in the Orange Book was, at least in part, inaccurate, Plaintiffs have not plausibly alleged an antitrust injury resulting from that conduct.

19    Plaintiffs' theory that the Orange Book listings served as a "lynchpin" for the settlement agreements, Pl. Opp. at 54, is discussed separately below.

20    To be considered "sham litigation," a lawsuit must be (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) conceal "an attempt to interfere directly with the business relationships of a competitor." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

21    *See* Def. Joint Mem. at 37; Pl. Opp. at 67. The Court therefore relies on the federal standards set forth pursuant to the Sherman Act, 15 U.S.C. § 1.

22    *See* more detailed discussion *infra* pp. 46–48.

23    Actavis and Teva additionally assert that Plaintiffs' claims against them fail as a matter of law because their settlements with Takeda could not have caused Plaintiffs' alleged injury. *See* Actavis and Teva Mem. at 2. In light of the Court's conclusion that Plaintiffs have failed to sufficiently allege causation as to all of the Defendants, it need not address this argument.

24    Another case may present circumstances where the generic's success in the patent litigation was less speculative. For instance, in *In re Niaspan,* the court held that plaintiffs' theory of causation based on likely success in the underlying patent litigation was sufficient to withstand a motion to dismiss. 42 F.Supp.3d at 755–57; *see also In re Ciprofloxacin Hydrochloride,* 261 F.Supp.2d at 211–12. In contrast to the allegations here, however, the plaintiffs in that case alleged a reverse payment as well as specific facts evincing that the generic was "confident that it would ultimately prevail" in the patent litigation, including that the generic had begun preparing to launch at-risk as soon as it obtained final FDA approval and that stock prices for the brand had dropped as a result. 42 F.Supp.3d at 756.

25    Although the court in *In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.,* a case cited by Plaintiffs in their brief, found "cursory" allegations linking the defendants' conduct to certain state statutes to be sufficient, that complaint contained significantly more specific allegations regarding the

2015-2 Trade Cases P 79,309

consumer protection statutes in the states where the named plaintiffs resided as well as separate conduct that purportedly violated those laws. 701 F.Supp.2d 356, 378–79 (E.D.N.Y.2010)).

26      In any event, an autonomous claim would fail here because "autonomous restitution only exists in the absence of a violation of law," and here, the conduct alleged is governed by federal and state antitrust laws. *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d at 412.

27      Because the Court concludes that the CAC does not state a claim for relief, it declines to address Defendants' state-specific arguments for dismissal, including their argument that Plaintiffs lack standing as indirect purchasers under certain states' laws.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

634 B.R. 599
United States Bankruptcy Court, D. Colorado.

IN RE: SAN LUIS & RIO GRANDE
RAILROAD, INC., Debtor.

In re: Saratoga and North Creek Railway, LLC, Debtor.

Lead Bankruptcy Case No. 19-18905-TBM
|
Bankruptcy Case No. 20-12313 Jointly
Administered Under Bankruptcy Case No. 19-18905
|
Signed September 2, 2021

**Synopsis**

**Background:** Claimant, a small feeder railway whose
freight cars allegedly were used by debtor, the owner and
operator of a historic 150-mile Colorado railway that was
reorganizing under Subchapter IV of Chapter 11, filed
administrative expense motion, seeking payment for "car
hire" and cancellation of "tariff" unilaterally imposed by
trustee for the return of empty cars owned by claimant.
Trustee objected and moved for partial summary judgment.

**Holdings:** The Bankruptcy Court, Thomas B. McNamara, J.,
held that:

the bankruptcy court had general bankruptcy jurisdiction to
resolve the parties' dispute;

the bankruptcy court declined to refer the matter to the Surface
Transportation Board (STB) for resolution;

the Association of American Railroads (AAR) "Car Service
Rule 2" did not prohibit trustee's imposition of a tariff or
charge for the return of empty freight cars owned by claimant;
and

alternatively, under the Colorado rules of contract
interpretation, AAR "Car Service Rule 2" did not prohibit
trustee's imposition of the subject tariff or charge.

Motion granted.

**Procedural Posture(s):** Objection to Administrative
Expense Claim; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*604** William Cross, James T. Markus, Jennifer M.
Salisbury, Zachary Sanderson, Markus Williams Young &
Hunsicker LLC, Denver, CO, for Trustee.

Harley J. Goldstein, Goldstein & McClintock LLLP, Chicago,
IL, Douglas T. Tabachnik, Law Offices of Douglas T.
Tabachnik, Freehold, NJ, for Creditor Committee.

**ORDER GRANTING MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Thomas B. McNamara, United States Bankruptcy Judge

**I. Introduction.**

This dispute pits two Colorado short-line railroads against
each other. The Debtor, San Luis and Rio Grande Railroad,
Inc. (the "SL&RG"), is the owner and operator of a historic
150-mile railway in the shadow of the Spanish Peaks. The
main line pushes westward from Walsenburg, Colorado, over
La Veta Pass (reputedly the highest rail passage in the United
States) toward the Sacred Mountain: Tsisnaasjiní (as known
by the Navajo) and also called Blanca Peak. From there, the
main track continues to the transportation hub of Alamosa,
Colorado, and even further west to Sugar Junction near
Monte Vista, Colorado which is the agricultural heartland of
**\*605** the San Luis Valley.[1] At that junction, the SL&RG
connects to the San Luis Central Railroad (the "SLC"), a small
feeder railway which heads north about 13 miles to Center,
Colorado, where it dead ends in potato and barley country.
The SLC owns 149 railway cars. For outbound national traffic
from Center, the SLC sends its loaded cars south to the
Monte Vista Junction, where they are interchanged to the
SL&RG. Then, the cars travel east through Alamosa and on
to Walsenberg, where they are interchanged with the Union
Pacific Railroad. Thence, the railcars can reach anywhere in
the continental United States. Inbound traffic flows in reverse.
The SLC operation depends entirely on transportation over
the SL&RG — there is no other way to go.

And therein is the rub. The SLC asserts that the SL&RG owes
money to the SLC for "car hire." "Car hire" is a railroad term
of art which means: "[c]ompensation to be paid by a user to an
owner for use of a car." 49 C.F.R. 1033.1(a)(2). Compensation
paid for car hire "may include, but need not be limited to,
hourly and mileage rates." *Id.* The idea is to compensate

railcar owners (like SLC) for the use of their equipment. 49 U.S.C. § 11122 ("the [car hire] regulations ... shall encourage the purchase, acquisition, and efficient use of freight cars"). By statute, "compensation to be paid for each type of freight car shall be determined by the expense of owning and maintaining that type of freight car, including a fair return on its cost ...." *Id.* The rate of car hire compensation may be set by private contract or through Federal transportation statutes and regulations which reference the Association of American Railroads (the "AAR") Circular No. OT-10 Code of Car Service Rules and Code of Car Hire Rules (separately, the "AAR Car Service Rules" and the "AAR Car Hire Rules," and together, the "AAR Rules"). Both the SL&RG and SLC are subscribing railroads in the AAR and have agreed to the AAR Rules.

Although the SL&RG acknowledges that some amounts are due to the SLC for car hire, the SL&RG asserts a type of offset based upon an alleged special agreement (which the SL&RG characterizes as a "reclaim"). Furthermore, on May 21, 2020, the SL&RG unilaterally imposed Tariff No. SLRG 8000, which was later amended by Tariff No. 8000-A on January 21, 2021 (the "Tariff"). [2]  The Tariff, as amended, states:

> The following charge will apply on all cars owned and controlled by the San Luis Central Railroad Company moved empty in interchange service between the Union Pacific Railroad Company at Walsenburg, Colorado and the San Luis Central Railroad Company at Monte Vista, Colorado: $225.00 per car.

The SLC refuses to pay the Tariff and contends that AAR Car Service Rule 2 prohibits the imposition of the Tariff. Meanwhile, the SL&RG demands that the SLC pay the Tariff.

All of the foregoing sounds fairly far afield from typical bankruptcy issues. However, the SL&RG is in the midst of a railroad reorganization under Subchapter IV of the Bankruptcy Code. 11 U.S.C. § 1161 *et seq.* Recently, the SLC filed its "Motion for Allowance and Payment of **\*606** Administrative Expense for Car Hire and for Other Related Relief" (Docket No. 487, the "Administrative Expense Motion"), wherein the SLC asked this Court to adjudicate

the dispute over car hire and the Tariff. Among other things, the SLC asserted that AAR Car Service Rule 2 prohibits the imposition of the Tariff. Then, the SLC asked this Court to order the SL&RG to pay car hire administrative expenses to the SLC, allow the SLC's pre-petition claim for car hire, and cancel the Tariff.

Thereafter, William A. Brandt Jr., the Chapter 11 Trustee for the SL&RG (the "Trustee") submitted an Objection to the Administrative Expense Motion (Docket No. 501, the "Objection") and filed his "Motion for Partial Summary Judgment on San Luis Central Railroad's Motion for Allowance and Payment of Administrative Expense Claim." (Docket No. 524, the "Summary Judgment Motion.") In the Summary Judgment Motion, the Trustee asked the Court to "find, as a matter of law, [AAR] Car Service Rule 2 does not preclude the Trustee from imposing a tariff or charge for the return of empty SLC-owned freight cars ...." So, the Summary Judgment Motion is very narrowly tailored. The SLC responded in opposition to the Summary Judgment Motion. (Docket No. 547, the "Opposition.") The Court conducted a hearing on the Summary Judgment Motion and Opposition. Having considered the issues, the Court determines that AAR Car Service Rule 2 does not prohibit the imposition of the Tariff. Nothing in either the AAR Car Service Rules or the companion AAR Car Hire Rules governs the imposition of transportation charges by a railroad for its services. Instead, transportation rates are established by the railroad carrier under the ambit of 49 U.S.C. §§ 10701, 10702 and 10704, which framework is separate and apart from the AAR Rules. Having resolved the narrow summary judgment question, the Court leaves for another day all the other myriad disputes between the SL&RG and SLC including, among others: whether the Tariff really is a "tariff"; whether the Trustee is entitled to impose the Tariff by statute; whether the Tariff is reasonable; whether the Trustee owes the SLC for car hire (and in what amount); and whether there is a special agreement between the SL&RG and SLC for "reclaim" which offsets any car hire compensation which might otherwise be owed.

## II. Jurisdiction and Venue.

The contest between the SL&RG and SLC (as framed by the Administrative Expense Motion, Objection, Summary Judgment Motion, and Opposition) raises uncommon and challenging jurisdictional issues. Bankruptcy courts are not typically called to adjudicate transportation disputes between

railroads. However, both the SLC and the Trustee contend that this Court has jurisdiction to resolve such matters. Both parties ask that this Court exercise such jurisdiction and proceed forward.

Bankruptcy courts, like all federal courts, are courts of limited jurisdiction. Federal courts possess "only that jurisdiction which has been conferred upon them by Congress." *Tafoya v. U.S. Dep't of Justice*, 748 F.2d 1389, 1390 (10th Cir. 1984) (citing *U.S. v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). And, "[a] federal court must in every case, and at every stage of the proceeding, satisfy itself as to its own jurisdiction ...." *Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*, 628 F.2d 1289, 1301 (10th Cir. 1980) (citing *Treinies v. Sunshine Min. Co.*, 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85 (1939)). So, irrespective of the views of the SLC and **\*607** the Trustee, the Court must independently assess its jurisdiction.

## A. The Court Has General Bankruptcy Jurisdiction Over the Dispute.

The United States Constitution grants Congress the power "[t]o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. Art. I § 8, cl. 4. The legislature used that power when it enacted the modern Bankruptcy Code. Congress vested United States district courts with "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a) and (b). Pursuant to 28 U.S.C. § 157(a), "[e]ach district court may provide that any and all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." The United States District Court for the District of Colorado (like every district court in the country) has provided by rule for automatic reference to bankruptcy judges. D.C. Colo. L. Civ. R. 84.1(a) ("A case or proceeding brought under or related to Title 11, United States Code, shall be referred automatically to the bankruptcy judges of this district under 28 U.S.C. § 157.") And, under 28 U.S.C. § 151, "[i]n each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district." Bankruptcy judges are "judicial officer[s] of the district court." *Id.*

The SLC invoked bankruptcy jurisdiction by filing (along with two other creditors) an Involuntary Bankruptcy Petition against the SL&RG. (Docket No. 1.) After the Involuntary

Petition, neither the SL&RG nor any other party in interest responded. So, on November 7, 2019, the Court issued an "Order for Relief." (Docket No. 18.) Accordingly, the SL&RG is in the midst of a bankruptcy railroad reorganization under Subchapter IV of the Bankruptcy Code. 11 U.S.C. § 1161 *et seq.* Thus, the Court has original and exclusive jurisdiction over the SL&RG bankruptcy case.

Through the Administrative Expense Motion, the SLC is asserting a post-petition claim against the SL&RG estate based on 11 U.S.C. § 503(b). "Adjudication of [an] administrative expense priority claim is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(B) (allowance or disallowance of claims against the estate), and (b)(2)(O) (other proceedings affecting the liquidation of assets of the estate)." *In re Blair Oil Invs., LLC*, 588 B.R. 579, 583 (Bankr. D. Colo. 2018); *see also W.A. Lane Co. v. Anderberg-Lund Printing Co. (In re Anderberg-Lund Printing Co.)*, 109 F.3d 1343, 1346 (8th Cir. 1997) ("A claim for an administrative expense pursuant to section 503(b) is a core proceeding for which the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(2)."); *In re Morreale*, 626 B.R. 571, 580 (Bankr. D. Colo. 2020) (same); *In re TriStar Fire Protection, Inc.*, 466 B.R. 392, 396 (Bankr. E.D. Mich. 2012) (allowance of administrative expense "is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (L), over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).")." SLC also is asserting a pre-petition claim for car hire. Allowance or disallowance of pre-petition claims is the heartland of bankruptcy jurisdiction. 28 U.S.C. § 157(b)(2)(B) ("core proceedings include ... allowance or disallowance of claims against the estate ....").

Arguably, because SLC relies on 11 U.S.C. § 503(b) as the basis for administrative **\*608** expense priority and also is asserting a pre-petition claim, the Court has exclusive jurisdiction over the dispute under 28 U.S.C. § 1334(a). However, at a minimum, the Court has original but not exclusive jurisdiction because "[m]atters arising under section 503(b) of the Bankruptcy Code are matters that may only arise in a bankruptcy case and, thus, the bankruptcy court is empowered to enter final orders with respect to the same." *In re Stainless Sales Corp.*, 579 B.R. 836, 839 (Bankr. N.D. Ill. 2017). Both the SLC and the Trustee concur that the Court has general bankruptcy jurisdiction to resolve the Administrative Expense Motion, Objection, Summary Judgment Motion, and Opposition. Thus, the Court concludes that it is empowered, as a matter of bankruptcy jurisdiction,

to adjudicate the dispute at least on the issue presented at this stage.

## B. The Court May Have Jurisdiction over the Dispute under the Interstate Commerce Commission Termination Act.

Assuming that the Court has original but not exclusive bankruptcy jurisdiction to adjudicate the contest between the SLC and the SL&RG, the Trustee contends that the Court also has jurisdiction under the Interstate Commerce Commission Termination Act of 1995 (the "ICCTA"), 49 U.S.C. § 10101 et seq. The ICCTA is a comprehensive law enacted by the Legislative Branch to govern interstate rail and surface transportation. Through the ICCTA, Congress "abolished the ... Interstate Commerce Commission and substantially deregulated the rail and motor carrier industries." *Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*, 215 F.3d 195, 197 (1st Cir. 2000). In place of the Interstate Commerce Commission (the "ICC"), Congress created the Surface Transportation Board (the "STB"). Under the ICCTA,

> [t]he jurisdiction of the [Surface Transportation] Board over
>
> > (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers ...
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). The STB has the authority to regulate rail car service and rail car hire, including the rate of compensation paid for the use of freight cars. 49 U.S.C. §§ 10745, 11121 and 11122.

"Read in isolation, [the ICCTA] language appears to grant the STB exclusive jurisdiction over any claim involving 'transportation by rail carriers.' " *Pejepscot*, 215 F.3d at 199. However, notwithstanding the role of the STB and its seeming exclusivity, Congress also established jurisdiction for federal courts to adjudicate certain disputes under the ICCTA. 49 U.S.C. § 11704 provides:

> (a) A person injured because a rail carrier providing transportation or service subject to the jurisdiction of the

Board ... does not obey an order of the Board, except an order for the payment of money, may bring a civil action in a United States District Court to enforce that order under this subsection.

> (b) A rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of **\*609** that carrier in violation of this part ....

> (c)(1) A person may file a complaint with the Board under section 11701(b) of this title or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier providing transportation subject to the jurisdiction of the Board ....

Juxtaposing 49 U.S.C. § 10501(b) and § 11704 leads to some confusion as to the respective jurisdictional roles of the STB and the federal courts. However, the majority view is that federal district courts have concurrent jurisdiction with the STB on at least some ICCTA issues, including car hire disputes. *Norfolk S. Ry. Co. v. Baltimore & Annapolis R.R.*, 715 Fed. Appx. 244, 249 (4th Cir. 2017) (unpublished) (appellate court determined that "federal courts retain original jurisdiction, concurrent with the STB over [car hire] disputes governed by the ICCTA"); *Pejepscot*, 215 F.3d at 199-205 (holding that federal district court had concurrent jurisdiction with STB over shipper's claim that rail carrier violated ICCTA requirement for rail carrier to provide service upon reasonable request); *Union Pac. R.R. Co. v. Baltimore & Annapolis R.R. Co.*, 2009 WL 3633349 n.1 (D. Md. Oct. 27, 2009) (implicitly acknowledging concurrent jurisdiction between federal district court and STB in car hire dispute); *San Luis Cent. R.R. Co. v. Springfield Terminal Ry. Co.*, 369 F. Supp. 2d 172 (D. Mass. 2005) (same). Of course, this Court is not a federal district court. Instead, under 28 U.S.C. § 151, this Court only "constitute[s] a unit of the district court." So, there is some further jurisdictional disconnect vis-à-vis this Court's ability to adjudicate ICCTA-oriented disputes. On the other hand, the SLC contends that only this Court — not the STB — may adjudicate the current controversy. Such contention effectively disclaims concurrent jurisdiction. In the end, it is enough to say for now that the Court may have jurisdiction to resolve the dispute under the ICCTA too.

If all the foregoing were not confusing enough, there is yet another complication: the doctrine of primary jurisdiction (which may come into play if there is concurrent jurisdiction as between the Court and the STB). The doctrine of primary jurisdiction applies to claims "properly cognizable in court

that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In those circumstances, "a court may leave an issue for agency determination when it involves the special expertise of the agency and would impact the uniformity of the regulated field." *DeBruce Grain, Inc. v. Union Pac. R.R. Co.,* 149 F.3d 787, 789 (8th Cir. 1998). According to the United States Supreme Court:

> No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.

*U.S. v. W. Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (invoking primary jurisdiction doctrine and holding that issues of railroad tariff construction and reasonableness should be referred to the ICC). While there is no "fixed formula" for the primary jurisdiction doctrine, commonly applied considerations include:

> (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, **\*610** though perhaps not determinative, the agency determination would materially aid the court.

*Pejepscot,* 215 F.3d at 205 (quoting *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir. 1979)) (directing district court to refer shipper's ICCTA claim to STB). In the special context of rail transportation, courts also have applied the doctrine of primary jurisdiction when the dispute "involve[s] issues related to national rail policy, and a judicial ruling could affect rail transportation throughout the country." *DeBruce Grain,* 149 F.3d at 789-90 (affirming trial court decision to refer rail car distribution dispute to STB); *see also Chlorine Inst., Inc. v. Soo Line R.R.,* 792 F.3d 903

(8th Cir. 2015) (affirming trial court's invocation of primary jurisdiction doctrine to refer railroad dispute over hazardous materials transportation to STB).

**C. The Court Exercises Jurisdiction Over the Dispute.**

The Court is sorely tempted to refer this dispute between the SL&RG and the SLC to the STB for resolution. However, ultimately, there are strong grounds for the Court to retain the matter. First, the Court has general bankruptcy jurisdiction to adjudicate the controversy under 28 U.S.C. §§ 157 and 1334. The SLC brought the dispute in this Court and is seeking payment of an administrative expense under a part of the Bankruptcy Code: 11 U.S.C. § 503(b). "A claim for an administrative expense pursuant to section 503(b) is a core proceeding for which the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(2)." *Anderberg-Lund Printing,* 109 F.3d at 1346. The SLC also has submitted a pre-petition claim which it seeks to liquidate. Both the SLC and the Trustee concur that this Court has general bankruptcy jurisdiction to issue final judgment on the issues presented. Second, during oral argument, the SLC disclaimed the existence of any concurrent jurisdiction with the STB. *See Entergy Serv., Inc. v. Union Pac. R.R. Co.,* 99 F.Supp.2d 1080, 1089 (D. Neb. 2000) ("the primary jurisdiction doctrine only applies where the agency and the courts have concurrent jurisdiction."). Third, even if the Court has concurrent jurisdiction with the STB (under either 28 U.S.C. §§ 157 and 1334 and/or 49 U.S.C. § 11704), the Court determines that it would be inappropriate to defer to the STB under the doctrine of primary jurisdiction (at least at this stage).

Again, both the SLC and the Trustee repeatedly have reaffirmed that they wish for the Court to decide the dispute. The SLC contends that because there is no concurrent jurisdiction with the STB, the doctrine of primary jurisdiction does not come into play at all.[3] The Trustee accepts **\*611** that there may be concurrent jurisdiction with the STB, but still argues that the Court should move ahead. Under these circumstances, both sides have effectively waived presentation of the issues to the STB. *Baltimore & Annapolis R.R.,* 2009 WL 3633349. Like this case, *Baltimore & Annapolis R.R.* involved an action to recover unpaid car hire charges under the AAR Rules. The *Baltimore & Annapolis R.R.* court considered the primary jurisdiction doctrine and decided: "Although the Surface Transportation Board ("STB") has primary jurisdiction over disputes such as this one under 49 U.S.C. §§ 10501(b) and 11704(c)(1), the

parties have waived any such jurisdictional claim by failing to assert it." *Id.* at \*1, n.1.

Moreover, even if the SLC and the SL&RG had not waived referral to the STB, the special bankruptcy context suggests that applying the doctrine of primary jurisdiction would be inappropriate at this stage. Since neither the SLC nor the SL&RG advocated for referral to the STB, neither has presented any legal support for making such a referral in the context of a bankruptcy. In the Court's own research, the Court has been unable to locate any case law support for deferring to the STB in the context of a railroad reorganization. It is not even clear that the STB would entertain such referral. After all, the SLC contends that the current issues are merely a contract dispute which the STB may decline to adjudicate. In any event, the unique railroad bankruptcy context also suggests that the Court should retain and adjudicate the dispute. Congress created a special part of the Bankruptcy Code authorizing bankruptcy courts to preside over the reorganizations of railways. This dispute may have a significant impact of the reorganization of the SL&RG. Furthermore, bankruptcy cases generally move rapidly. The reorganization process (including potential sale of the railway) may be thwarted if the Court refers the dispute to the STB, which likely would cause further delay, disruption, and expense. The trial on the merits of the controversy between the SLC and the Trustee is set to commence in the Court in less than two months. The case is at a substantially advanced stage. Finally, as neither party advocated referral to the STB, the Court has no grounds to conclude that the STB has specialized legal acumen on the legal issues currently at play. Importantly, with respect to the Summary Judgment Motion and Opposition, the central issue is interpretation of text. The Court regularly examines and interprets texts of all types including statutes, regulations, rules, and contracts. Numerous federal courts also have decided issues about car hire under the AAR Rules without referral to the STB. *See Norfolk S.*, 715 Fed. Appx. 244 (in dispute over car hire charges appellate court determined that while federal court and STB had concurrent jurisdiction, trial court did not abuse its discretion in deciding car hire dispute and resulting damages without referral to STB); *Springfield Terminal*, 369 F. Supp. 2d 172 (deciding not to refer car hire dispute to STB); *Baltimore & Annapolis R.R.*, 2009 WL 3633349 (adjudicating car hire dispute without referral to STB); *First Union Rail Corp. v. Springfield Ry. Terminal Co.*, 2007 WL 1612717 (W.D.N.C. May 31, 2007) (granting summary judgment in car hire dispute); *but see Englehard Corp. v. Springfield Terminal Ry. Co.*, 193 F. Supp. 2d 385 (D.

Mass. 2002) (referring some car hire claims under AAR Rules to STB). **\*612** Furthermore, neither party has presented a basis for the Court to conclude that agency expertise is required to unravel intricate, technical facts pertaining to the Summary Judgment Motion and Opposition. As the Court will explain below, the relevant facts are undisputed at this stage. So, the Court will retain jurisdiction and decide the narrow legal issue presented in the Summary Judgment Motion and Opposition.

### D. <u>Venue Is Proper in the Court.</u>

Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. Neither the SLC nor the Trustee has contested the Court's venue.

### III. <u>Procedural Background.</u>

On April 12, 2021, the SLC filed its Administrative Expense Motion. As set forth in the Administrative Expense Motion, the SLC asked this Court for the following relief:

> (1) to determine SLC has an allowable and immediately due and payable administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) for car hire in the amount of $39,583.23, through January, 2021; (2) to determine that going forward, the Trustee may not make any reduction for special reclaim to the amounts invoiced by SLC for car hire, and that the Trustee must pay SLC car hire invoices in full as they come due as allowable administrative expenses; (3) to determine that the amount of SLC's pre-petition claim is $109,587.49; (4) to direct the Trustee to cancel Freight Tariff SLRG 8000-A and to discontinue billing SLC for freight tariff charges for the movement of empty SLC railcars, or attempting to use freight tariff charges as an offset to SLC's car hire charges; and (5) to grant SLC such other relief as is proper under the facts and circumstances of this case.

(Docket No. 487 at 14.) Thereafter, the Trustee filed his Opposition to the Administrative Expense Motion. (Docket No. 501.) The Court set the Administrative Expense Motion and Opposition for a two-day trial starting on September 9, 2021. (Docket No. 516.)

Thereafter, the Trustee filed his Summary Judgment Motion. In the Summary Judgment Motion, the Trustee focused only on the Tariff Issue and asked the Court to "find, as a matter of law, Car Service Rule 2 does not preclude the Trustee from imposing a tariff or charge for the return of empty SLC-owned freight cars [and] enter partial summary judgment in the Trustee's favor on that issue in connection with the Admin Expense Motion filed by SLC ...." (Docket No. 524 at 10.) Then, the SLC responded in opposition to the Summary Judgment Motion. (Docket No. 547.) On August 19, 2021, the Court conducted a hearing on the Summary Judgment Motion and Opposition, during which the Court heard fulsome legal argument from both the Trustee and the SLC.

#### IV. <u>Summary Judgment Legal Standards.</u>

Motions for summary judgment are governed by Fed. R. Civ. P. 56, as incorporated herein by Fed. R. Bankr. P. 7056. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is "no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). The moving party bears the initial burden of identifying the basis for its motion and designating those portions of the record which it believes entitles it to judgment. Fed R. Civ. P. 56(c); **\*613** Celotex, 477 U.S. at 323, 106 S.Ct. 2548. In response, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ...." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead:

> [T]he nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and

"set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.... To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.

Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998) (citations omitted). *See also* Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016) (same); Llewellyn v. Allstate Home Loans Inc., 711 F.3d 1173, 1181 (10th Cir. 2013) (nonmoving party has the affirmative duty of coming forward with evidence supporting his claim at summary judgment); Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1115 (10th Cir. 2001) (same).

In reviewing a motion for summary judgment, the Court must "view the facts and evidence in the light most favorable to the nonmoving party." Morris v. City of Colo. Springs, 666 F.3d 654, 660 (10th Cir. 2012). But, unsupported, conclusory allegations will not create an issue of fact, and the non-moving party must do more than provide its subjective interpretation of the evidence. Tran v. Sonic Indus. Servs., Inc., 490 Fed. Appx. 115, 117-118 (10th Cir. 2012) (unpublished) ("Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof.") (citing Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995)). "A party cannot rely entirely on pleadings, but must present significant probative evidence to support its position." Hansen v. PT Bank Negara Indonesia (Persero), 706 F.3d 1244, 1247 (10th Cir. 2013) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). And, "[i]f the nonmoving party fails to make a sufficient showing on an essential element with respect to which [it] has the burden of proof, judgment as a matter of law is appropriate." Id. However, "when the evidence could lead a rational fact-finder to resolve a dispute in favor of either party, summary judgment is improper." C.L. Frates & Co. v. Westchester Fire Ins. Co., 728 F.3d 1187 (10th Cir. 2013).

Summary judgment need not be an all-or-nothing exercise disposing of every cause of action. Instead, a moving party may seek partial summary judgment disposing of certain claims or deciding important but discrete legal issues. Fed. R. Civ. P. 56(a) ("A party may move for summary judgment,

identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."). The ability of the Court to enter partial summary judgment "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no issue of fact." Fed. R. Civ. P. 56(a) Advisory Committee Notes.

### V.  Undisputed Facts.

The critical first step in adjudicating a motion for summary judgment is to identify the undisputed facts. Only then can the Court apply the law to the facts and reach a legal conclusion. Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is **\*614** no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") Procedural rules, including Fed. R. Civ. P. 56(c) and 56(e) as well as L.B.R. 7056-1 govern the presentation and contravention of facts.

### A.  The Trustee's Undisputed Facts.
In this dispute, the Trustee presented only eleven alleged undisputed facts. All of the alleged undisputed facts were supported with citations to "particular parts of materials in the record, including depositions, documents ... affidavits or declarations, ... interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1); Summary Judgment Motion at 4-6. The Trustee's proposed undisputed facts are as follows:

**Fact No. 1.** The SLRG owns and operates a railroad (the "SLRG Line") that is approximately 150 miles long that primarily supports the transportation of grain, minerals, specialty rock products and produce in Colorado.

**Fact No. 2.** The SLRG Line connects with SLC's rail line just east of Monte Vista, Colorado, at Sugar Junction.

**Fact No. 3.** SLC-owned freight cars are received on the SLRG Line at Sugar Junction and transported by SLRG to the Union Pacific rail line at Walsenburg, Colorado.

**Fact No. 4.** Empty SLC-owned freight cars are received from the Union Pacific line at Walsenburg and returned via the SLRG Line to SLC at Sugar Junction.

**Fact No. 5.** The AAR [the Association of American Railroads] has established the Car Service and Car Hire Agreement, which includes a comprehensive set of Car Hire Rules and Car Service Rules, which the AAR has published in a document referred to as Circular No. OT-10 (the "AAR Rules").

**Fact No. 6.** Car Service Rule 2 provides:

A. Handling of Cars: Unless covered by a Car Service order or directive, foreign cars not needed for loading must have doors closed and may be:

1. Delivered to the home road at any junction, subject to Rule 6.

2. Forwarded to the road (including the haulage rights carrier-tenant) from which originally received under load, at the junction where received, except that when handled in road haul service, cars of direct connection ownership may not be delivered empty to a road which does not have a direct connection with the car owner. If the junction where received under load is also a junction with the car owner, the car must be delivered to the owner at that junction.

3. Returned to the delivering road (including the haulage rights carrier-tenant) when handled only in switching service, unless at a junction with the home road.

4. Stored (applies only to boxcars, as authorized in 49 C.F.R. 1039.14(c)(1)(ii), that are not moving under empty mileage charges).

B. Notification of Intention to Store Cars: The holding railroad must notify the Car Service Officer of the owning railroad of its intention to store cars under the provisions of this rule. Notification must:

1. Be transmitted by midnight of the third day after cars were released from inbound load or received at initial storage or loading point in one of the following manners: a. TRAIN II message, or b. by telephone confirmed in writing.

2. Include the initial and number of individual cars.

 **\*615**  3. Include the date and location cars were released empty or received at initial storage point.

C. Definition of Junction: "Junction" as used in this rule means stations where roads interchange cars at a common point or within switching limits over their own lines, or an intermediate line or lines, or a car ferry or float within such limits. Roads so interchanging cars shall be considered direct connections. This information

should be registered in the Industry Reference Junction and Interchange File and when the interchange is other than over their own rails, the channel through which the interchange is effected must be shown.

**Fact No. 7.** Both SLC and the Debtor have subscribed to the AAR Rules, thereby agreeing to "abide by and enforce the rules prescribed for the handling of and settlement of freight cars."

**Fact No. 8.** After the bankruptcy filing the Trustee imposed a freight tariff against SLC for movement of empty SLC-owned freight cars on the SLRG Line. San Luis & Rio Grande Railroad Company Freight Tariff SLRG 8000.

**Fact No. 9.** The SLC Tariff applies on all empty freight cars owned or controlled by SLC moved between the Union Pacific line at Walsenburg and the SLC-owned line at Sugar Junction.

**Fact No. 10.** Under the direction of the Trustee, SLRG charged and invoiced SLC for fees imposed under the SLC Tariff beginning in June 2020.

**Fact No. 11.** SLC has not commenced any proceeding or filed any complaint with the Surface Transportation Board (the "STB") regarding the SLC Tariff and the STB has not made any determinations with respect to the SLC Tariff.

In the Opposition, the SLC did not contest Fact Nos. 1-2, 5-7, and 9-11. Thus, each of those facts is deemed undisputed and accepted. Fed. R. Civ. P. 56(c) and (e); L.B.R. 7056-1(b), (c) and (d). Nevertheless, in the Opposition, the SLC stated: "SLC disputes the facts set forth in paragraphs 9, 10 and 14 [Fact Nos. 3, 4 and 8] of the Trustee's Motion and restates them as follows ...." Opp'n. at 4. But, on closer examination, it is quite apparent that the SLC has not properly contravened Fact Nos. 3, 4 and 8 either. The SLC did not cite admissible evidence actually contesting Fact Nos. 3, 4 and 8 and showing the existence of a genuine dispute of material fact. Instead, the SLC merely attempted to "restate" Fact Nos. 3, 4 and 8 in a fashion it apparently perceives is more favorable to the SLC. For example, with respect to Fact No. 3, the SLC just "restated" Fact No. 4 by adding the following after the word "cars": "that are loaded with commodities being shipped by rail pursuant to request and instructions of shippers located on the SLC line." That restatement has no real significance, is not supported by admissible evidence, [4] and does not negate proposed Fact No. 3. So, the Court rejects the additional language. With respect to Fact No. 4, the SLC

purports to change the text by adding the following italicized phrases: "Empty SLC owned freight cars are received from the Union Pacific line at Walsenberg *pursuant to the Car Service Rules* and returned *pursuant to the Car Service Rules* via the SLRG Line to SLC at Sugar Junction." Again, the SLC failed to properly contravene Fact No. 4 and the additions are not **\*616** supported by admissible evidence. [5] Instead, the SLC merely is attempting to insert a legal conclusion about the AAR Car Service Rules. The Court rejects the rework. Finally, with respect to Fact No. 8, the SLC proposes to add some text at the end of Fact No. 8 about the Tariff: "without designating any party, including SLC, that would be liable for payment of the tariff in the absence of a request for transportation service to move empty SLC cars." Again, the SLC has not disputed that the Trustee imposed the Tariff. And, the actual text of the Tariff is already before the Court. (Docket No. 487-5.) The SLC "restatement" merely attempts to improperly interject legal conclusions and argument about the meaning of the Tariff. So, the Court rejects the proposed addition.

The Court has carefully reviewed each of the eleven proffered undisputed facts asserted by the Trustee and compared such facts to the record citations. Every alleged undisputed fact is accurate and fully supported in accordance with Fed. R. Civ. P. 56 and L.B.R. 7056-1. And, as set forth above, the SLC has not properly contravened any of the eleven undisputed facts. Therefore, the Court finds the foregoing eleven facts advanced by the Trustee are undisputed and accepted for purposes of the Summary Judgment Motion and Opposition. Hereinafter, the Court refers to such facts as the "Trustee's Undisputed Facts."

**B. The SLC Additional Undisputed Facts.**

In the Opposition, the SLC also presented eight "additional facts" that it contends are undisputed. Opp'n at 4-6; L.B.R. 7056-1(b)(4) (contemplating possible submission of "additional facts" in opposition to a motion for summary judgment). The SLC's proposed additional undisputed facts are as follows:

**Additional Fact No. 1.** In the opinion of expert Frederic W. Yocum, as shown in his affidavit submitted herewith, the Car Service Rules and Rule 2 in particular require rail carriers to return empty cars to their owners without attempting to impose any charge, including a freight tariff charge.

**Additional Fact No. 2.** Mr. Yocum is not aware of any situation in which a rail carrier attempted to charge the owner of a railcar being returned empty after having received the revenue for the loaded movement.

**Additional Fact No. 3.** Mr. Yocum is aware of situations in which a rail carrier charged the owner of a railcar in order to move empty cars at the request of the owner, such as those covered by the tariffs which the Trustee has submitted as Exhibits F through I to the Trustee's Response [Docket #501]. However, each of those tariffs has very specific conditions that must be met in order to make them applicable, such as the owner sending cars in need of repair to a major repair facility. None of the conditions in those tariffs apply in this case.

**Additional Fact No. 4.** The long-standing and universal practice within the rail industry is to return empty cars to their owner without attempting to impose any freight tariff charge.

**Additional Fact No. 5.** The Trustee has not attempted to charge other rail carriers to move empty cars even though there are several rail carriers, **\*617** such as Union Pacific and Burlington Northern, that routinely have loaded cars delivered to SLC and empties returned over the SLRG line.

**Additional Fact No. 6.** SLC has never requested SLRG or the Trustee, by means of a bill of lading or otherwise, to move empty SLC cars back to the SLC line, indicating that the empty cars are being moved in accordance with the Car Service Rules rather than a request by SLC or any other entity for transportation services.

**Additional Fact No. 7.** Even though empty SLC cars are received on the SLRG line from Union Pacific and have been moved over the lines of other rail carriers and from the customer of the shipper that unloaded the car, the Trustee has not attempted to impose any freight tariff charge on any of those entities.

**Additional Fact No. 8.** The Burkhardt Affidavit accurately describes the process and events by which a typical shipment of a loaded car from SLC to the destination designated by the shipper and the return of the empty car to SLC, indicating that no railroad other than SLRG attempts to impose any charge, including a freight tariff, on the return of the empty car.

In his Reply in support of the Summary Judgment Motion, the Trustee did not address any of the eight additional facts asserted by the SLC. And, at the hearing on the Summary Judgment Motion, the Trustee contested only proposed Additional Fact No. 1, contending that such alleged fact was impermissible opinion testimony from an expert on the ultimate issue upon which the Court is called to decide in contravention of Fed. R. Evid. 701 and 702. The SLC responded by arguing that an expert may opine on the ultimate issue under Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue.") The Court sustains the Trustee's objection and will not consider Additional Fact No. 1 for a myriad of reasons. First, the SLC mischaracterizes proposed Additional Fact No. 1. It is not a "fact" at all. Instead, as the text reveals, it is merely an "opinion": "*In the opinion* of expert Frederic W. Yocum ... the Car Service Rules and Rule 2 in particular require rail carriers to return empty cars to their owners without attempting to impose any charge, including a freight tariff charge." (emphasis added.) Opinions really have no place in the summary judgment context in which the Court is called upon to determine whether "there is no genuine dispute as to any material fact ...." Fed. R. Civ. P. 56(a). Furthermore, the proffered opinion is directed at an ultimate issue of law (not fact). Effectively, the expert is attempting to testify on the legal interpretation of AAR Car Service Rule 2. However, an expert may not present a legal conclusion instructing the trier of fact "how it should decide the case." *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) ("we conclude the expert in this case was improperly allowed to instruct the jury on how it should decide the case."). Furthermore, "testimony on ultimate issues of law ... is inadmissible because it is detrimental to the trial process." *Id.* at 809. Put another way, the proposed expert testimony fails the basic Fed. R. Evid. 702(a) hurdle of "help[ing] the trier of fact to understand the evidence or to determine a fact in issue." Proposed Additional Fact No. 1 does not help the Court in any way. Ultimately, the Court (not an expert) must decide whether AAR Car Service Rule 2 prohibits the imposition of a tariff or charge for the return of empty SLC-owned freight cars. *Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) ("While expert witnesses may testify as to the ultimate matter at issue, **\*618** Fed. R. Evid. 704(a), this refers to testimony on ultimate facts; testimony on ultimate questions of law, i.e., legal opinions or conclusions is not favored."); *U.S. v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979) ("[A]n expert witness cannot state legal conclusions ....").

While the Court will not consider Additional Fact No. 1, the Trustee conceded Additional Fact Nos. 2-8. Since proposed Additional Fact Nos. 2-8 were not controverted by the Trustee, they will be accepted by the Court. Hereinafter, the Court refers to such seven additional facts as the "SLC Additional Undisputed Facts."

## VI. <u>Legal Analysis and Conclusions.</u>

Through the Summary Judgment Motion, the Court is called upon to decide a single and discrete legal question:

> Does AAR Car Service Rule 2 preclude the Trustee from imposing a tariff or charge for the return of empty SLC-owned freight cars?

The question sounds quite simple and depends, of course, on the text of AAR Car Service Rule 2. Car Service Rule 2 is titled: "Empty Foreign Cars Not Needed for Loading." The text of AAR Car Service Rule is accurately set forth in Trustee's Undisputed Fact No. 6, set forth above. Review of the text of AAR Car Service Rule 2 unequivocally proves that the Rule does not mention tariffs or charges for the return of empty freight cars. The Trustee essentially argues that the summary judgment analysis starts and ends with that observation. In other words, since the topic of tariffs or charges for the return of empty cars is not addressed, the Trustee contends that, as a matter of legal interpretation, AAR Car Service Rule 2 simply does not and cannot prohibit the imposition of tariffs or charges for the return of empty freight cars.

The SLC's counter-position is much more circuitous, convoluted and complex. The SLC acknowledges that AAR Car Service Rule 2 "does not expressly address whether a tariff may or may not be imposed on the return of empty cars." Opp'n at 3. Indeed, the SLC agrees that "Car Service Rule 2 is obviously silent on whether the Trustee (or any similarly-situated person/entity) may impose a tariff for its obligation to return empty cars." Opp'n at 10. But, those observations about the text are not the end for the SLC. The SLC suggests that AAR Car Service Rule 2 is "an ambiguous contractual provision" (presumably because it does not address whether a tariff may or may not be imposed on the return of empty cars).

Opp'n at 2. The SLC contends that the Court should apply Colorado contract law to confirm that AAR Car Service Rule 2 is ambiguous. According to the SLC, the topic of tariffs or charges for the return of empty freight cars is "naturally within the scope" on AAR Car Service Rule 2, but somehow was left out of the text. Under these circumstances, the SLC invites the Court to consider "extrinsic evidence of the historical non-imposition of charges or tariffs" for the transportation of empty freight cars. Opp'n at 10. According to the SLC, if the Court considers such extrinsic evidence, then the Court will reach the conclusion that AAR Car Service Rule 2 "strongly implies that the return of empty cars is an obligation for which the Trustee may **<u>not</u>** impose any charge, including a freight tariff." Opp'n at 9 (emphasis in original). Thus, the SLC advocates denial of the Summary Judgment Motion.

Resolving the competing legal positions of the Trustee and the SLC requires the Court to divert into an analysis of the context and history of AAR Car Service Rule 2 as well as the AAR Rules. Then, the Court must determine the correct method for interpreting AAR Car Service Rule 2. The Trustee advocates for standard statutory interpretation. The SLC **\*619** wants the Court to apply Colorado law governing private contracts. After deciding on the correct method of interpretation, the Court will decide the summary judgment question.

### A. <u>The Context and History of AAR Car Service Rule 2.</u>

The dispute between the SLC and the SL&RG involves "car service" and "car hire." As a matter of federal transportation law, car service and car hire have well-developed and distinct meanings. " ' [C]ar service' includes ... the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, other vehicles, and special types of equipment used in the transportation of property by rail carrier ...." 49 U.S.C. § 10102(2). To simplify, car service generally pertains to the use and movement of railway equipment. On the other hand, "car hire" means: "[c]ompensation to be paid by a user to an owner for use of a car." 49 C.F.R. 1033.1(a)(2). So, car hire deals with payment for use of railway equipment.

Congress empowered the STB, a federal agency, to regulate car service and car hire in the United States. With respect to car service, 49 U.S.C. § 11121 provides:

> (a)(1) A rail carrier proving transportation ... shall furnish safe and adequate car service and establish, observe, and enforce reasonable rules and practices on car service ....

(2) The Board may require a rail carrier to file its car service rules with the Board.

(b) The Board may designate and appoint agents and agencies to make and carry out its directions related to car service ....

Similarly, with respect to car hire, 49 U.S.C. § 11122 states:

(a) The regulations of the Board on car service shall encourage the purchase, acquisition, and efficient use of freight cars. The regulations may include —

(1) the compensation to be paid for the use of a locomotive, freight car, or other vehicle;

(2) the other terms of any arrangement for the use by a rail carrier of a locomotive, freight car, or other vehicle not owned by the rail carrier using the locomotive, freight car, or other vehicle .... and

(3) sanctions for nonobservance.

(b) The rate of compensation to be paid for each type of freight car shall be determined by the expense of owning and maintaining that types of freight car, including a fair return on its cost giving consideration to current costs of capital, repairs, materials, parts, and labor. In determining the rate of compensation, the Board shall consider the transportation use of each type of freight car, the national level of ownership of each type of freight car, and other factors that affect the adequacy of the national freight car supply.

Thus, the STB ultimately is responsible for regulating car service and car hire. But, the STB (and its predecessor, the ICC) have exercised their regulatory powers for car service rules and car hire rules mostly in a cooperative fashion with the railway industry.

Car service and car hire rules for railway transportation were developed over more than a century by the federal government, working closely in tandem with railroads and their associations. *Baltimore & Ohio R.R. Co. v. New York, New Haven and Hartford R.R. Co.*, 196 F. Supp. 724 (S.D.N.Y. 1961) (after the Esch Car Service Act of 1917 (40 Stat. 101), the ICC "created the Bureau of Car Service to administer its powers under the Act; this **\*620** Bureau worked directly with the American Railway Association's Commission on Car Service to help it establish and enforce reasonable rules and practices with respect to car service");

*see also* *Boston & Maine R.R. v. U.S.*, 162 F. Supp. 289 (D.Mass. 1958) (discussing historical development of car hire and car service rules). The United States Supreme Court explained some of the history:

> The country's railroads long ago abandoned the custom of shifting freight between the cars of connecting roads, and adopted the practice of shipping the same loaded car over connecting lines to its ultimate destination. The freight cars of the Nation thus became in essence a single common pool, used by all roads. This practice necessarily required some arrangements for eventual return of a freight car to the lines of the road which owned it, and in 1902 the railroads through their trade association dealt with this and related problems in a code of car-service rules with which the roads agreed amongst themselves to comply.

*U.S. v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 743, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *see also* *Chicago, R.I. & P. Ry. Co. v. U.S.*, 284 U.S. 80, 90, 52 S.Ct. 87, 76 L.Ed. 177 (1931) (explaining history of car service and car hire rules as well as governmental administrative involvement).

The AAR or its predecessor — working with the ICC — developed AAR Car Service Rule 2 pertaining to the movement of empty cars in the first half of the last century. *In Matter of Boston & Maine Corp.*, 600 F.2d 307, 308 (1st Cir. 1979) ("Since 1930, the rules of the Association of American Railroads (AAR) for determining net rental balances for freight car rentals (per diem charges) have had the sanction of the Interstate Commerce Commission.") In 1950, the ICC approved the AAR Rules. *U.S. v. Atl. & E. Carolina Ry. Co.*, 238 F. Supp. 551, 552 (E.D.N.C. 1964) ("The procedure for establishing per diem rental charges on such cars was approved by the Interstate Commerce Commission in its report effective October 7, 1950."); *Joint Petition for Rulemaking on Railroad Car Hire Compensation Decision*, Ex. Parte No. 334 Sub-No. 8 at 2 (STB Apr. 9, 1997) (citing *Assoc. of Am. R.Rs. — Agreement*, 277 I.C.C. 413 (ICC 1950)).

Finally, in 1969, the ICC adopted AAR Car Service Rules 1 and 2 as federal government regulations. *Allegheny-Ludlum Steel,* 406 U.S. at 742-3, 92 S.Ct. 1941 ("The effect of the [Interstate Commerce] Commission's order now under review is to promulgate two of these rules [AAR Car Service Rules 1 and 2] as the Commission's own."); *Id.* at 743 n.1, 92 S.Ct. 1941. [6] Thereafter, several railroads and shippers sought to enjoin the enforcement of such rules. *Id.* at 743, 92 S.Ct. 1941. The United States Supreme Court held that the ICC's "action in promulgating these rules [AAR Car Service Rules 1 and 2] was substantively authorized by the Echs Act and procedurally acceptable under the Administrative Procedures Act." *Id.* at 758, 92 S.Ct. 1941.

So, at that stage and for some time thereafter, AAR Car Service Rule 2 was a formal federal government regulation. 49 C.F.R. 1033.2 (1969); 34 Fed. Reg. 14172 (Sept. 4, 1969). However, later, AAR Car Service Rule 2 was removed from the Code of Federal Regulations as a separate federal regulation. *Investigation of Adequacy of Railroad Freight Car Ownership, Car Utilization, Distribution Rules, and Practices,* 362 I.C.C. 844, 1980 WL 14207 (July 18, 1980) ("While it is in the public **\*621** interest to rescind mandatory [car service and car hire] rules [in 49 C.F.R. § 1033], we nevertheless retain authority to oversee car service activities...."). Notwithstanding, the current STB regulations make several references to the AAR Rules. *See* 49 C.F.R. §§ 1033.1(a)(6) and 1033.1(c)(2)(ii). In *Baltimore & Annapolis R.R.,* the Court went so far as to declare that Circular OT-10 (the AAR Rules) "has been adopted as part of the STB's regulations." *Baltimore & Annapolis R.R.,* 2009 WL 3633349, at \*1. That may be an overstatement. But, there still is a close relationship between the AAR Rules, including AAR Car Service Rule 2, and federal regulation.

**B. The Method of Interpreting AAR Car Service Rule 2.**

The SLC and the Trustee propose two different approaches to construing AAR Car Service Rule 2. The Trustee invites the Court to apply a statutory construction approach. Similar to statutes, federal regulations are interpreted by "applying general rules of statutory construction, beginning with the plain language of the regulations." *Time Warner Ent. Co., L.P. v. Everest Midwest Licensee, L.L.C.,* 381 F.3d 1039, 1050 (10th Cir. 2004). The historical development of Car Service Rule 2 supports a statutory construction approach. After all, AAR Car Service Rule 2 was adopted as a federal regulation by the ICC. And, the United States Supreme

Court endorsed such rule-making. *Allegheny-Ludlum Steel,* 406 U.S. at 742-3, 92 S.Ct. 1941. Nevertheless, as part of deregulation of the railway industry, AAR Car Service Rule 2 (and all the AAR Rules) later were removed from the Code of Federal Regulations. So, the regulatory analogy is not perfect. However, before the Trustee filed his Summary Judgment Motion, the SLC appeared to endorse a regulatory view of AAR Car Service Rule 2. In the Administrative Expense Motion, the SLC contended: "The STB has exercised its regulatory authority and *delegated* certain car hire and car service responsibilities to the Association of American Railroads." Administrative Expense Motion at 4 (emphasis added). The concept of "regulatory delegation" (a phrase also used by the Trustee) suggests that AAR Car Service Rule 2 should be interpreted using principles of statutory interpretation.

On the other hand, the SLC now characterizes AAR Car Service Rule 2 as merely a "private contract," asserting, among other things: "the issue is solely one of contract interpretation"; "Car Service Rule 2 ... is a private contractual agreement"; and "[t]he critical question in this case — whether [AAR Car Service] Rule 2 precludes the imposition of a freight tariff — involves a matter of interpretation of a private contract." Opp'n at 2, 11. The SLC further asserts that AAR Car Service Rule 2 is ambiguous as a matter of Colorado contract law. Then, since AAR Car Service Rule 2 supposedly is ambiguous, the SLC seeks to introduce "extrinsic evidence of the non-imposition of charges or tariffs" to establish that AAR Car Service Rule 2 actually prohibits the imposition of tariffs or other charges for the return of empty cars. Opp'n at 10. The SLC's argument is a complex and winding road premised entirely on the AAR Rules merely being a private contract. It is the linchpin of the SLC's legal position.

There is some facial allure to the SLC's contract contention. After all, the AAR Rules bear the heading "Car Service and Car Hire Agreement." AAR Rules at 2. That heading is followed by the following:

> The subscribing railroad company promises and agrees with each railroad company severally which subscribes and files a counterpart hereof .... that the subscribers will abide by and enforce the **\*622** rules prescribed for the handling and settlement for freight cars and included in the Codes

of Car Service and Car Hire Rules, promulgated by the Association. Further, That the subscribing railroad company agrees to the creation of a Business Services Group with plenary powers, as provided in Car Hire Rule 19, and which Group ... shall cooperate with the Surface Transportation Board in all car service matters on and between all railroads ....

AAR Rules at 2. The words "agreement" and "agrees" are words commonly used in contracts. Both the SL&RG and the SLC are railroads that have subscribed to the AAR Rules. Trustee's Undisputed Fact No. 7; AAR Rules at 6. According to the lists contained in the AAR Rules, there are approximately 853 other railroads that also are subscribers to the AAR Rules.

Aside from the text of the AAR Rules, the SLC relies heavily (perhaps exclusively) on *Springfield Terminal*, 369 F. Supp. 2d at 173, for the proposition that the AAR Rules are a contract. Opp'n at 8. The SLC quotes *Springfield Terminal* as follows in a parenthetical: (Circular No. OT-10 [AAR Rules] "is a contract under which the parties agreed to abide by the Code of Car Hire Rules issued by the Association of American Railroads ('AAR'), and industry trade group."). Opp'n at 8. The quotation sounds quite compelling. However, unfortunately (especially because the SLC was a party in the *Springfield Terminal* case and should know better), the SLC has mischaracterized the *Springfield Terminal* decision and its holding. In fact, the *Springfield Terminal* case suggests that the AAR Rules are not a private contract.

The illustrate the point, a short detour into the *Springfield Terminal* decision is necessary. In that case, the SLC sued another railway for car hire charges under the AAR Rules, which the SLC suggested were a state law contract supporting a state law cause of action. Citing to the SLC's complaint in *Springfield Terminal*, the court noted that SLC *contended* "[t]he Agreement is a contract under which the parties agreed to abide by the Code of Car Hire Rules issued by the Association of American Railroads, an industry trade group." *Id.* at 173. But, that passage is not a holding of the *Springfield Terminal* court as the SLC now suggests. Instead, that passage was merely a recitation of an allegation in the SLC's own complaint — nothing more. Instead, ultimately, the *Springfield Terminal* court decided against the SLC.

The *Springfield Terminal* court identified the question:

The issue for this Court is whether the Agreement [the AAR Rules] is a contract that falls within [49 U.S.C.] § 10709 and thus the "exclusive remedy" is a state-law cause of action. Typically, contracts pursuant to § 10709 have involved the purchase of rail carrier services by a shipper. A review of caselaw revealed no contracts involving car hire enforced under state law. [Defendant] argues that the Agreement should not be treated as a voluntary contract within the scope of the statutory exception because it has regulatory force and receives continued regulatory oversight.

*Id.* at 176. The Court ultimately concurred with the defendant's argument and determined that "the state-law cause of action for breach of the Agreement [the AAR Rules] is preempted." *Id.* at 177. The *Springfield Terminal* court also decided that the STB "has primary jurisdiction over these matters [*i.e.*, claims by the SLC to recover car hire]. *Id.* at n. 5. And, the case proceeded no further in court. So, the *Springfield Terminal* decision suggests that the AAR Rules are not a private contract because the AAR Rules have regulatory **\*623** force and receive continued regulatory oversight by the STB. Indeed, counsel for the SLC acknowledged that he had misread the *Springfield Terminal* decision at the hearing on the Summary Judgment Motion.

Other than the mischaracterized *Springfield Termination* decision, the SLC has not been unable to cite any case law support for the proposition that the AAR Rules are merely a private contract. And, the Court, through its own independent research has been unable to locate precedent suggesting that the AAR Rules are simply a contract entered into between private parties. With respect to AAR Car Service Rule 2, the SLC's argument fails to recognize the historical evolution of AAR Car Service Rule 2, including that it was adopted as a formal federal regulation in 1969. And, the AAR Rules are referenced today in the current federal regulations. 49 C.F.R. §§ 1033.1(a)(6) ad 1033.1(c)(2)(ii).

In any event, the SLC insists that the Court should apply Colorado contract law to AAR Car Service Rule 2. This contention illustrates why the AAR Rules are not a typical private contract. The SLC refers the Court to a handful of Colorado decisions (state and federal) construing contracts under Colorado law and finding various provisions ambiguous: *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1173 (10th Cir. 1999); *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052 (D. Colo. 2013); *Cheyenne Mountain Sch. Dist. v. Thompson*, 861 P.2d 711, 715 (Colo. 1993). But, the question arises, why apply Colorado law at all? Unlike most contracts, the AAR Rules do not contain a choice of law provision. And, there are 853 other railroad subscribers to the AAR Rules (most of whom, judging by their names) are not Colorado companies. So, it seems quite a stretch for the SLC to contend that the AAR Rules are effectively a Colorado contract governed by Colorado law. Confronted with the issue at oral argument, counsel for the SLC retreated a bit and suggested that the law governing the AAR Rules shifts depending on the nature of the dispute and the parties. So, according to the SLC, the AAR Rules might be governed by all 50 States' law. For example, a dispute between railroads from Mississippi and Alaska concerning AAR Car Service Rule 2 supposedly would be governed under Mississippi or Alaska law; but the same AAR Car Service Rule 2 is governed by Colorado law if both railroads are in Colorado – again, a very anomalous result, to say the least. And, then, counsel for the SLC suggested that maybe federal common law for contracts should apply. But, there is no federal common law of contracts applicable for contracts in which the federal government is not a party and no federal statute is implicated. *See Rodriguez v. F.D.I.C.*, ––– U.S. ––––, 140 S. Ct. 713, 717, 206 L.Ed.2d 62 (2020) ("Judicial lawmaking in the form of federal common law plays a necessarily modest role under a Constitution that vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States."); *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1484 (9th Cir. 1985) ("[f]ederal common law of contracts applies to contracts with the federal government ...."). And, the SLC has not supplied any supposed federal common law of contracts rule of decision for the dispute.

All the foregoing problems with choice of law strongly suggest that the AAR Rules are not a typical private contract as the SLC suggests. Instead, the AAR Rules are just that — a series of industry rules — which at one time were federal

regulations and now are quasi-regulatory **\*624** because of the regulatory supervision of the STB. Another way of looking at it is that the STB has effectively delegated part of its statutory responsibility for regulatory oversight of car service and car hire issues to the AAR.

During oral argument, the Trustee analogized the AAR Rules to the Rules of Professional Conduct governing lawyers. Rules of Professional Conduct typically are developed by industry (State Bar Associations) and approved by the State Judiciaries. All lawyers in a State Bar agree to be bound by the Rules of Professional Conduct; so in that sense, just as with the AAR Rules, the Rules of Professional Conduct might be characterized as a sort of contract. Nevertheless, courts generally apply statutory construction rules, not contract rules, when construing Rules of Professional Conduct governing lawyers. *Miller Weisbrod, LLP v. Klein Frank PC*, 2014 WL 3512994, at *9 (N.D. Tex. Jul. 16, 2014) ("To determine the meaning of the Texas Disciplinary Rules of Professional Conduct, a court must apply general statutory construction rules."); *Babineaux v. Foster*, 2005 WL 711604, at *3 (E.D. La. Mar. 21, 2005) (applying "traditional maxim of statutory construction" to interpretation of Louisiana Rules of Professional Conduct). The Trustee's analogy makes sense and suggests that the Court should construe AAR Car Service Rule 2 under standard principles of statutory interpretation.

Another analogy suggests that statutory construction is the most appropriate method for interpretation of the AAR Rules. Just as the AAR did for the railway industry, the National Association of Securities Dealers (the "NASD") developed a set of rules (governing stock market operations and market activities) for member securities brokerage firms. An appellate court characterized the NASD (which no longer exists) as follows:

> The National Association of Securities Dealers ("NASD") is a non-profit, self-regulatory organization registered pursuant to the Maloney Act amendments to the Securities Exchange Act of 1934 ("Exchange Act"). 15 U.S.C. § 78a *et seq.*; *see also National Assoc. of Sec. Dealers, Inc.*, 5 SEC 627 (1939). NASD is the only securities association registered with the Securities and Exchange Commission ("SEC") under 15 U.S.C.

§ 78*o*–3, and is the primary regulatory body for the broker-dealer industry. It supervises the conduct of its members under the general aegis of the SEC.

*Sparta Surgical Corp. v. Nat'l Ass'n of Secs. Dealers, Inc.,* 159 F.3d 1209, 1210 (9th Cir. 1998), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,* 578 U.S. 374, 136 S. Ct. 1562, 194 L.Ed.2d 671 (2016). The role of the NASD in the securities industry (another heavily regulated industry) bears many similarities to the role of the AAR in the heavily regulated railway industry. In any event, when construing NASD rules, courts typically turn to statutory construction methods rather than contract interpretation. *See French v. First Union Secs., Inc.,* 209 F. Supp. 2d 818, 832 (M.D. Tenn. 2002) (interpretation of NASD rules "boils down to a matter of statutory construction"); *Garrison v. Sagepoint Fin., Inc.,* 185 Wash.App. 461, 345 P.3d 792, 805 (2015) (applying "statutory construction" to interpret NASD Rule 3050).

Although the Court appreciates that the methodology question is close, the Court determines that AAR Car Service Rule 2 (which at one time was promulgated as a federal regulation) should be interpreted like a quasi-regulation under typical rules of statutory construction rather than as a **\*625** private contract governed by Colorado state law.

### C. Applying Rules of Statutory Construction, AAR Car Service Rule 2 Does Not Prohibit the Imposition of a Tariff or Other Charge for Transportation of Empty Cars.

Having decided to apply canons of statutory construction to AAR Car Service Rule 2, the job — deciding whether AAR Car Service Rule 2 prohibits the imposition of tariffs or other charges for the transportation of empty cars — becomes fairly easy. There are three subsections to Car Service Rule 2.

• Subsection A titled "Handling of Cars"

• Subsection B titled "Notification of Intention to Store Cars"

• Subsection Part C titled "Definition of Junction"

Subsection B pertains solely to the intention to store railcars. The provision has nothing to do with tariffs or other charges. Neither the SL&RG nor the SLC has indicated an intention

to store railcars. So, Subsection B is not implicated in the current dispute. Subsection C presents only a definition of the term "junction." "Junction" means "stations where roads interchange cars at a common point or within switching limits over their own lines, or an intermediate line or lines ...." Thus, Walsenberg and Monte Vista qualify as "junctions." However, the definition of "junctions" has nothing to do with tariffs and is inapposite to the current controversy.

That leaves Subsection A, which is directed at "Handling of Cars." The SLC asserts that Subsection A is the part of AAR Car Service Rule 2 that prohibits the imposition of tariffs or other charges for the transportation of empty cars. Reexamining the text, Subsection A states, in relevant part:

> [F]oreign cars not needed for loading must have doors closed and may be: (1) Delivered to the home road at any junction .... (2) Forwarded to the road ... from which originally received under load, at the junction where received .... (3) Returned to the delivering road ... when handled only in switching service .... (4) Stored ....

The SLC repeatedly asserted that Subsection A provides that "SLC empties 'must be delivered to the owner' at the junction where the loaded cars were received, which is Monte Vista." Opp'n at 9. That proposition is demonstrably false. AAR Car Service Rule 2 does not require the return of empty cars at all. Instead, AAR Car Service Rule 2 mandates that empty car doors "must" be closed and "may be delivered ... forwarded ... [or] returned" to the owner of the empty car. So, the return "at the junction where received" is purely optional. At oral argument, counsel for the SLC conceded that AAR Car Service Rule 2 does not mandate return of empty cars.

But, that is not even the main point. The critical issue is that AAR Car Service Rule 2 also says absolutely nothing about tariffs or other charges being imposed for transportation of empty cars. The topic is not addressed at all. And, for good reason, because tariffs and other charges imposed by a railway are governed by a series of statutes independent of the AAR Rules. 49 U.S.C. § 10701 covers "standards for rates, classifications, through routes, rules, and practices" and provides, in relevant part:

(b) A rail carrier providing transportation subject to the jurisdiction of the Board ... may not discriminate in its rates ....

(c) Except as provided in subsection (d) of this section and unless the rate is prohibited by a provision of this part, a rail carrier providing transportation subject **\*626** to the jurisdiction of the Board ... may establish any rate for transportation or other services provided by the rail carrier.

(d)(1)If the Board determines, under section 10707 of this title, that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable.

(2) In determining whether a rate established by a rail carrier is reasonable for purposes of this section, the Board shall give due consideration to —

(A) the amount of traffic which is transported at revenues which do not contribute to going concern value and the efforts made to minimize such traffic;

(B) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and

(C) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues, recognizing the policy of this part that rail carriers shall earn adequate revenues ....

A companion statute, 49 U.S.C. § 10702, states:

A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall establish reasonable —

(1) rates, to the extent required by section 10707, divisions of joint rates, and classifications for transportation and service it may provide under this part; and

(2) rules and practices on matters related to that transportation or service.

And 49 U.S.C. § 10704 authorizes the STB to impose various remedies in transportation rate disputes:

(a)(1) When the Board, after a full hearing, decides that a rate charged or collected by a rail carrier for transportation subject to the jurisdiction of the Board under this part, or that a classification, rule, or practice of that carrier, does or will violate this part, the Board may prescribe the maximum rate, classification, rule, or practice to be followed. The Board may order the carrier to stop the violation. When a rate, classification, rule, or practice is prescribed under this subsection, the affected carrier may not publish, charge, or collect a different rate and shall adopt the classification and observe the rule or practice prescribed by the Board.

(2) The Board shall maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under this part that are adequate, under honest, economical, and efficient management, for the infrastructure and investment needed to meet the present and future demand for rail services and to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. The Board shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph. Revenue levels established under this paragraph should —

(A) provide a flow of net income plus depreciation adequate to support **\*627** prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and

(B) attract and retain capital in amounts adequate to provide a sound transportation system in the United States.

So, railroad transportation rates (whether they are characterized as a tariff or some other charge) are governed comprehensively by statutes quite independent of the AAR Rules, and particularly AAR Car Service Rule 2. Thus, it should come as no surprise that AAR Car Service Rule 2 does not cover the topic and does not purport to prohibit the imposition or tariffs or other charges for the transportation of empty cars.

In any event, since AAR Car Service Rule 2 does not encompass the issue, the Court applies the "omitted-case

canon" of interpretation advanced by the Trustee in its Latin form during oral argument — *casus omissus pro omisso habendus est*, or in rough English translation: a matter not covered is to be treated as not covered. Antonin Scalia and Bryan A. Garner READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (Thompson/West 2012). According to Justice Scalia: "The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it." *Id*. To put it another way, an "absent provision cannot be supplied by the courts." *Id*. at 94. That is because "a *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554, 45 S.Ct. 188, 69 L.Ed. 435 (1925).

Although the appellate court did not use the Latin phraseology, the Eighth Circuit Court of Appeals applied the foregoing principle in another case construing the AAR Rules which is quite analogous: *Chicago, Rock Island & Pac. R.R. Co. v. Chicago and N.W. Ry. Co.*, 280 F.2d 110 (8th Cir. 1960). In that case, a railway employee sued his railway company (Chicago and North Western Railway Co. ("North Western")) for a personal injury incurred while attempting to release a hand brake on a rail car owned by another railway (Chicago, Rock Island & Pacific Railroad Co. ("Rock Island")). North Western tendered the defense to the Rock Island, which refused to participate in the negotiation or settlement of the claim. Rock Island cited the AAR "Codes of Car Service and Interchange Rules" (to which both railroads were subscribers) for the proposition that the AAR Rules "operated as a waiver of, or bar to, any claim for indemnity or contribution." *Id*. at 112. Apparently, many railroads "had observed the protocol of not making claims against other railroads [for such personal injury indemnification or contribution]." *Id*. at 113. But that custom was not enough to convince the appellate panel, which instead focused on the AAR Rules and the absence of any express provision waiving claims for indemnification or contribution. The Eighth Circuit put it this way:

> The fatal weakness of Rock Island's contention becomes apparent on examination of the [AAR] Car Service & Interchange Rules upon which it so strenuously relies. We are unable to detect any language therein which, even by inference, could be construed as constituting a waiver of, or bar to, the legal right of one railroad member to seek indemnity or contribution from another member. There is no reference of any kind in the rules to indemnity or contribution. *In our view, the rules are solely designed to govern the care and maintenance of cars belonging to one carrier while in possession of another ....*

If the railroad companies which are parties to the Code of Rules desire to waive **\*628** this legal right effectively, they should have no difficulty in clearly expressing such intent, and until they do, efforts to have such a provision read into the rules by judicial interpretation will, in all likelihood, be unavailing.

*Id*. at 113-14 (emphasis added, footnote omitted). Just so. Like the absence of an anti-identification or anti-contribution provision in *Chicago, Rock Island & Pac. R.R.*, the AAR Rules also contain no provisions pertaining to tariffs or other charges for the transportation of empty cars.

Turning back to the "omitted-case canon," if AAR Car Service Rule 2 is interpreted under the canon, the result is apparent. AAR Car Service Rule 2 says nothing at all about tariffs or other changes which may or may not be imposed for the transportation of empty cars. Accordingly, the Trustee has met his burden to obtain partial summary judgment on the narrow issue presented. The Court determines that AAR Car Service Rule 2 does not prohibit the Trustee from imposing the Tariff, or any other tariff, or any other charge for the transportation of empty cars. [7]

**D. Applying Colorado Rules of Contract Interpretation, AAR Car Service Rule 2 Does Not Prohibit the Imposition of a Tariff or Other Charge for Transportation of Empty Cars.**

Although the Court rests its decision on the text of AAR Car Service Rule 2 and principles of statutory interpretation, for good measure, and alternatively, the Court also considers the issue under the Colorado law [8] contract framework advocated by the SLC. The SLC contends that AAR Car Service Rule 2 is "ambiguous as a matter of law." Opp'n at 8. Under Colorado contract law:

> To ascertain whether certain provisions of a contract are ambiguous, 'the language used therein must be examined and construed in harmony with the plain and generally accepted meaning of the words employed and by reference to all the parts and provisions of the agreement and the nature of the transaction with forms its subject matter.' " A document is ambiguous "when it is reasonably susceptible to more than one meaning."

*Cheyenne Mountain*, 861 P.2d at 715 (quoting *Christmas v. Cooley*, 158 Colo. 297, 406 P.2d 333, 335 (1965) and *N. Ins. Co. of N.Y. v. Ekstrom*, 784 P.2d 320, 323 (Colo. 1989)).

But why is AAR Car Service Rule 2 supposedly ambiguous? First, the SLC argues that Car Service 2 is "susceptible to more than one interpretation." Opp'n at 9. But the Court simply does not see any possible construction of the text of AAR Car Service Rule 2 that prohibits the imposition of a tariff or other charge for the transportation of empty cars. As explained previously, the "plain and generally accepted meaning of the words" in AAR Car Service Rule 2 merely identifies the location at which empty cars should be returned to the car owner if the railway in possession of the empty cars optionally wishes to effectuate a return. So, there is no apparent facial ambiguity suggesting that AAR Car Service Rule 2 is susceptible to "more than one meaning."

Next, the SLC acknowledges that AAR Car Service Rule 2 is "silent on whether **\*629** the Trustee ... may impose a tariff ...." Opp'n at 10. Then, the SLC quotes *Moncrief*, 174 F.3d at 1173, for the proposition that: "[a] contract's silence on a particular issue does not create an ambiguity in every instance, but silence on a matter naturally within the scope of the contract gives rise to ambiguity." Opp'n at 10. The *Cheyenne Mountain* decision, 861 P.2d at 715, states the same proposition. So, then, the SLC suggests that tariffs or other charges for the transportation of empty cars "are naturally within the scope of" AAR Car Service Rule 2. Opp'n at 10. But this proposition does not follow at all. Tariffs or other charges are not "naturally within the scope of" of AAR Car Service Rule 2 or any of the AAR Rules. Again, tariffs and other charges are never mentioned in relation to either loaded cars or empty cars — and for good reason. That is because, as demonstrated previously, tariffs and other charges are subject to a separate federal statutory scheme. 49 U.S.C. §§ 10701, 10702 and 10704. So, that topic is not "naturally within the scope of" AAR Car Service Rule 2 or any of the AAR Rules.

Finally, the SLC also contends that the supposed ambiguity of AAR Car Service Rule 2 may be established by virtue of "extrinsic evidence" which should be "conditionally admitted in the context of a motion for summary judgment." Opp'n at 9-10. The SLC is correct that, as a matter of Colorado contract law, extrinsic evidence sometimes may be conditionally admitted to assess ambiguity. *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 n.3 (Colo. 1984) ("In determining whether a contract is ambiguous, the court may conditionally admit extrinsic evidence on this issue."); *Cheyenne Mountain*, 861 P.2d at 715 (same); *Stroh Ranch*, 935 F.Supp.2d at 1060. The type of extrinsic evidence which might be enlightening includes "evidence of local usage and

the circumstances surrounding the making of the contract." *Cheyenne Mountain*, 861 P.2d at 715. "The parties' prior course of dealings may also be considered in determining whether a contract is ambiguous." *Centennial-Aspen II Ltd. P'ship v. City of Aspen*, 852 F. Supp. 1486, 1492 (D. Colo. 1994).

The SLC invites the Court to consider SLC Additional Fact Nos. 2-8 as extrinsic evidence establishing ambiguity of AAR Car Service Rule 2. The Court has done so. However, none of SLC Additional Fact Nos. 2-8 bear on "the circumstances surrounding the making of the contract [*i.e.*, the AAR Rules]." Instead, SLC Additional Fact Nos. 2-8 really bear only on generic usage and course of dealing. In summary, SLC Additional Fact Nos. 2-8 show only that: one expert (Frederic W. Yocum) is not aware of any rail carriers charging the owner of a rail car being returned empty except for in "very specific conditions"; "[t]he long-standing and universal practice within the rail industry is to return empty cars to their owner without attempting to impose any freight charge"; and the Trustee has not charged other rail carriers to move empty cars. Notably, none of SLC Additional Fact Nos. 2-8 provides evidence of the historical course of dealing between the SL&RG and the SLC. Instead, the propositions are generic (except that the Trustee has not attempted to impose a tariff or other charge on other rail carriers). None of that comes close to establishing that AAR Car Service Rule 2 is ambiguous.

One of the principal problems with SLC's extrinsic evidence ambiguity argument is that there is no specific tie-in with AAR Car Service Rule 2. See *Chicago, Rock Island & Pac. R.R.*, 280 F.2d 110 (even though there was an industry "protocol" that railroads would not sue each other, that practice was not mandated in the **\*630** AAR Rules). So, for example, assuming that "[t]he long-standing and universal practice within the rail industry is to return empty cars to their owner without attempting to impose any freight charge" (which is the SLC's main extrinsic evidence contention), that does not mean that AAR Car Service Rule 2 itself prohibits the imposition of tariffs or other charges. For example, such tariffs or other charges for the transportation of empty cars may be invalid or unreasonable by reason of rate setting statutes such as 49 U.S.C. §§ 10701, 10702 and 10704. Possibly, as the SLC also suggested in the Opposition and at oral argument, a tariff or other charge cannot be imposed for the movement of empty cars unless the owner has "request[ed]" return of the empty cars under 49 U.S.C. §§ 11101(a) and (b). [9] Or, maybe there is some other reason for the alleged industry course of dealing (like an informal

"protocol"). The Court simply does not know. But, just because "a long-standing and universal practice within the rail industry" not to charge for the movement of empty cars exists, that does not mean AAR Car Service Rule 2 is ambiguous.

Accordingly, as a matter of Colorado contract law, the Court rejects the SLC's invitation for the Court to determine that AAR Car Service Rule 2 is ambiguous.

### VII. Conclusion.

In an effort to narrow the issues for trial, the Trustee has requested partial summary judgment on a very narrow question: Does AAR Car Service Rule 2 preclude the Trustee from imposing a tariff or charge for the return of empty SLC-owned freight cars? The Trustee has met his summary judgment burden. For the reasons set forth above, the Court concurs with the Trustee that AAR Car Service Rule 2 does not preclude the Trustee from imposing a tariff or charge for the return of empty SLC-owned freight cars. Thus, the Court grants the Summary Judgment Motion and enters partial summary judgment on that discrete issue regarding AAR Car Service Rule 2.

### All Citations

634 B.R. 599

## Footnotes

1     The SL&RG also extends south from Alamosa to Antonito, Colorado, near the New Mexico border. However, operations on that segment are not at issue.

2     The SLC disputes that the charge applied to cars through the Tariff is properly characterized as a "tariff." Nonetheless, for ease of reference in this Order, the Court will use the term "Tariff" to refer to the charge imposed in Tariff 8000 as amended by Tariff 8000-A.

3     The SLC repeatedly has changed its legal positions. In the Opposition, the SLC argued that "the application of principles of 'primary jurisdiction,' compels the conclusion that the Court should refer the matter [the dispute] to the panel charged with making formal interpretations and resolving disputes related to contractual provisions of the AAR Rules, namely the AAR Arbitration Panel." Opp'n at 3; *see also* Opp'n at 12-15 (" 'Primary Jurisdiction' Strongly Suggests the Court Should Refer the Matter to the AAR Arbitration Panel."). However, the doctrine of primary jurisdiction only applies to claims "properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter,* 507 U.S. at 268, 113 S.Ct. 1213; *see also* *DeBruce Grain,* 149 F.3d at 789 ("a court may leave an issue for agency determination when it involves the special expertise of the agency and would impact the uniformity of the regulated field."); *Entergy Serv.,* 99 F. Supp. 2d at 1089 (same). The SLC failed to identify any legal authority for invoking the primary jurisdiction doctrine to send a dispute to arbitration to be conducted outside of an administrative agency. In any event, at oral argument, the SLC shifted again. Most recently, the SLC contended that the Court does not have concurrent jurisdiction with the STB and, therefore, the doctrine of primary jurisdiction is inapplicable. Thus, the SLC has waived any primary jurisdiction doctrine arguments.

4     The SLC cited Paragraph Nos. 19, 21, and 27 of the Affidavit of Edward A. Burkhardt (Docket No. 487-1) as a basis for the additional language. However, those parts of the Affidavit do not support the additional proposed text.

5     The SLC cited Paragraph No. 19 of the Affidavit of Edward A. Burkhardt (Docket No. 487-1) as a basis for the additional language. However, that portion of the Affidavit does not support the additional proposed text. In fact, the "Car Service Rules" are not even referenced in Paragraph 19 of the Affidavit.

6    The version of AAR Car Service Rule 2 at issue in *Allegheny-Ludlum Steel*, 406 U.S. 742, 92 S.Ct. 1941, is substantially similar to the current version of AAR Car Service Rule 2.

7    The Tariff might be invalid or unreasonable for other reasons. However, that is an issue for another day.

8    As set forth above, the Court has not been able to ascertain why or how Colorado law governs the AAR Rules. However, that seems to be the SLC's position.

9    49 U.S.C. §§ 11101 states: "(a) A rail carrier providing transportation or service subject to the jurisdiction of the Board ... shall provide the transportation or service on reasonable request .... (b) A rail carrier shall also provide to any person, on request, the carrier's rates and other service terms." In one of its many alternative arguments, the SLC suggests that the Trustee cannot impose the Tariff because it is not really a "tariff" at all and since charges can only be assessed "on request." Opp'n at 10-11.

---

**End of Document**                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

2023 WL 4363002
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dr. Douglas SCHOTTENSTEIN, M.D.,
Thompson Real Estate, LLC, and Schottenstein
Pain and Neuro, PLLC, Plaintiffs,
v.
Derek LEE, Pearl Chan, and Kong H. Chan, Defendants.

22cv1197 (DLC)
|
Signed July 6, 2023

**Attorneys and Law Firms**

For plaintiffs: Edward Daniel Altabet, Brach Eichler LLC,
101 Eisenhower Parkway, Roseland, NJ 07068, Jeffrey A.
Donner, Donner Law, 708 Highway 35 South, Neptune,
New Jersey 07753, Richard Bruce Rosenthal, Richard Bruce
Rosenthal, Esq., 545 E. Jericho Turnpike, Huntington Station,
NY 11746.

For defendant Kong Chan: Jeremy Graham Feigenbaum,
Spodek Law Group, P.C., 85 Broad Street, 17th Floor, New
York, NY 10004.

OPINION AND ORDER

DENISE COTE, United States District Judge:

**\*1**  Defendant Kong H. Chan ("Kong") moves for judgment
on the pleadings, as to all claims against him, pursuant to Fed.
R. Civ. P. 12(c). For the reasons that follow, the motion is
granted.

**Background**

The following facts are taken from the FAC. The alleged facts
are assumed to be true. Only the facts relevant to the instant
motion will be recited.

Dr. Douglas Schottenstein is the owner of Schottenstein Pain
& Neuro, PLLC d/b/a NY Spine Medicine (the "Medical
Practice"), a pain management practice. Dr. Schottenstein is
also the owner of Thompson Real Estate, LLC, a domestic
limited liability company that owns Dr. Schottenstein's

residence. Defendants Derek Lee ("Lee") and Pearl Chan
("Chan") are former employees of the Medical Practice.
Defendant Kong is the father of Pearl Chan; Kong has never
worked for the plaintiffs.

Plaintiffs allege that, over a number of years, Lee and Chan
fraudulently wired money out of various bank accounts of
the plaintiffs to themselves. Plaintiffs further allege that the
defendants moved funds between different accounts held by
the plaintiffs in order to conceal the fraud. The alleged scheme
included installing a keylogger program on the plaintiffs'
computers in order to obtain information necessary to access
the plaintiffs' financial accounts, and impersonating Dr.
Schottenstein on several calls with his financial institutions.

Specifically, the plaintiffs allege that Lee and Chan: (1) wired
a total of $748,848 out of a checking account for Thompson
Real Estate held at Citibank and Dr. Schottenstein's
bank account at Iberia Bank; (2) forged a check for
$118,000 from the Iberia account to Dr. Schottenstein,
which they then cashed; (3) gained access to the Medical
Practice's bank accounts at Chase Bank and improperly
and without authorization withdrew approximately $500,000;
and (4) fraudulently charged approximately $700,000 to the
plaintiffs' American Express credit card. The plaintiffs assert
that Kong received funds in connection with Lee and Chan's
alleged fraud.

The plaintiffs filed the initial complaint in this action on
February 11, 2022, asserting claims against Lee and Chan
only. On August 17, the case was reassigned to this Court.
On September 30 a schedule was set for filing amended
pleadings.

Plaintiffs filed their FAC on November 4, joining Kong as
a defendant. The FAC asserts claims against all defendants
for violations of the Racketeer Influenced and Corrupt
Organizations Act (RICO), 18 U.S.C. § 1962 et seq.,
fraud, conversion, tortious interference with contract, battery,
conspiracies to commit fraud and tort, and intention infliction
of emotional distress. On January 24, 2023, Kong filed an
answer to the FAC.

On March 1, 2023, Kong moved for judgment on the
pleadings, as to all claims against him, pursuant to Fed. R.
Civ. P. 12(c). On March 29, the plaintiffs filed their opposition
to the 12(c) motion, and cross moved for leave to amend the
FAC. The plaintiffs' proposed SAC narrows the claims against
Kong to a claim for conversion only, brought under New York

Law. The motion for judgment on the pleadings became fully submitted on April 6.

## Discussion

**\*2** Although the FAC asserts numerous claims against Kong, plaintiffs intend to pursue only their claim of conversion. Accordingly, this Opinion addresses only that claim.

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." Lively v. WAFRA Investment Advisory Group, Inc., 6 F.4th 293, 301 (2d Cir. 2021) (citation omitted). To survive a motion to dismiss for failure to state a claim, the complaint "must plead enough facts to state a claim to relief that is plausible on its face." Green v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Charles v. Orange County, 925 F.3d 73, 81 (2d Cir. 2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs." Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." Hamilton v. Westchester County, 3 F.4th 86, 91 (2d Cir. 2021) (citation omitted).

Under New York law "conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." V&A Collection, LLC v. Guzzini Props. Ltd., 46 F.4th 127, 133 (2d Cir. 2022) (citation omitted). To state a claim of conversion, the plaintiff must allege that

> (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the

property, and (4) the demand for the return is refused.

Id. (citation omitted). No demand is necessary where the plaintiff can show that the defendant knew that he or she wrongfully possessed the property. Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49-50 (2d Cir. 1996).

Where, as here, a plaintiff brings a claim for conversion of money, "an action will lie ... where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." Bascunan v. Elsaca, 874 F.3d 806, 820 n.56 (2d Cir. 2017) (citation omitted). Funds are specifically identifiable when the funds constitute a "specific sum" that is "determinate and reflects an ascertained amount." Family Health Mgmt., LLC v. Rohan Devs., LLC, 171 N.Y.S.3d 44, 50 (1st Dep't 2022) (citation omitted). [1]

**\*3** Plaintiffs have failed to state a claim for conversion against Kong. As an initial matter, the FAC pleads no facts to suggest that Kong was involved in the alleged underlying conversions by defendants Lee and Chan. The FAC asserts that "Chan and Lee made all [the fraudulent] wire transfers." The FAC alleges instead, in conclusory terms, that Kong converted funds previously stolen from Dr. Schottenstein. The FAC contains no facts explaining Kong's purported involvement in the alleged conversion scheme other than his control of an account that received stolen funds.

The SAC narrows the allegations against Kong to the receipt of a single wire transfer into a jointly held bank account. The allegation against Kong in the proposed SAC is:

> With respect to Kong Chan, on or about March 20, 2020, Lee caused the sum of $319,000, to be transferred from the Chase Account owned by Thompson Real Estate to an account owned by Lee at Chase. On or about August 31, 2020, Lee then wired the sum of $128,000 to an account at Bank of America owned by Pearl Chan. On September 1, 2020, Pearl Chan, in turn, transferred $111,000 of this $128,000 to an account at Bank

of America jointly in her name and
Defendant Kong Chan's name.

(emphasis added).

The $111,000 is not a specifically identifiable fund for the purposes of conversion. It is alleged to be a portion of the $319,000 stolen from the plaintiffs. In determining whether funds are "specifically identifiable" courts have considered "whether the money was segregated, the number of transfers involved (or the degree of separation from the plaintiff seeking recovery), and whether the defendant from which recovery was sought was implicated in the bad acts alleged." Fam. Health Mgmt., 171 N.Y.S.3d at 49-50. Here, the single deposit into Kong's jointly held account was preceded by several wire transfers of different amounts of money spanning six months. There is no allegation that the $111,000 was ever segregated in the accounts through which it moved prior to the deposit into Kong's joint account or segregated in some fashion within Kong's account. Under these circumstances, the $111,000 is not sufficiently traceable. Furthermore, the proposed SAC contains no allegations that plaintiffs made a demand for return of their money to Kong, or that Kong otherwise knew that he wrongfully possessed the plaintiffs' property in his jointly held account.

The allegations included in the proposed SAC fail to state a claim for conversion against Kong, and as such, amendment would be futile. Accordingly, plaintiffs' request for leave to amend is denied, and Kong's motion for judgment on the pleadings is granted.

## Conclusion

Kong's March 1, 2023, motion for judgment on the pleadings as to all claims against him is granted. Plaintiffs' request for leave to amend the FAC is denied.

**All Citations**

Slip Copy, 2023 WL 4363002

## Footnotes

1    Caselaw within this district suggests that where a claim for conversion "rests on an allegation of fraudulent taking," it is furthermore "subject to the pleading requirements of Rule 9(b)." Daly v. Castro Llanes, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998). Because plaintiffs' claim fails to meet even the more lenient pleading standard, the Court need not address this issue.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.